IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| IN RE:<br><br>DAVID MICHAEL MOBLEY<br>*Debtor* | §<br>§<br>§<br>§<br>§ | Case No. 22-60004<br>Chapter 11 |
| QUALITY LEASE AND RENTAL<br>HOLDINGS, LLC, *et al.*,<br>*Plaintiffs*<br><br>v.<br><br>DAVID MICHAEL MOBLEY,<br>*Debtor/Defendant* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Adversary No. _____ |

**PLAINTIFFS' COMPLAINT TO DETERMINE THE DISCHARGEABILITY OF
DEBT PURSUANT TO 11 U.S.C § 523(a), (2), (4), and (6) AGAINST
DEBTOR/DEFENDANT DAVID MICHAEL MOBLEY**

Plaintiffs Quality Lease and Rental Holdings, LLC ("**QLRH**"), Quality Lease
Rental Service, LLC ("**QLRS**"), Quality Lease Service, LLC ("**QLS**" and with QLRS, the
"**Quality Companies**"), Rocaceia, LLC ("**Rocaceia**") (collectively, "**Plaintiffs**") hereby
file their Complaint to Determine the Dischargeability of Debt Pursuant to 11 U.S.C. §
523(a), (2), (4), and (6) ("**Complaint**") against Debtor/Defendant David Michael Mobley
("**Michael Mobley**" or "**Debtor**"), and allege as follows:

**SUMMARY OF THIS ACTION**

1.      This is an action seeking a determination that over $40 million in debts of
Debtor Michael Mobley are not dischargeable under 11 U.S.C. § 523(a), (2), (4), and (6)
because such debts resulted from Michael Mobley's false representations, fraudulent
conduct, and breaches of fiduciary duty in connection with the sale and post-sale operation

of oilfield services companies.  In addition, Debtor's conduct was intentional, purposeful, and willful, and his actions were done maliciously to defraud and harm Plaintiffs.

2.      Debtor's debts arose from Plaintiffs claims that center around the sale of the Quality Companies, two oilfield services companies founded by Michael Mobley that operated out of in El Campo, Texas.

3.      On December 31, 2012, Michael Mobley and his former wife, Greta Yvette Mobley ("**Yvette Mobley**"), through their wholly-owned entity QLS HoldCo, Inc. ("**Holdco**" together with Yvette Mobley and Michael Mobley, "**Sellers**"), sold the Quality Companies, to the newly-created QLRH, pursuant to the terms and conditions of a Purchase and Contribution Agreement ("**Purchase Agreement**"). The purchase price was calculated using a multiple of the Quality Companies' reported normalized EBITDA,[1] which at the end of the third quarter in 2012 was reported to be annualized at approximately $14 million. Calculated as 80% of a five times (5x) multiple, the purchase price calculation resulted in a $70 million going concern valuation of the Quality Companies. Based on this EBITDA calculation, Sellers received the following consideration in exchange for selling the Quality Companies to QLRH: (a) approximately $40 million cash; (b) a $20 million note from QLRH ("**$20 Million Note**"); and (c) a 20% ownership interest in QLRH.

4.      The Quality Companies specialized in providing wellsite construction, equipment rental, and production and support services to some of the largest oil producers in the country and reported more than $20 million in annual revenues at the time of the

---

[1] "EBITDA" refers to a company's earnings before interest, taxes, depreciation, and amortization. "Normalized" EBITDA removes certain personal and discretionary expenses and expenditures that may otherwise be included in reported EBITDA.

Purchase Transaction. QLRH believed, and Michael Mobley represented, that the future success of the Quality Companies was dependent upon Michael Mobley continuing to manage the Quality Companies for a transitional period after the purchase. As a condition to consummating the purchase and sale, QLRH and Michael Mobley contemporaneously entered into an Employment Agreement under which QLRH agreed to employ Michael Mobley as President of QLRH for an initial term of three years at an annual base salary of $275,000. Under this agreement, Michael Mobley would continue to lead, manage, and operate the Quality Companies and, importantly, was restricted from competing with the Quality Companies or assisting others to do so. After the sale ("**Purchase Transaction**"), Michael Mobley, Yvette Mobley, and their sons David Russell Mobley ("**Mikey Mobley**") and Cody Mobley (collectively, the "**Mobleys**") were all employed by QLRH and tasked with managing the Quality Companies along with QLRH's CEO, Allan Martin.

5.      In negotiating the deal, Michael Mobley represented to QLRH that the Quality Companies, through Michael Mobley and their employees, possessed extremely valuable trade knowledge as well as significant proprietary and confidential information concerning business operations in the oilfield industry, including customer and supplier lists, technical data, financial information regarding sales, costs, pricing, marketing, and strategy, contracts with third parties, vendor management information, rig housing design and manufacturing information, and specialized methods, processes, and techniques of the Quality Companies. Michael Mobley also represented to QLRH that they had valuable goodwill and longstanding relationships with the Quality Companies' major customers and vendors, and likewise the ability to develop new customers and expand the client base for

the Quality Companies—all of which would be transferred to QLRH under the Purchase Agreement. In the Purchase Agreement, Michael Mobley agreed that, for **five years** after the sale, they would not: (1) compete with the Quality Companies or assist others in doing so; (2) solicit customers of the Quality Companies; (3) hire former employees of the Quality Companies; or (4) intentionally interfere with the business relationships of the Quality Companies. Michael Mobley agreed to similar restrictive covenants in his Employment Agreement with QLRH.

6.      During negotiations, Michael Mobley also disclosed that he managed several affiliated companies in which he and Yvette owned majority interests, including Q.C.E. Supply, Inc. ("**QCE**"), Texas Quality Mats, LLC ("**TQ Mats**"), Texas Quality Gate Guard Service, LLC ("**TQ Gate**" collectively with QCE and TQ Mats, the "**Mobley Affiliates**"). Michael Mobley provided QLRH and its agents with a written description of the affiliated companies and the equipment owned by each. Michael Mobley assured QLRH that the Quality Companies provided all of the revenue-generating wellsite services and housing rentals that QLRH sought to acquire. Michael Mobley further assured QLRH that the Mobley Affiliates were customers of the Quality Companies, did not compete with the Quality Companies, and did not provide any of the service lines, equipment, or housing that were sources of revenue for the Quality Companies. Based upon those representations, the parties drafted the Employment Agreement (and Purchase Agreement) to permit Michael Mobley to continue to manage and operate the Mobley Affiliates in the same limited manner and to the same limited extent that they were operated on the date of the Purchase Transaction ("**Closing Date**")—provided that Michael Mobley would not allow

"the Mobley Affiliates to expand or increase such operations in any manner that would have an adverse effect on the Business of [QLRH] without the written consent of [QLRH]."

7.      Despite their express representations, Michael Mobley brazenly violated his agreements with QLRH. Before the Closing Date, Michael Mobley began making preparations to compete with QLRH, procuring insurance to cover new equipment ordered by the Mobley Affiliates that Michael Mobley would use to expand the business of QCE and siphon business from QLRH. Immediately after the Closing Date, Michael Mobley aggressively solicited QLRH customers, expanded the business of the Mobley Affiliates to compete with QLRH, and diverted business from QLRH to the Mobley Affiliates and two companies formed by Mikey and Cody Mobley, Solid Liberty Services, LLC ("**SLS**") and Solid Liberty Rental Services, LLC ("**SLRS**" together with SLS, "**Solid Liberty**"). When QLRH customers called, Michael Mobley caused work orders to be diverted to Mobley Affiliates for various wellsite construction, equipment rental, and production and support services that the Quality Companies had provided in the past to the same customers. Michael Mobley caused the Mobley Affiliates to invoice customers of the Quality Companies for wellsite services provided by employees of the Quality Companies and helped the Mobley Affiliates collect payment for those services. Michael Mobley even caused the Mobley Affiliates to invoice QLRH for services that they provided using QLRH equipment and employees—the same services that previously had generated revenue for the Quality Companies.

8.     Not surprisingly, QLRH's revenues plummeted to a fraction of those reported prior to the Purchase Transaction. By the end of January 2013 (only one month after the Closing Date), QLRH's revenues were projected to fall short by nearly half of the prior year reported revenues and continued to drop in the weeks and months that followed. While the Mobley Affiliates' illegitimate equipment and services business boomed—particularly QCE's—and revenues tripled or more, much of the equipment that QLRH used to generate revenue either sat idle in the yard or was inoperable and in need of repairs. By March 2013, QLRH executives were very concerned about the dramatic revenue shortfalls and Michael Mobley's failure to provide any credible explanation. On or around March 16, 2013, Allan Martin and other QLRH executives met with Michael and Yvette Mobley at Yvette Mobley's house to discuss the problem. When questioned about the financial performance of the companies he managed, Michael Mobley became extremely aggressive and defensive—at one point violently picking up and slamming down a dining table—and threatened to "blow up" QLRH and the Quality Companies and take away all of their customers. In direct contravention of the promises made in the Purchase Agreement and Employment Agreement, Michael Mobley insisted that the Mobley Affiliates could compete with the Quality Companies and that he could simply transfer QCE to his sons (now that he had built it up at the expense of the Quality Companies).

9.     Michael Mobley soon made good on his threat. On April 5, 2013, Mikey and Cody Mobley resigned their management positions with QLRH. The next day, QLRH terminated Yvette Mobley and placed Michael Mobley on administrative leave in an effort to investigate the wrongdoing and prevent QLRH's complete destruction. On April 17,

2013, Mikey and Cody Mobley used SLS—formed only weeks earlier—to acquire QCE and disguise the fact that their parents Michael and Yvette Mobley were breaching their express contractual obligations to QLRH. In a sham transaction, QCE was purportedly "sold" to SLS for $3.6 million—roughly the same amount that Yvette Mobley contemporaneously "loaned" to Cody Mobley, through an intermediary, for no apparent reason. On April 19, 2013, Mikey and Cody Mobley also formed SLRS to compete with QLRH in the construction and rental of rig housing—another lucrative segment of QLRH's business.

10.     As the QLRH executives attempted to salvage the businesses they had purchased only months earlier, Michael Mobley, working with the Mobley Affiliates and other Mobleys, began picking off QLRH's customers, vendors, employees, and revenue streams. Michael Mobley and the Mobley Affiliates solicited and hired away key QLRH employees from every sector of the business, including sales personnel, supervisors, drivers, operators, pushers, carpenters, mechanics, roustabouts, welders, and maintenance crew. In blatant violation of the Purchase Agreement and Employment Agreement, Michael Mobley directly or indirectly managed and/or financed the Mobley Affiliates and Solid Liberty.

11.     By the summer of 2013, QLRH was hemorrhaging customers and revenues. Not only were the Mobleys, Mobley Affiliates, and Solid Liberty directly competing with QLRH, but QLRH executives learned that Michael Mobley had made false representations in the Purchase Agreement and omitted material facts that induced QLRH to enter into the Purchase Transaction. Among other things, Michael Mobley falsely represented and

warranted at the time of the Purchase Transaction that they had transferred certain assets to QLRH, that the transferred assets were in proper working condition, that they had disclosed all material customers and suppliers, that they were not aware of any customers who were planning to move their business, that they had disclosed all liabilities, and that they had complied with all applicable laws—each of which was false at the time made.

12.    As a direct and proximate result of the conduct described above, QLRH lost its major customers and revenues and subsequently filed for bankruptcy protection in October 2014. Meanwhile, Michael Mobley, the Mobley Affiliates, and Solid Liberty continued to compete with QLRH in express violation of the Purchase Agreement and Employment Agreement and their common law and statutory duties.

13.    In September 2013, Plaintiffs filed claims in Texas state court against Michael Mobley (and other parties) arising from Michael Mobley's willful breaches and fraudulent conduct described herein. After Plaintiffs filed for bankruptcy, this lawsuit was removed to U.S. Bankruptcy Court and later U.S. District Court for the Southern District of Texas. On August 26, 2019, Plaintiffs filed its Sixth Amended Counterclaims against Michael Mobley and other defendants (the "**Counterclaims**" which is incorporated herein and attached as **Exhibit 1**, hereto).

14.    After years of protracted litigation, Plaintiffs' lawsuit against Michael Mobley was set for trial on January 24, 2022, in U.S. District Court for the Southern District of Texas, Corpus Christ Division, before the Hon. Judge David Morales. Defendant Michael Mobley filed a bankruptcy petition on January 21, 2022, staying the long-scheduled trial and prosecution of Plaintiffs' claims against him.

15.     Accordingly, by and through this adversary proceeding, Plaintiffs seek to have the debts created by Debtor Michael Mobley's fraudulent conduct described herein be determined to be excepted from discharge under 11. U.S.C § 523(a)(2), (a)(4), and (a)(6). Plaintiffs seek to hold Michael Mobley to account for the substantial harm he caused Plaintiffs as a result of his unlawful, deceitful and tortious acts, including the roughly $40 million that QLRH was fraudulently induced to pay to purchase the Quality Companies.

## PARTIES

16.     Quality Lease and Rental Holdings, LLC is a Delaware limited liability company with its principal place of business in Moore, Texas. QLRH filed a voluntary Chapter 11 bankruptcy petition on October 1, 2014. Case No. 14-60074 (Bankr. S.D. Tex.). Pursuant to § 7.4 of the Joint Chapter 11 First Amended Plan of Liquidation (the "**Quality Plan**"), confirmed on May 22, 2015, QLRH is the assignee of all litigation claims (except avoidance actions) that belonged to the QLRS, QLS, and Rocaceia estates, including the claims giving rise to the debts described herein.

17.     Quality Lease Rental Service, LLC is a Texas limited liability company with its principal place of business in Moore, Texas. Following execution of the Purchase Agreement, QLRS operated as a wholly-owned subsidiary of QLRH. QLRS filed a voluntary Chapter 11 bankruptcy petition on October 1, 2014. Case No. 14-60075 (Bankr. S.D. Tex.). Pursuant to § 7.4 of the Quality Plan, confirmed on May 22, 2015, QLRS assigned all its litigation claims (except avoidance actions) to QLRH, including the claims giving rise to the debts described herein.

18.     Quality Lease Service, LLC is a Texas limited liability company with its principal place of business in Moore, Texas. Following execution of the Purchase Agreement, QLS operated as a wholly-owned subsidiary of QLRH. QLS filed its voluntary Chapter 11 bankruptcy petition on October 1, 2014. Case No. 14-60076 (Bankr. S.D. Tex.). Pursuant to § 7.4 of the Quality Plan, confirmed on May 22, 2015, QLS assigned all its litigation claims (except avoidance actions) to QLRH, including the claims giving rise to the debts described herein.

19.     Rocaceia, LLC is a Delaware limited liability company with its principal place of business in Moore, Texas. Rocaceia filed its voluntary Chapter 11 bankruptcy petition on October 1, 2014. Case No. 14-60077 (Bankr. S.D. Tex.). Pursuant to § 7.4 of the Quality Plan, confirmed on May 22, 2015, Rocaceia assigned all its litigation claims (except avoidance actions) to QLRH, including the claims giving rise to the debts described herein.

20.     Debtor and Defendant David Michael Mobley is an individual domiciled in Fort Bend County, Texas. Michael Mobley may be served with process at 3815 Montgomery Rd., Richmond, Texas 77406, or wherever he may be found.

## RULE 7008 STATEMENT

21.     Plaintiffs, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure, and Local Rule 7008-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas, state that Plaintiffs consent to entry of final order or judgments on core proceedings by the bankruptcy court.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 157 and 1334(b) and 11 U.S.C § 523. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this action arises under, arises in, and/or relates to federal securities laws.

23.     This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (C), (H) and (O).

24.     This is an adversary proceeding pursuant to Fed. R. Bankr. P. 7001 that relates to *In re David Michael Mobley*, No. 22-60004 (Bankr. S.D. Tex.) now pending in this Court. Plaintiffs are creditors of Debtor and have filed proofs of claim in Debtor's bankruptcy case.

25.     Debtor is subject to personal jurisdiction in this Court because Debtor is a Texas resident, and this dispute arises out of and relates to their actions and conduct in Texas.

26.     Venue is proper under 28 U.S.C. § 1409.

## STATEMENT OF FACTS

**A.     PRE-CONTRACT NEGOTIATIONS AND REPRESENTATIONS**

27.     As early as September 2011, Michael Mobley engaged J.G. "Tex" Garner and his company, Associate Equity Group ("**AEG**")[2], to help find a buyer for the Quality Companies. Between that time and the Purchase Transaction, AEG solicited several

---

[2] Associate Equity Group is an assumed name of Tarrant Sunbelt, Inc.

potential buyers and secured at least three separate letters of intent to purchase, although none of these deals managed to close.

28.     During its search for buyers, AEG came into contact with Atlantic Merchant Capital Investors, LLC ("**AMCI**") and its managing member, Allan Martin. AMCI is a private equity firm that seeks out small to medium sized companies focused on a niche of a larger overall market. AMCI focuses on targets that can derive significant benefit from centralized management—often times companies that are still owned by their original founders. AMCI also emphasizes keeping former owners economically tied to the continuing success of their former companies.

29.     In 2012, AMCI was looking for opportunities in the oilfield services industry and was drawn to the type and wide range of services offered by the Quality Companies, especially the ancillary services provided in connection with rig housing rentals. AMCI and Michael Mobley subsequently executed a letter of intent (the "**Letter of Intent**") dated October 10, 2012, setting forth the principal terms and conditions upon which AMCI was proposing to purchase an interest in the Quality Companies, including that Michael Mobley would continue to be employed by the Quality Companies and execute a five-year non-compete in connection with the Purchase Transaction. On November 7, 2012, AMCI formed Rocaceia, which AMCI intended to use as its principal vehicle to invest in opportunities in the oilfield services industry, including the Quality Companies. On December 4, 2012, Rocaceia formed QLRH, the buyer entity through which the parties continued negotiations and effected the Purchase Transaction.

30.     Martin understood the importance of established personal relationships in the oilfield services industry and that Michael Mobley's relationships with the Quality Companies' customers were critical to the value of the Purchase Transaction. Thus, the Letter of Intent proposed that: (a) Michael Mobley retain a 20% interest in the Quality Companies; and (b) part of the purchase price be paid with a note, the value of which would depend on the continued earnings of the Quality Companies. The Letter of Intent pegged the purchase price and value of Michael Mobley's rollover equity interest to the Quality Companies' EBITDA—earnings that, unbeknownst to AMCI, were inflated and misrepresented by Michael Mobley.

31.     In soliciting QLRH's investment, Michael Mobley made several representations regarding the Quality Companies that were material to QLRH's decision to acquire the Quality Companies. For example, Michael Mobley presented QLRH representatives with the Quality Companies' audited historical financial statements and unaudited interim financial statements (collectively, "**Financial Statements**") that purported to demonstrate the level of historical profitability and income for the Quality Companies. Michael Mobley also provided QLRH representatives with sellers' disclosure statements and various lists of the Quality Companies' material assets and operations, and assured them that the Quality Companies owned all machinery, equipment, vehicles, and other items necessary to continue operating the Quality Companies' existing business in the same manner following the Purchase Transaction. The Financial Statements purported to show that past earnings of the Quality Companies accounted for both the rental income,

service income, and expenses associated with those assets, corroborating Michael Mobley's representations that those items would be conveyed in the Purchase Transaction.

32.     Michael Mobley represented to QLRH and its agents that the Quality Companies had valuable relationships with long-standing customers and the potential to develop new customers and expand their client base, all of which was to be transferred to QLRH on the Closing Date. Recognizing the value of these relationships, QLRH negotiated an arrangement whereby, following the Purchase Transaction, QLRH would employ Michael Mobley, Yvette Mobley, and their sons to ensure continuity and stability as well as to help manage and operate the Quality Companies in continuing to grow those businesses. In addition, it was agreed that Michael and Yvette Mobley, individually, would retain ownership of the real property in El Campo where the Quality Companies were headquartered (the "**El Campo Yard**") and QLRH would enter into a multi-year lease for its use post-closing.

33.     Prior to the Closing Date, Michael Mobley disclosed to QLRH representatives that they managed several affiliated companies in which they owned majority interests, including the Mobley Affiliates. At the request of QLRH's representatives, Michael Mobley provided QLRH with written descriptions of the Mobley Affiliates' operations and the equipment owned by each. QCE was described only as "an equipment and connection company that buys and sells used equipment, pipe, and tanks." Michael Mobley represented that QCE was actually a customer of the Quality Companies, using "QLS or other contractors to rig down and move equipment." The description provided for QCE also indicated that QCE held approximately $700,000 in inventory.

Although Michael Mobley later admitted in a deposition that this figure was understated by $300,000, QCE's financial statements and tax returns for 2012 reflect less than $13,000 in inventory and equipment with a gross book value under $400,000. Michael Mobley described TQ Mats as a company "affiliated with laying board road mats for board road locations which hires QLS or any other company to haul mats or use equipment to dig pits or level locations."  Michael Mobley described TQ Gate as "a company that provides gate guards for locations" and a customer of the Quality Companies that used QLS to move its equipment and rig up water and fuel services.

34.     Michael and Yvette Mobley assured QLRH that the Quality Companies provided all the revenue-generating wellsite services and housing that QLRH sought to acquire and that the Mobley Affiliates were customers of the Quality Companies, did not compete with the Quality Companies, and did not provide any of the service lines, equipment, or rig housing that were sources of revenues for the Quality Companies. Based on those assurances, Michael Mobley and QLRH representatives negotiated deal terms that would allow Michael Mobley to continue managing and operating the Mobley Affiliates on the condition that his management and operation of those companies would not interfere with his work on behalf of the Quality Companies.

35.     In addition, Michael and Yvette Mobley, through Tex Garner, provided a 'Seller's Business Disclosure Statement' (the "**Sellers' Disclosure**") to QLRH in the weeks leading up to the Closing Date. The Sellers' Disclosure was signed by Michael Mobley and stated "Seller is providing the following disclosure information knowing that the buyer may rely on its accuracy in deciding whether to purchase the business and that it may also

influence the price and terms offered by the buyer." Michael Mobley made several representations on the Sellers' Disclosure with respect to the Quality Companies, fully anticipating that QLRH would rely on them, including that:

a.    there are no revenues or expenses of the business that are not clearly reflected in the financial statements being presented to buyer;

b.    there is no equipment used in the business that it does not own;

c.    there is no equipment used in the business that is not in good and operable condition, or for which maintenance has been deferred or is not suitable for the current usage; and

d.    during the past two years, there were no significant sales or sales within a category which were substantial in the aggregate and which are not likely to repeat within the next two years.

36.    Relying on the foregoing representations by Michael Mobley, QLRH agreed to enter into the Purchase Transaction to acquire the Quality Companies in exchange for approximately $40 million cash, the $20 Million Note, and 20% equity in QLRH, all pursuant to the terms of the Purchase Agreement.

37.    A true and correct copy of the Purchase Agreement is attached hereto as **Exhibit B** to the Counterclaims. A true and correct copy of the $20 Million Note is attached hereto as **Exhibit C** to the Counterclaims.

**B.    MICHAEL MOBLEY'S OBLIGATIONS UNDER THE PURCHASE AGREEMENT**

38.    On December 31, 2012, Sellers and QLRH entered into the Purchase Agreement. Michael Mobley made numerous representations and warranties to QLRH in Article III of the Purchase Agreement. Pursuant to § 7.02, QLRH's obligations under the Purchase Agreement were conditioned upon those representations and warranties being true and correct in all respects as of the Closing Date. Michael Mobley represented and

warranted in § 3.25 that "[n]o representation or warranty by Sellers in this Agreement and no statement contained in the Disclosure Schedules to this Agreement or any certificate or other document furnished or to be furnished to [QLRH] pursuant to this Agreement contains any **untrue** statement of material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, **not misleading**." (emphasis added)

39.     In § 3.06 of the Purchase Agreement, Michael Mobley represented and warranted that the Financial Statements included in the disclosure schedules attached to the Purchase Agreement ("**Disclosure Schedules**") were complete, prepared in accordance with GAAP, and "fairly present the financial condition" of the Quality Companies. In § 3.10(a), Michael Mobley represented and warranted that § 3.10(a) of the Disclosure Schedules was "a true, accurate and complete list of all vehicles equipment, rig houses and other tangible assets owned by [the Quality Companies] and/or used in the business of [the Quality Companies]." The list of assets found in § 3.10(a) of the Disclosure Schedules appeared to confirm Michael Mobley's statements in negotiations regarding the Quality Companies' assets that would be conveyed in the Purchase Transaction. In § 3.11 of the Purchase Agreement, Michael Mobley further represented and warranted that the buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property of the Quality Companies were "in good operating condition and repair, and are adequate for the uses to which they are being put," and that none required maintenance or repairs "except for ordinary, routine maintenance and repairs that are not material in nature or cost." Michael Mobley also represented and warranted in

17

that same section that the buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property "currently owned or leased by" the Quality Companies "are sufficient for the continued conduct of [the Quality Companies'] business after the Closing in substantially the same manner as conducted prior to the Closing and constitute all of the rights, property and assets necessary to conduct the business of [the Quality Companies] as currently conducted."

40.    Michael Mobley represented and warranted in § 3.15(a) of the Purchase Agreement that "no Seller Party has received any notice, or has any reason to believe, that any of [the Quality Companies'] Material Customers has ceased, or intends to cease after the Closing, to use its goods or services or to otherwise terminate or materially reduce its relationship with the [Quality Companies]."

41.    Michael Mobley represented and warranted in § 3.17 of the Purchase Agreement that there were no current or potential legal or governmental proceedings involving or affecting the Quality Companies, or any of those companies' assets, and that nothing had occurred that would give rise to, or serve as a basis for, future proceedings against the Quality Companies. In § 3.21 and the corresponding Disclosure Schedules, Michael Mobley represented and warranted that neither of the Quality Companies employed any independent contractors, and also that there were no actions pending or threatened to be brought or filed "by or with any Governmental Authority or arbitrator in connection with the employment of any current or former applicant, employee, consultant, volunteer, or independent contractor" of the Quality Companies, including without limitation "any claim relating to unfair labor practices, employment discrimination,

harassment, retaliation, equal pay, wage and hours or any other employment related matter arising under applicable Laws." Section 3.21(c) added that "[a]ll employees classified as exempt under the Fair Labor Standards Act and state and local wage and hour laws are properly classified."

42.     As QLRH would later learn, each of the foregoing representations and warranties made by Michael Mobley were false at the time they were made.

43.     Michael Mobley agreed to non-competition and non-solicitation covenants in § 5.07 of the Purchase Agreement. In § 5.07(a), Michael Mobley covenanted that, for a period of five years from the Closing Date, they would not, and would not permit any of their "Affiliates," to directly or indirectly: (i) engage in or assist others in engaging in "Restricted Business" in North America; (ii) hold an interest in any entity that engages directly or indirectly in "Restricted Business" in North America in any capacity; or (iii) intentionally interfere in any material respect with the Quality Companies' customer or supplier relationships (whether formed prior to or after the date of the Purchase Agreement).

44.     The Purchase Agreement defines "Restricted Business" as the past, actual, and anticipated business of the Quality Companies as of the Closing Date, including but not limited to the provision of wellsite construction, production, and support services to the oilfield industry, including "rental equipment, rig housing and accommodations, water and sewer systems, power supply, frac tank services, vacuum truck services, waste management, water hauling, liquids and solid control, completion fluids, gravel trucks, roustabout crews, heavy hauling, transfer equipment, securing rights and permits, clearing

and leveling of land, building of roads & pads, and pipeline construction." An "Affiliate" of a party is defined as "any other Person that directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with" that party. As negotiated, Michael's and Yvette Mobley's operation of QCE, TQ Mats, and TQ Gate were carved out from the non-competition and non-solicitation covenants in § 5.07 of the Purchase Agreement, but only to the extent that those entities continued to conduct their business "in the same manner and to the same extent" as on the Closing Date.

**C.    MICHAEL MOBLEY'S OBLIGATIONS UNDER THE EMPLOYMENT AGREEMENT**

45.    Contemporaneous with the execution of the Purchase Agreement, QLRH and Michael Mobley entered into the Employment Agreement, through which Michael Mobley would receive an annual base salary of $275,000 in his role as President of QLRH. A true and correct copy of the Employment Agreement is attached hereto as **Exhibit D** to the Counterclaims.

46.    Michael Mobley acknowledged and agreed in § 1.2 of the Employment Agreement that he owed a strict duty of loyalty to QLRH and pledged to "devote his full business time and effort to the performance" of the Employment Agreement and to his duties as described therein, using "his best efforts to advance the business and welfare" of QLRH. Notwithstanding those provisions, the Employment Agreement permitted Michael Mobley to continue to manage and operate the Mobley Affiliates "in the same manner as such entities are currently managed and operated" as of the Closing Date, "so long as such management and operation do not materially interfere with [Michael Mobley's] fulfillment of his obligations and duties under this Agreement."

20

47.     In addition to his covenants regarding non-competition and non-solicitation in § 5.07 of the Purchase Agreement, Michael Mobley agreed to several covenants regarding non-competition and non-solicitation in § 2 of the Employment Agreement. In § 2.2, Michael Mobley covenanted that during his term of employment with QLRH and for two years following termination of his employment, he would not, "directly or indirectly, engage or invest in, own, manage, operate, finance, control, or participate in the ownership, management, operation or control of, be employed by, lend credit to,  render consulting or other services or advice to, or assist in any way, any Person which is in direct or indirect competition with the Business" in North America or any other country within which QLRH has provided products or services or offered to provide products or services.

48.     The Employment Agreement defines "Business" as including the provision of wellsite construction, production, and support services to the oilfield industry, including "rental equipment, rig housing and accommodations, water and sewer systems, power supply, frac tank services, vacuum truck services, waste management, water hauling, liquids and solid control, completion fluids, gravel trucks, roustabout crews, heavy hauling, transfer equipment, securing rights and permits, clearing and leveling of land, building of roads & pads, and pipeline construction." As in the Purchase Agreement, § 2.2 of the Employment Agreement included a narrow carve-out for the lines of business conducted by the Mobley Affiliates as they existed on the Closing Date. For those lines of business competitive with QLRH's business, § 2.2's carve-out is subject to Michael Mobley's agreement that, absent written consent from QLRH, he would not permit the Mobley

Affiliates "to expand or increase such operations in any manner that would have an adverse effect" on QLRH's Business.

49.    In § 2.3 of the Employment Agreement, Michael Mobley covenanted that, during his term of employment with QLRH and for two years following termination of his employment, he would not, and would not permit affiliated entities including the Mobley Affiliates, to do any of the following, "directly or indirectly, individually or in combination with others, including as a partner, member, shareholder, manager, director, officer, independent contractor, employee, consultant, joint venture, or otherwise":

    a.    solicit or counsel any "Restricted Person" to terminate any business relationship with QLRH or commence a similar business relationship with anyone in direct or indirect competition with the Business in North America or any other country within which QLRH has provided products or services or offered to provide products or services;

    b.    accept, with or without solicitation, any business from any "Restricted Person" of a nature or type provided by the Business;

    c.    solicit or counsel any of the employees, agents, or independent contractors of QLRH to terminate their relationship with QLRH;

    d.    hire any employee, agent or independent contractor who worked for QLRH during the 12 months before such hiring;

    e.    interfere with, adversely affect, or cause or seek to cause the termination of, any agreement or arrangement of any kind to which QLRH is a party or from which it benefits;

    f.    seek to interfere with or adversely affect the ongoing relationships between QLRH and its suppliers, customers, or professional and business contacts.

The Employment Agreement defines "Restricted Person" as any person who was or is a customer, supplier, vendor, or business associate of QLRH, or with whom QLRH solicited business or discussed a potential business relationship during the two years prior to the

termination of Michael Mobley's employment at QLRH, regardless of that person's location. Notably, § 2.3 does **not** contain any carve-out from the non-solicitation covenants for the Mobley Affiliates.

50.     Section 4 of the Employment Agreement required Michael Mobley to keep in strict secrecy and confidence any and all information (regardless of format) that he obtained, developed, or had access to during the course of his relationship with QLRH, including, but not limited to: (a) customer and supplier lists, records, and technical data; (b) information regarding sales, costs, pricing, marketing, and contracts with third parties; (c) plans for product, market, or service developments or improvements; and (d) any other information that derives economic value, either directly or indirectly, from being confidential, proprietary, or a trade secret of QLRH or its actual or potential customers ("**Confidential Information**"). Further, § 4 of the Employment Agreement provided that such Confidential Information "is and shall remain the property of" QLRH, both during his term of employment with QLRH and after termination of his employment, and that Michael Mobley would not, without QLRH's prior written consent, use, disclose, or cause to be disclosed any Confidential Information to any third party.

51.     Contemporaneous with the execution of the Purchase Agreement and Employment Agreement, Michael Mobley signed the Amended and Restated QLRH Limited Liability Company Agreement ("**QLRH LLC Agreement**"), dated as of December 31, 2012. A true and correct copy of the QLRH LLC Agreement is attached as **Exhibit E** to the Counterclaims. In § 8.3(d) of the QLRH LLC Agreement, Michael Mobley agreed to non-competition and non-solicitation covenants nearly identical to those

Michael Mobley agreed to in § 2 of the Employment Agreement, effective for so long as Sellers held an interest in QLRH and for a period of two years thereafter. The non-competition and non-solicitation covenants in § 8.3(d) of the QLRH LLC Agreement do not contain any carve-out for the Mobley Affiliates, Mikey Mobley, or Cody Mobley.

## D.   MICHAEL MOBLEY AND AFFILIATES COMPETE WITH THE QUALITY COMPANIES IMMEDIATELY AFTER THE CLOSING DATE

52.     The moment after the Purchase Transaction closed in January 2013, the revenues of QLRH began to decline precipitously as Michael Mobley, contrary to the terms of the Purchase Agreement, Employment Agreement, and QLRH LLC Agreement, began diverting revenues and assets of QLRH to the Mobley Affiliates. Michael Mobley spent little time or effort in maintaining or developing the business of the Quality Companies. Instead, Michael Mobley devoted his time and virtually all his attention to increasing and expanding the service lines of the Mobley Affiliates in such a manner that they would be in direct competition with the Quality Companies.

53.     Michael Mobley utilized and exploited his personal relationships with QLS employees, and particularly with its sales personnel, to enlist their assistance in diverting work orders and ultimately revenues from the Quality Companies to the Mobley Affiliates and directed QLS employees and personnel to perform services on behalf of the Mobley Affiliates at no cost.

54.     Among other acts, Michael Mobley caused new, incoming work orders from customers of the Quality Companies to be diverted and performed by QCE and to TQ Mats. Sales staff on the payroll of the Quality Companies originated new work orders for the Mobley Affiliates rather than for the Quality Companies (their employer), despite the

customers requesting wellsite construction, support, and equipment rental—the very services that the Quality Companies had provided in the past to the same customers. Making matters worse, many of these diverted work orders came from the Quality Companies' largest customers, such as GeoSouthern Energy Corp. ("**GeoSouthern**"). Michael Mobley, through past financial reports and statements in the Purchase Agreement, represented to QLRH that these customers were among the most significant revenue sources for the Quality Companies, representations that played a major part in QLRH's decision to purchase the Quality Companies. By diverting these revenues post-sale, not only was QLRH deprived of these revenues, but its new in-house competitors gained a foothold in the market and funding to expand further, while the Quality Companies footed the salaries and the costs associated for these competitors to acquire the Quality Companies' revenue streams.

55.     In addition to diverted work orders, the Quality Companies were deprived of substantial income from, and use of, its Closed Loop Mud Systems ("**Closed Loop Systems**").[3] The Closed Loop Systems were assets of the Quality Companies and included with the conveyed assets on Schedule 3.10(a) of the Purchase Agreement. After the Closing Date, however, Michael Mobley began contending that the Closed Loop Systems belonged to QCE, despite the listing in the Purchase Agreement and numerous invoices before the sale showing QLS renting out the Closed Loop Systems to GeoSouthern and other customers. Based on his unfounded allegations that QCE owned the Closed Loop Systems,

---

[3] A closed loop mud system is a series of tanks and pumps used at a drilling site in the management and storage of drilling mud, fluids, and cuttings.

Michael Mobley caused QCE to fill new work orders for the system from GeoSouthern and collect hundreds of thousands in rental revenues. Jeff Hunt, a Rocaceia employee, confronted Michael Mobley about the use of the Closed Loop Systems, showing him Schedule 3.10(a). In response, Mobley simply tore up the schedule handed to him and stated bluntly that the Closed Loop Systems were not sold. Before the Purchase Transaction, the Closed Loop Systems represented $800–$1,000 of revenue per day, in addition to revenues from associated moving and rigging charges.

56.     QCE quickly became one of the principal entities through which Michael Mobley diverted the Quality Companies' revenue. Before the Purchase Transaction, QCE was an equipment supply company with operations limited to the sale of pipe fittings and the leasing of a specific piece of equipment: a "gas buster" or mud-gas separator. In the days and weeks after the sale, however, Michael Mobley, with the assistance of his son Mikey, caused QCE to acquire over $2,500,000 in equipment of the same type used by the Quality Companies, including vacuum trucks, frac tanks, and trucks. Michael Mobley then used this equipment to expand the lines of business of the Mobley Affiliates so that they competed with the Quality Companies. Michael Mobley dispatched this newly acquired equipment to perform wellsite services for the customers of the Quality Companies while permitting QLRH equipment to remain idle. For instance, at a time when QLS was supposedly unable to deliver vacuum truck services because of a shortage of drivers, Michael Mobley caused QCE to employ the drivers that worked for QLS and directed them to drive the newly acquired QCE vacuum trucks for the benefit of QCE.

57.     On or about March 16, 2013, QLRH CEO Martin, together with QLRH CFO Michael Eitler and QLRH VP Douglas Licker, met with Michael Mobley and Yvette Mobley at Yvette's home to discuss and determine the cause of the precipitous drop in revenues that the newly acquired companies were experiencing. At the instruction of Michael and Yvette Mobley, Mikey and Cody Mobley appeared at the meeting shortly after it began. Throughout the meeting, Martin, Eitler, and Licker felt physically threatened. When questioned about the financial condition of the companies that were under his management, Michael Mobley became extremely defensive and aggressive—at one point violently picking up and slamming down a dining table. He threatened to "blow up" the company and refused to return to QLRH the revenues that had been diverted to QCE and TQ Mats. He added defiantly that he could sell the QCE to his sons.

E.     **MICHAEL MOBLEY AND AFFILIATES SCRAMBLE TO CONCEAL THEIR CONDUCT**

58.     While still employed as a part of the QLRH management team, Mikey and Cody Mobley made plans to use SLS, a new entity they had formed weeks earlier on March 22, 2013, to acquire QCE and disguise the fact that their parents Michael and Yvette Mobley were using SLS to evade their legal obligations to QLRH. On April 5, 2013, Mikey and Cody Mobley resigned their management positions with QLRH.

59.     The next day on April 6, 2013, Michael, Mikey, and Cody Mobley appeared at the QLRH offices alleging that they brought a sheriff's deputy in order to gain access to the facilities. In reality, they did not have any deputy with them and were instead attempting to trespass. Security guards hired by QLRH asked them to leave and stopped them from entering the facilities, at which point Michael and Mikey Mobley attempted to access the

upstairs offices by force. QLRH's security guards again stopped them. After the brief altercation, Martin advised Michael Mobley that QLRH was terminating Yvette Mobley and placing Michael Mobley on paid administrative leave in an effort to prevent QLRH's complete destruction.

60.    On April 17, 2013, Michael and Yvette Mobley signed documents that purported to sell all of their stock in QCE to SLS. Mikey and Cody Mobley, through SLS, agreed to a $3.6 million purchase price for QCE's stock. The sale of QCE, however, was a sham. In addition to effectively gifting QCE to SLS, around the same time, Michael and Yvette Mobley transferred a total of $3.6 million in "loans" to QCE and SLS through an intermediary. Yvette Mobley also transferred over $3 million to Cody Mobley purportedly in the form of "loans," which he then deposited in Solid Liberty and QCE accounts to fund competing operations. Almost immediately after opening its doors, Solid Liberty began "leasing" real estate from Michael Mobley for Solid Liberty's office and yard, but as with the illusory loans and sale, Solid Liberty was not required to make lease payments. After QLRH later terminated the lease and vacated the El Campo Yard, Michael Mobley aided Solid Liberty and QCE by allowing them to move operations to the El Campo Yard, on information and belief, under another pretense of a paying lease. The purpose of these sham transactions was a thinly veiled attempt to evade the non-compete clauses applicable to Michael Mobley under the Purchase Agreement, Employment Agreement, and QLRH LLC Agreement. On April 19, 2013, Mikey and Cody Mobley formed a second entity, SLRS, with the intent of using SLRS to compete with QLRH in the construction and rental of rig housing. Michael Mobley directly or indirectly, managed, operated, or financed or

participated in the management, operation, and/or financing of, and lent credit to SLS and SLRS, both of which are in direct competition with the Quality Companies.

61.     Much of the revenue QLRH lost from its major customers went directly to Michael Mobley and the Mobley Affiliates. For instance, GeoSouthern, which Michael Mobley represented in the Purchase Agreement as the Quality Companies' second biggest customer in both 2011 and 2012, only paid QCE approximately $640,000 and $450,000 in total for products and services during those years, respectively. But in the first six months of 2013 alone, GeoSouthern paid QCE $2.78 million—an amount that is almost identical to revenues that the Quality Companies received from GeoSouthern for the first six months of each 2011 and 2012. In fact, QCE's revenues from GeoSouthern in the first half of 2013 represent a massive expansion of QCE's business as of the Closing Date, as they are more than double of QCE's total revenue from all customers of $1.2 million in 2012.

62.     While QLRH was attempting to rescue the Quality Companies from the Mobleys' systematic and widespread looting, the Mobleys shamelessly set out to hire away QLRH and the Quality Companies' key employees, in direct violation of the Purchase Agreement, Employment Agreement, and QLRH LLC Agreement. In the first few weeks after the Closing Date, the Mobleys caused QCE to hire away several employees of QLRH, including drivers, roustabouts, and other employees of the Quality Companies. By late 2013, QCE employed over 35 former QLRH employees, including virtually all of QLRH's former sales staff. For example, at the time of the Purchase Transaction, Stacy Metting and Amy Eubanks were sales representatives for QLRH, but by October 2013, both were sales

representatives for QCE. Not surprisingly, when key sales personnel left the Quality Companies, so did many customers.

63.     As time went on, QLRH learned of additional false representations in the Purchase Agreement. For instance, the Purchase Agreement stated that the Quality Companies were in compliance with the Fair Labor Standards Act. Yet an audit by the Department of Labor found that certain salaried QLS employees were actually non-exempt employees under the Fair Labor Standards Act, and thus were entitled to overtime for all hours worked in excess of 40 hours in a work week. After reaching a settlement with the Department of Labor, QLRH was required to pay $94,283.33 in back wages, and $94,283.33 in liquidated damages.

## F.     LITIGATION AND BANKRUPTCY

64.     On April 8, 2013, QLRH filed a complaint in the United States District Court for the Middle District of Florida, Tampa Division, asserting claims for breach of the Employment Agreement, breach of fiduciary duties in connection with Mobley's position as president of QLRH, and fraudulent inducement. Two days later, Michael Mobley, Yvette Mobley, TQ Mats, TQ Gate, Quality Lease Air Service, LLC, and QCE filed a Petition and Application for Temporary Restraining Order and Temporary Injunction in the 329th Judicial District Court in Wharton County, Texas. QLRH voluntarily dismissed the action it commenced in Florida and asserted counterclaims in the action pending in Wharton County (the "**Original Action**") mirroring those it made in the Florida complaint.

65.     As a direct result of Michael Mobley's false representations, fraud, breaches of fiduciary duty, and willful injurious conduct, Plaintiffs filed Chapter 11 bankruptcy

petitions on October 1, 2014. Pursuant to 28 U.S.C. § 1452 and Federal Rule of Bankruptcy Procedure 9027, the Plaintiffs removed the Original Action on October 8, 2014.

66.     On July 17, 2019, the Original Action was referred back to the United States District Court for trial. The Original Action was set for trial in District Court on January 24, 2022.

67.     On January 21, 2022, Michael Mobley filed a voluntary petition for relief under Chapter 11 of Title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, along with a Suggestion of Bankruptcy in the Original Action, halting the scheduled trial and staying Plaintiffs' prosecution of its claims against Michael Mobley.

## CONDITIONS PRECEDENT

68.     All conditions precedent have been performed or occurred.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:  STATUTORY FRAUD

69.     Plaintiffs repeat and re-allege the allegations set forth in all preceding paragraphs of this Complaint as if fully set forth herein.

70.     Pursuant to 11 U.S.C. § 523(a), a discharge under §§ 727, 1141, 1228(a), 1228(b), or l328(b) of the Bankruptcy Code does not discharge an individual Debtor from any debt:

> (2) For money, property, [or] services ... to the extent obtained by…
>
> (A) false pretenses, a false representation, or actual fraud…
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

31

71.     The Purchase Transaction is a transaction involving real estate or stock in a corporation or joint stock company within the meaning of Texas Business and Commerce Code § 27.01.

72.     In negotiating the Purchase Transaction, Michael Mobley made numerous material misrepresentations or false representations of past or existing fact that constituted actual fraud and operated as willful and malicious injury to QLRH and its property. Michael Mobley, directly or indirectly, provided to QLRH and its agents Financial Statements, the Sellers Disclosure, and other diligence materials that grossly distorted the financial and operating condition of the Quality Companies. Specifically, Michael Mobley:

   a.     misrepresented that he had no reason to believe that any of the Quality Companies' Material Customers would not repeat their use of the Quality Companies' goods or services or materially reduce their relationship with the Quality Companies, in each case, after the Closing Date;

   b.     misrepresented the tangible assets belonging to the Quality Companies that were to be conveyed in the Purchase Transaction;

   c.     misrepresented in the Sellers' Disclosure that the tangible assets belonging to the Quality Companies were in good operating condition and not in need of any non-routine maintenance or repair;

   d.     misrepresented in the Sellers' Disclosure that the Quality Companies did not use any equipment in connection with their business that the Quality Companies did not own;

   e.     misrepresented during the due diligence process that QCE was simply "an equipment and connection company that buys and sells used equipment, pipes and tanks" and that QCE used "QLS or other contractors to rig down and move equipment"; and

   f.     misrepresented during the due diligence process that QCE had $700,000 in inventory, a figure that is either understated by approximately $300,000 or false in characterizing equipment held for rental as inventory.

73.     Michael Mobley knew that the foregoing material misrepresentations were false and misleading when made prior to the Closing Date. Michael Mobley made identical false representations in the Purchase Agreement and had no intention of complying with his obligations thereunder. Michael Mobley participated in the preparation of the Financial Statements, Sellers' Disclosure, and other diligence materials that were transmitted to QLRH and its agents. Moreover, Michael Mobley had operated the Quality Companies for nearly two decades prior to the Purchase Transaction. Through his role in managing the operations and finances of those companies, Michael Mobley understood that the information contained in the Financial Statements and other diligence materials was false and grossly inaccurate. The facts described above were not known to QLRH or its agents and could not have been discovered through the exercise of ordinary diligence.

74.     Michael Mobley also falsely represented that following the Purchase Transaction, he would continue to operate the Mobley Affiliates in the same manner and to the same extent conducted as of the Closing Date and would not permit the Mobley Affiliates to expand or increase their operations to compete with QLRH and the Quality Companies. Michael Mobley had no intention of honoring and complying with those promises at the time they were made, as evidenced by QCE's rapid expansion of its equipment purchases starting a mere ***three days*** after the Closing Date. In negotiating the Purchase Transaction, Michael Mobley misrepresented that QCE's inventory was valued at $700,000 and by characterizing its assets as inventory rather than rental equipment that could be used to compete with QLRH and the Quality Companies. By the time QCE was

purportedly sold to SLS less than four months after the Closing Date, QCE had equipment valued at approximately $3 million.

75.     Moreover, Michael Mobley knew that certain material customers would either cease doing business or would materially reduce their business with the Quality Companies after the Closing Date, yet Michael Mobley made false representations in this regard and failed to disclose this to QLRH or its agents before the finalizing the Purchase Transaction.

76.     Michael Mobley intentionally made the foregoing misrepresentations for the purposes of inflating the Purchase Price and inducing QLRH to enter into the Purchase Transaction. Michael Mobley made those misrepresentations willingly and knowing, or having reason to expect, that QLRH and its agents would use the information in the Financial Statements, Sellers Disclosure, and other diligence materials in negotiating a Purchase Price and in ultimately deciding whether to enter into the Purchase Transaction. Michael Mobley represented to QLRH and its agents that the Financial Statements, the Sellers' Disclosure, and other diligence materials accurately described the financial and operating condition of QLS and QLRS. Similarly, Michael Mobley assured QLRH and its agents that they would continue to operate the Mobley Affiliates in the same manner and to the same extent conducted as of the Closing Date in order to induce QLRH to enter into a Purchase Transaction that permitted Michael Mobley to carry on managing and operating the Mobley Affiliates in such a manner.

77.     Michael Mobley benefitted from his false representations and promises through the expansion of their respective businesses. These benefits came from using the services of post-acquisition QLS employees without pay and from using the business information conveyed to QLRH in the Purchase Transaction, including customer and supplier information, development and business plans, vendor management information, pricing and marketing information, target customer lists and contacts, rig housing design and manufacturing information, and other specialized methods, processes, and techniques.

78.     QLRH, by and through its agents, actually and justifiably relied on the false representations in the Financial Statements and other diligence materials prepared and transmitted by Michael Mobley (personally and through agents). The purpose of disseminating such information is to grant prospective buyers like QLRH an opportunity to vet the financial state of a potential acquisition. QLRH and its agents justifiably believed that the information contained therein would be accurate, particularly given Michael Mobley's representations that the audited and unaudited Financial Statements had been prepared in accordance with GAAP and fairly depicted the financial condition of the Quality Companies. QLRH, by and through its agents, also actually and justifiably relied on Michael Mobley's false promises regarding the Mobley Affiliates by entering into a Purchase Transaction that permitted Michael Mobley to carry on managing and operating the Mobley Affiliates.

79.     Accordingly, QLRH and its agents used the false and misleading information conveyed by Michael Mobley in deciding whether to engage in the Purchase Transaction and in arriving at a Purchase Price. The cumulative effect of the false representations and

promises made by Michael Mobley was to greatly overstate the value of the assets, past and potential earnings, and revenue streams to be acquired by QLRH in the Purchase Transaction, and to vastly understate the Quality Companies' liabilities and operating costs.

80.     In reliance on Michael Mobley's material misrepresentations described above, QLRH entered into the Purchase Transaction. Had Michael Mobley not made the foregoing false representations and promises, QLRH would not have consummated the Purchase Transaction. Thus, as a direct and proximate cause of Michael Mobley's false pretenses, false representations and fraudulent conduct, Plaintiffs suffered substantial monetary losses amounting to tens of millions of dollars. QLRH, for itself and as the Quality Companies' assignee, now seeks rescissory and/or compensatory damages that are excepted from discharge under 11 U.S.C § 523(a). Because Michael Mobley had actual knowledge of the above-described false representations and promises, QLRH is also entitled to recover exemplary damages, which Plaintiffs also seek to be excepted from discharge under 11 U.S.C § 523(a).

81.     Michael Mobley, through Holdco, obtained tens of millions of dollars of money, services, and property from Plaintiffs through false pretenses, false representations, and fraudulent conduct, and caused willful and malicious injury to QLRH through the conduct described above. This has created debts owed by Michael Mobley to Plaintiffs that should be excepted from and denied discharge under 11 U.S.C. § 523(a)(2), (a)(6).

## SECOND CLAIM FOR RELIEF:  FRAUD BY AFFIRMATIVE MISREPRESENTATION

82.     Plaintiffs repeat and re-allege the allegations set forth in all preceding paragraphs of this Complaint as if fully set forth herein.

83.     Pursuant to 11 U.S.C. § 523(a), a discharge under §§ 727, 1141, 1228(a), 1228(b), or l328(b) of the Bankruptcy Code does not discharge an individual Debtor from any debt:

> (2) For money, property, [or] services ... to the extent obtained by…
>
> > (A) false pretenses, a false representation, or actual fraud…
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

84.     In marketing to and negotiating with QLRH regarding the purchase of the Quality Companies, Michael Mobley made material false representations of past or existing fact that constituted actual fraud and operated as willful and malicious injury to QLRH and its property. Michael Mobley, directly or indirectly, provided to QLRH and its agents Financial Statements, the Sellers' Disclosure, and other diligence materials that grossly distorted the financial condition of the Quality Companies. Specifically, Michael Mobley:

> a.     misrepresented that they had no reason to believe that any of the Quality Companies' Material Customers would not repeat their use of the Quality Companies' goods or services or materially reduce their relationship with the Quality Companies, in each case, after the Closing Date;
>
> b.     misrepresented the tangible assets belonging to the Quality Companies that were to be conveyed in the Purchase Transaction;
>
> c.     misrepresented in the Sellers' Disclosure that the tangible assets belonging to the Quality Companies were in good operating condition and not in need of any non-routine maintenance or repair;
>
> d.     misrepresented in the Sellers' Disclosure that the Quality Companies did not use any equipment in connection with their business that the Quality Companies did not own;

e.     misrepresented during the due diligence process that QCE was simply "an equipment and connection company that buys and sells used equipment, pipes and tanks" and that QCE used "QLS or other contractors to rig down and move equipment"; and

f.     misrepresented during the due diligence process that QCE had $700,000 in inventory, a figure that is either understated by approximately $300,000 or false in characterizing equipment held for rental as inventory.

85.     Michael Mobley knew that the foregoing material misrepresentations were false and misleading when made prior to the Closing Date. Michael Mobley made identical false representations in the Purchase Agreement and had no intention of complying with their obligations thereunder. Michael Mobley participated in the preparation of the Financial Statements, Sellers' Disclosure, and other diligence materials that were transmitted to QLRH and its agents. Moreover, Michael Mobley had operated the Quality Companies for nearly two decades prior to the Purchase Transaction. Through his role in managing the operations and finances of those companies, Michael Mobley understood that the information contained in the Financial Statements and other diligence materials was false and grossly inaccurate. The facts described above were not known to QLRH or its agents and could not have been discovered through the exercise of ordinary diligence.

86.     Further, Michael Mobley falsely represented that following the Purchase Transaction, he would continue to operate the Mobley Affiliates in the same manner and to the same extent conducted as of the Closing Date, and would not permit the Mobley Affiliates to expand or increase their operations to compete with QLRH. Michael Mobley had no intention of honoring and complying with those promises at the time they were made, as evidenced by QCE's rapid expansion of its equipment purchases starting a mere

*three days* after the Closing Date. In negotiating the Purchase Transaction, Michael Mobley misrepresented that QCE's inventory was valued at $700,000 and by characterizing its assets as inventory rather than rental equipment that could be used to compete with QLRH and the Quality Companies. By the time QCE was purportedly sold to SLS less than four months after the Closing Date, QCE had equipment valued at approximately $3 million.

87.     Moreover, Michael Mobley knew that certain material customers would either cease doing business or would materially reduce their business with the Quality Companies after the Closing Date, yet Michael Mobley made false representations in this regard and failed to disclose this to QLRH or its agents before finalizing the Purchase Transaction.

88.     Michael Mobley intentionally made the foregoing misrepresentations for the purposes of inflating the Purchase Price and inducing QLRH to enter into the Purchase Transaction. Michael Mobley made those misrepresentations willingly and knowingly, or having reason to expect, that QLRH and its agents would use the information in the Financial Statements, Sellers' Disclosure, and other diligence materials in negotiating a Purchase Price and in ultimately deciding whether to enter into the Purchase Transaction. Michael Mobley represented to QLRH and its agents that the Financial Statements and other diligence materials accurately described the operating and financial condition of the Quality Companies. Similarly, Michael Mobley assured QLRH and its agents that he would continue to operate the Mobley Affiliates in the same manner and to the same extent conducted as of the Closing Date in order to induce QLRH to enter into a Purchase

Transaction that permitted Michael and Yvette Mobley to carry on managing and operating the Mobley Affiliates in such a manner.

89.     QLRH, by and through its agents, actually and justifiably relied on the false representations in the Financial Statements, Sellers' Disclosure, and other diligence materials prepared and transmitted by Michael Mobley. The purpose of disseminating such information is to grant prospective buyers like QLRH an opportunity to vet the financial state of a potential acquisition. QLRH and its agents justifiably believed that the information contained therein would be accurate, particularly given Michael Mobley' representations that the audited and unaudited Financial Statements had been prepared in accordance with GAAP and fairly depicted the financial condition of the Quality Companies. QLRH, by and through its agents, also actually and justifiably relied on Michael Mobley's false promises regarding the Mobley Affiliates by entering into a Purchase Transaction that permitted Michael Mobley to carry on managing and operating the Mobley Affiliates.

90.     Accordingly, QLRH and its agents used the false information conveyed by Michael Mobley in deciding whether to engage in the Purchase Transaction and in arriving at a Purchase Price. The cumulative effect of the false representations and promises made by Michael Mobley was to greatly overstate the value of the assets, past and potential earnings, and revenue streams to be acquired by QLRH in the Purchase Transaction, and to vastly understate the Quality Companies' liabilities and operating costs.

91.     In reliance on Michael Mobley's material misrepresentations described above, QLRH entered into the Purchase Transaction. Had Michael Mobley not made the foregoing affirmative misrepresentations, QLRH would not have consummated the Purchase Transaction. Thus, as a direct and proximate cause of Michael Mobley's fraudulent conduct, Plaintiffs suffered substantial losses amounting to tens of millions of dollars. QLRH, for itself and as the Quality Companies' assignee, now seeks rescissory and/or compensatory damages that are excepted from discharge under 11 U.S.C § 523(a).

92.     Michael Mobley, through Holdco, obtained tens of millions of dollars of money, services, and property from Plaintiffs through false pretenses, false representations, and fraudulent conduct, and caused willful and malicious injury to QLRH through the conduct described above. This has created debts owed by Michael Mobley to Plaintiffs that should be excepted from and denied discharge under 11 U.S.C. § 523(a)(2), (a)(6).

### THIRD CLAIM FOR RELIEF:  FRAUD BY NON-DISCLOSURE

93.     Plaintiffs repeat and re-allege the allegations set forth in all preceding paragraphs of this Complaint as if fully set forth herein.

94.     Pursuant to 11 U.S.C. § 523(a), a discharge under §§ 727, 1141, 1228(a), 1228(b), or l328(b) of the Bankruptcy Code does not discharge an individual Debtor from any debt:

> (2) For money, property, [or] services ... to the extent obtained by…
>
> > (A) false pretenses, a false representation, or actual fraud…
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

95.     Michael Mobley made numerous material omissions that constituted actual fraud and operated as willful and malicious injury to QLRH and its property. Michael Mobley had a duty to disclose material facts to QLRH and its agents regarding the financial condition of the Quality Companies that were not contained in the Financial Statements, Sellers Disclosure, and other diligence materials disseminated by Michael Mobley. Michael Mobley disclosed to QLRH certain facts regarding the Quality Companies' financial condition that created a material and false impression with respect to the Quality Companies' profitability and value. Thus, Michael Mobley had a duty to disclose the entire truth regarding the Quality Companies' financial condition. Michael Mobley's duty of full disclosure was further memorialized in § 3.25 of the Purchase Agreement, where Michael Mobley warranted that no document had been furnished to QLRH in connection with the Purchase Transaction that omitted "a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading."

96.     Among other things, Michael Mobley failed to disclose the following:

a.      that the Quality Companies' profitability and earnings levels as reported in the Financial Statements and other due diligence materials reflected revenues from Closed Loop Systems and mud hauling, which Seller knew would not continue after the Purchase Transaction;

b.      that they had reason to believe that the Quality Companies' Material Customers would not repeat their use of the Quality Companies' goods or services or would materially reduce their relationship with the Quality Companies, in each case, after the Closing Date;

c.      that the Quality Companies' profitability and earnings levels as reported in the Financial Statements and other due diligence materials had been achieved through a pattern and practice of overbilling customers of QLS and QLRS;

      d.      that the Quality Companies' Financial Statements did not properly account for the cost of equipment and services that Sellers would allege was provided by QCE at no cost prior to the Purchase Transaction;

      e.      that following the Purchase Transaction, QCE would begin charging the Quality Companies' for the cost of equipment and services provided to such an extent that QCE would become one of their most significant vendors;

      f.      that Michael Mobley would allege that the equipment necessary to operate the Closed Loop System business conducted by the Quality Companies prior to the Purchase Transaction actually belonged to QCE and would not be conveyed to QLRH.

97.    Michael Mobley knowingly concealed the existence of the foregoing material facts from QLRH and its agents with the specific intent that they rely on the Financial Statements and other diligence materials in deciding whether to enter into the Purchase Transaction. Michael Mobley participated in the preparation of the Financial Statements and other diligence materials that were transmitted to QLRH and its agents. Moreover, Michael Mobley had operated the Quality Companies for nearly two decades prior to the Purchase Transaction. Through his role in managing the operations and finances of those companies, Michael Mobley understood that the information contained in the Financial Statements and other diligence materials was grossly inaccurate. The facts described above were not known to QLRH or its agents and could not have been discovered through the exercise of ordinary diligence. Michael Mobley represented to QLRH and its agents that the Financial Statements and other diligence materials accurately described the financial condition of the Quality Companies.

98.     QLRH, by and through its agents, actually and justifiably relied on the false representations in the Financial Statements and other diligence materials prepared and transmitted by Michael Mobley. The purpose of disseminating such information is to grant prospective buyers like QLRH an opportunity to vet the financial state of a potential acquisition. QLRH and its agents justifiably believed that the information contained therein would be complete and accurate, particularly given Michael Mobley's representations that the audited and unaudited Financial Statements had been prepared in accordance with GAAP and fairly depicted the financial condition of the Quality Companies.

99.     Accordingly, QLRH and its agents used the false information conveyed by Michael Mobley and were deprived of material information as a result of the omissions of Michael Mobley in deciding whether to engage in the Purchase Transaction and in arriving at a Purchase Price. The cumulative effect of the omissions made by Michael Mobley was to greatly overstate the value of the assets, past and potential earnings, and revenue streams to be acquired by QLRH in the Purchase Transaction, and to vastly understate the Quality Companies' liabilities and operating costs. Had Michael Mobley disclosed the above-described omitted material facts, QLRH would not have consummated the Purchase Transaction. Thus, as a direct and proximate cause of Michael Mobley's fraudulent conduct, Plaintiffs suffered substantial losses amounting to tens of millions of dollars. QLRH, for itself and as the Quality Companies' assignee, now seeks rescissory and/or compensatory damages that are excepted from discharge under 11 U.S.C § 523(a).

100.   Michael Mobley, through Holdco, obtained tens of millions of dollars of money, services, and property from Plaintiffs through false pretenses, false representations, and fraudulent conduct, and caused willful and malicious injury to QLRH through the conduct described above. This has created debts owed by Michael Mobley to Plaintiffs that should be excepted from and denied discharge under 11 U.S.C. § 523(a)(2), (a)(6).

### FOURTH CLAIM FOR RELIEF:  SECURITIES FRAUD

101.   Plaintiffs repeat and re-allege the allegations set forth in all preceding paragraphs of this Complaint as if fully set forth herein.

102.   Pursuant to 11 U.S.C. § 523(a), a discharge under §§ 727, 1141, 1228(a), 1228(b), or l328(b) of the Bankruptcy Code does not discharge an individual Debtor from any debt:

> (2) For money, property, [or] services ... to the extent obtained by…
>
>> (A) false pretenses, a false representation, or actual fraud…
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

103.   The interests in the Quality Companies sold to QLRH and the notes conveyed to Sellers as consideration for those interests in the Purchase Transaction were "Securities" as defined by the 1934 Act, 15 U.S.C. §78c.

104.   Michael Mobley engaged in an unlawful combination, conspiracy, and course of conduct, employed a scheme to defraud, made untrue statements of material facts or omitted material facts, provided false or misleading documents, and engaged in acts, practices, and courses of business and conduct which operated as actual fraud upon QLRH, and caused willful and malicious injury to QLRH, in connection with the purchase and sale

of securities, in violation of § 10 of the 1934 Act, 15 U.S.C. § 78j, and Rule 10b-5 promulgated thereunder.

105.   Specifically, Michael Mobley:

a.   misrepresented that they had no reason to believe that the Quality Companies' Material Customers would not repeat their use of the Quality Companies' goods or services or would materially reduce their relationship with the Quality Companies, in each case, after the Closing Date;

b.   misrepresented the tangible assets belonging to the Quality Companies that were to be conveyed in the Purchase Transaction;

c.   misrepresented that the tangible assets belonging to the Quality Companies were in good operating condition and not in need of any non-routine maintenance or repair;

d.   misrepresented that the Quality Companies did not use any equipment in connection with their business that the Quality Companies did not own;

e.   misrepresented that the Quality Companies had exclusive and proprietary rights to trade secrets possessed by the Quality Companies that were to be conveyed in the Purchase Transaction, including customer information, development and business plans, vendor management, pricing information, target customer lists and contacts, and rig housing design and manufacturing information;

f.   misrepresented during the due diligence process that QCE was simply "an equipment and connection company that buys and sells used equipment, pipes and tanks" and that QCE used "QLS or other contractors to rig down and move equipment"; and

g.   misrepresented during the due diligence process that QCE had $700,000 in inventory, a figure that by Michael Mobley's own admission was understated by approximately $300,000.

106.   Among other things, Michael Mobley also failed to disclose the following:

a.   that the Quality Companies' profitability and earnings levels as reported in the Financial Statements and other due diligence materials reflected revenues from Closed Loop Systems and mud hauling, which Seller knew would not continue after the Purchase Transaction;

46

b.   that they had reason to believe that the Quality Companies' Material Customers would not repeat their use of the Quality Companies' goods or services or would materially reduce their relationship with the Quality Companies, in each case, after the Closing Date;

c.   that the Quality Companies' Financial Statements did not properly account for the cost of equipment and services that Sellers would allege was provided by QCE at no cost prior to the Purchase Transaction;

d.   that following the Purchase Transaction, QCE would begin charging the Quality Companies' for the cost of equipment and services provided to such an extent that QCE would become one of their most significant vendors;

e.   that Michael Mobley would allege that the equipment necessary to operate the Closed Loop System business conducted by the Quality Companies prior to the Purchase Transaction actually belonged to QCE and would not be conveyed to QLRH; and

f.   that the Quality Companies owned significant revenues streams from the sale of reclaimed oil stored in Quality Companies' tanks, which Sellers would wrongfully divert to themselves after the Closing Date.

107.   QLRH, by and through its agents, actually and justifiably relied on the false representations and omissions described above. The purpose of disseminating such information during a due diligence process is to grant prospective buyers like QLRH an opportunity to vet the financial state of a potential acquisition. QLRH and its agents justifiably believed that the information received during its due diligence would be complete and accurate, particularly given Michael Mobley's representations that the audited and unaudited Financial Statements had been prepared in accordance with GAAP and fairly depicted the financial condition of the Quality Companies.

108.   Accordingly, QLRH and its agents used the false information conveyed by Michael Mobley and were deprived of material information as a result of the omissions of Michael Mobley, in deciding whether to engage in the Purchase Transaction and in arriving

at a Purchase Price. The cumulative effect of these false representations and omissions was to greatly overstate the value of the assets, past and potential earnings, and revenue streams to be acquired by QLRH in the Purchase Transaction, and to vastly understate the Quality Companies' liabilities and operating costs. Without these misrepresentations and omissions, QLRH would not have consummated the Purchase Transaction. Thus, as a direct and proximate cause of Michael Mobley's fraudulent conduct, Plaintiffs suffered substantial losses amounting to tens of millions of dollars. QLRH, for itself and as the Quality Companies' assignee, now seeks rescissory and/or compensatory damages that are excepted from discharge under 11 U.S.C § 523(a).

109.   Michael Mobley, through Holdco, obtained tens of millions of dollars of money, services, and property from Plaintiffs through false pretenses, false representations, and fraudulent conduct, and caused willful and malicious injury to QLRH through the conduct described above. This has created debts owed by Michael Mobley to Plaintiffs that should be excepted from and denied discharge under 11 U.S.C. § 523(a)(2), (a)(6).

### FIFTH CLAIM FOR RELIEF:  BREACH OF PURCHASE AGREEMENT AND QLRH LLC AGREEMENT

110.   Plaintiffs repeat and re-allege the allegations set forth in all preceding paragraphs of this Complaint as if fully set forth herein.

111.   Pursuant to 11 U.S.C. § 523(a), a discharge under §§ 727, 1141, 1228(a), 1228(b), or l328(b) of the Bankruptcy Code does not discharge an individual Debtor from any debt:

> (2) For money, property, [or] services ... to the extent obtained by…
>
> > (A) false pretenses, a false representation, or actual fraud…

(4) For fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny…

(6) for willful and malicious injury by the debtor to another entity or to the

property of another entity.

112.   On December 31, 2012, Sellers and QLRH executed the Purchase Agreement.

113.   QLRH performed all of its obligations under the Purchase Agreement.

114.   In Article III of the Purchase Agreement, Michael Mobley represented and warranted to QLRH that the statements contained therein were true and correct as of December 31, 2012. Among other things, Michael Mobley represented and warranted:

a.   in § 3.06, that the Financial Statements included in the Disclosure Schedules were complete, prepared in accordance with GAAP, and "fairly present the financial condition" of the Quality Companies;

b.   in § 3.10(a), that § 3.10(a) of the Disclosure Schedules was a true, accurate and complete list of all vehicles, equipment, rig houses and other tangible assets owned by and/or used in the business of the Quality Companies;

c.   in § 3.11, that the buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles, and other items of tangible personal property belonging to the Quality Companies were in good operating condition and repair and that none required non-routine maintenance or repairs;

d.   in § 3.11, that the buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles, and other items of tangible personal property owned or leased by the Quality Companies constituted everything necessary to continue conducting the business of the Quality Companies in the same manner following the Purchase Transaction;

e.   in § 3.15(a), that Michael Mobley has not received any notice, or has any reason to believe, that any the Quality Companies "Material Customers" has ceased, or intends to cease after the Closing, to use the goods or services of the Quality Companies or to otherwise

terminate or materially reduce its relationship with the Quality Companies;

f.     in § 3.17, that there were no current or potential legal or governmental proceedings involving or affecting the Quality Companies, or any of those companies' assets, and that nothing had occurred that would give rise to, or serve as a basis for, future proceedings against the Quality Companies;

g.     in § 3.21, that there were no actions pending or threatened to be brought or filed in connection with the employment of any current or former applicant, employee, consultant, volunteer, or independent contractor of the Quality Companies, including without limitation "any claim relating to unfair labor practices, employment discrimination, harassment, retaliation, equal pay, wage and hours or any other employment related matter arising under applicable Laws";

h.     in Disclosure Schedules § 3.21, that neither of the Quality Companies employed any independent contractors; and

i.     in § 3.25, that "no representation or warranty by Sellers in this Agreement and no statement contained in the Disclosure Schedules to this Agreement or any certificate or other document furnished or to be furnished to [QLRH] pursuant to this Agreement contains any untrue statement of material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading."

115. Michael Mobley additionally made several covenants regarding non-competition and non-solicitation in § 5.07 of the Purchase Agreement. In § 5.07(a), Michael Mobley covenanted that, for a period of five years from the closing date, he would not, and would not permit any of their "Affiliates," to directly or indirectly: (a) engage in or assist others in engaging in "Restricted Business" in North America; (b) hold an interest in any entity that engages directly or indirectly in "Restricted Business" in North America in any capacity; or (c) intentionally interfere in any material respect with the Quality Companies' business relationships with their customers or suppliers (whether formed prior to or after the date of the Purchase Agreement). In § 5.07(b), Michael Mobley further

covenanted that, for a period of five years from the Closing Date, he would not, and would not permit any of their Affiliates to, directly or indirectly hire or solicit any employee of the Quality Companies, or "encourage any such employee to leave such employment" or "hire any such employee who has left such employment." Similarly, Michael Mobley covenanted in § 5.07(c) that, for a period of five years from the Closing Date, he would not, and would not permit any of his Affiliates to, directly or indirectly "solicit or entice, or attempt to solicit or entice" any of the Quality Companies' actual or potential clients or customers for the purposes of diverting their business or services from the Quality Companies. As negotiated, the Mobley Affiliates were carved out from the non-competition and non-solicitation covenants in § 5.07 of the Purchase Agreement, but only to the extent that those entities continued to conduct their business "in the same manner and to the same extent" as on the Closing Date.

116.    In breach of the Purchase Agreement, Michael Mobley falsely certified that the above-described representations and warranties in Article III were true and correct in all respects as of the Closing Date. Michael Mobley knew or had reason to know that each of those representations and warranties were untrue. For instance, Michael Mobley knew or had reason to know that the Financial Statements and other diligence materials transmitted to QLRH and its agents contained inaccurate or incomplete information that distorted the financial condition of the Quality Companies, because Michael Mobley participated directly in the preparation and provision of those materials. Michael Mobley had operated the Quality Companies for nearly two decades prior to the Purchase Transaction. Through his role in managing the operations and finances of those companies,

Michael Mobley understood that the information contained in the Financial Statements and other diligence materials was grossly inaccurate. Accordingly, Michael Mobley also knew or had reason to know that the disclosure schedules attached to the Purchase Agreement and other documents transmitted to QLRH in connection with the Purchase Transaction contained numerous false statements of material fact and omitted a wide range of material facts necessary to make the statements contained therein not false or misleading, contrary to the representation and warranty Michael Mobley made in § 3.25.

117. Michael Mobley additionally knew or had reason to know that the representations and warranties regarding the equipment and other assets of the Quality Companies described in § 3.10(a) and § 3.11 were false. For instance, § 3.10(a) of the disclosure schedules failed to list the equipment that the Quality Companies used in connection with their Closed Loop System business prior to Purchase Transaction. Following the Purchase Transaction, Michael caused QCE to bill QLS and QLRS rental fees for the use of equipment needed to run the Closed Loop System business or in other instances, caused QCE to collect rental payments from the Closed Loop System directly. Accordingly, Michael Mobley knew or had reason to know that his representations and warranties in § 3.11 regarding the Quality Companies' equipment and other assets being "sufficient for the continued conduct of [the Quality Companies'] business after the Closing in substantially the same manner as conducted prior to the Closing and constitute all of the rights, property and assets necessary to conduct the business of [the Quality Companies] as currently conducted" were false. Finally, Michael Mobley knew or had reason to know that several vehicles and pieces of equipment owned by the Quality

Companies—for instance, the vacuum trucks—needed non-routine maintenance and repairs of a material nature and cost.

118.    Michael Mobley knew that the representations in § 3.15(a) regarding continued business with Material Customers (defined as a source of annual revenues over $25,000) were false. Michael Mobley admitted as much, stating after the Closing Date that he knew, at the time the Purchase Transaction was being negotiated, that certain customers generating over $50,000 in revenues for the Quality Companies would not repeat their business or would materially reduce its relationship with the Quality Companies after the Closing Date.

119.    Michael Mobley knew or had reason to know that the above-described representations and warranties from § 3.17 and § 3.21 regarding employment-related legal or governmental investigations or proceedings were false. An audit by the Department of Labor found that certain salaried QLS employees were actually non-exempt employees under the Fair Labor Standards Act, and thus were entitled to overtime for all hours worked in excess of 40 hours in a work week. After reaching a settlement with the Department of Labor, QLRH was later required to pay $94,283.33 in back wages, and $94,283.33 in liquidated damages.

120.    Absent Michael Mobley falsely certifying the representations and warranties they made in Article III of the Purchase Agreement, the Purchase Transaction would never have closed. Under § 7.02 of the Purchase Agreement, QLRH's obligations to consummate the Purchase Transaction were conditioned upon those representations and warranties from Michael Mobley being true and correct in all respects as of the Closing Date. Thus, but for

Michael Mobley's breaches of these representations and warranties, QLRH would not have entered into the Purchase Transaction.

121.    After the Closing Date, Michael Mobley further breached the non-competition and non-solicitation covenants in § 5.07 of the Purchase Agreement while he served in a fiduciary capacity for QLRH as its President. These breaches include, without limitation:

    a.    soliciting and hiring employees, agents, or independent contractors of QLRH and the Quality Companies to work for the Mobley Affiliates, Solid Liberty, and/or other competing companies that Michael Mobley owns or controls;

    b.    drastically expanding or permitting the expansion of the business of the Mobley Affiliates to provide additional services in competition with QLRH and the Quality Companies, including without limitation, the leasing of Closed Loop Systems, vacuum truck services, construction services, roustabout services, and other truck hauling services;

    c.    expanding the businesses of the Mobley Affiliates and Solid Liberty to include rig housing and accommodations;

    d.    soliciting and contacting customers of the Quality Companies to move their business to the Mobley Affiliates or Solid Liberty;

    e.    contacting clients of the Quality Companies, and requesting that accounts receivable due to the Quality Companies be paid directly to Michael or Yvette Mobley and/or competing companies owned or controlled by Michael or Yvette Mobley, including the Mobley Affiliates and Solid Liberty;

    f.    accepting through the Mobley Affiliates and Solid Liberty business from the Quality Companies' customers of the same nature or type as the Quality Companies previously provided to those customers;

    g.    financing or lending credit, directly or indirectly, to the Mobley Affiliates, Mikey Mobley, Cody Mobley, and Solid Liberty for purposes of competing with QLRH and the Quality Companies; and

      h.      investing in, managing, operating, financing, rendering consulting services to or assisting, directly or indirectly, the Mobley Affiliates, Mikey Mobley, Cody Mobley, and Solid Liberty for purposes of competing with QLRH and the Quality Companies.

As a consequence of Michael Mobley's willful and malicious breaches of the non-competition and non-solicitation covenants in § 5.07 of the Purchase Agreement, QLRH and the Quality Companies sustained substantial injury and damages, including but not limited to the loss of revenues, reputation, and customer goodwill.

122.    On December 31, 2012, QLRH, Rocaceia, and Sellers executed the QLRH LLC Agreement.

123.    QLRH performed all of its obligations under the QLRH LLC Agreement.

124.    In § 8.3(d) of the QLRH LLC Agreement, Michael Mobley agreed to non-competition and non-solicitation covenants nearly identical to those Michael Mobley agreed to in § 2 of the Employment Agreement, effective for so long as Sellers held an interest in QLRH and for a period of two years thereafter.

125.    Through the actions described in preceding paragraphs, Michael Mobley willfully and maliciously breached the non-competition and non-solicitation covenants in § 8.3(d) of the QLRH LLC Agreement. As a consequence of Michael Mobley's breaches of the non-competition and non-solicitation covenants in § 8.3(d) of the QLRH LLC Agreement, QLRH sustained substantial injury and damages, including but not limited to the loss of revenues, reputation, and customer goodwill.

126.    Accordingly, as a direct and proximate cause of Michael Mobley's breaches of the Purchase Agreement and the QLRH LLC Agreement, Plaintiffs suffered injury and losses amounting to tens of millions of dollars. QLRH, for itself and as the Quality

Companies' assignee, now seeks rescissory and/or compensatory damages that are excepted from discharge under 11 U.S.C § 523(a).

127.   Michael Mobley, through Holdco, obtained tens of millions of dollars of money, services, and property from Plaintiffs through fraud or defalcation while an officer of QLRH, and caused willful and malicious injury to QLRH through the conduct described above. This has created debts owed by Michael Mobley to Plaintiffs that should be excepted from and denied discharge under 11 U.S.C. § 523(a)(2), (a)(4), (a)(6).

### SIXTH CLAIM FOR RELIEF: BREACH OF FIDUCIARY DUTY

128.   Plaintiffs repeat and re-allege the allegations set forth in all preceding paragraphs of this Complaint as if fully set forth herein.

129.   Pursuant to 11 U.S.C. § 523(a), a discharge under §§ 727, 1141, 1228(a), 1228(b), or l328(b) of the Bankruptcy Code does not discharge an individual Debtor from any debt:

> (4) For fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny…
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

130.   As QLRH President, Michael Mobley owed fiduciary duties to QLRH, including but not limited to: (a) the duty of loyalty; (b) the duty of utmost good faith; (c) the duty of candor; (d) the duty to refrain from self-dealing; the duty not to usurp corporate opportunities for personal gain; (e) the duty to act with integrity of the strictest kind; (f) the duty of fair, honest dealing; (g) the duty of full disclosure; and (h) the duty to use uncorrupted business judgment for the sole benefit of the company.

131.    Michael Mobley breached his fiduciary duties to QLRH, and caused willful and malicious injury to QLRH, through actions including but not limited to:

a.    soliciting and hiring employees, agents, or independent contractors of QLRH and the Quality Companies to work for the Mobley Affiliates, Solid Liberty, and/or other competing companies that Michael Mobley owns or controls;

b.    drastically expanding or permitting the expansion of the business of the Mobley Affiliates to provide additional services in competition with QLRH and the Quality Companies, including without limitation, the leasing of Closed Loop Systems, vacuum truck services, construction services, roustabout services, and truck hauling services;

c.    expanding the businesses of the Mobley Affiliates and Solid Liberty to include rig housing and accommodations;

d.    soliciting and contacting customers of the Quality Companies to move their business to the Mobley Affiliates or Solid Liberty;

e.    contacting the Quality Companies' clients, and requesting that accounts receivable due to the Quality Companies be paid directly to Michael or Yvette Mobley and/or competing companies owned or controlled by Michael or Yvette Mobley, including the Mobley Affiliates and Solid Liberty;

f.    accepting, through the Mobley Affiliates and Solid Liberty, business from the Quality Companies' customers of the same nature or type as the Quality Companies previously provided to those customers;

g.    financing or lending credit, directly or indirectly, to the Mobley Affiliates, Mikey Mobley, Cody Mobley, and Solid Liberty for purposes of competing with QLRH and the Quality Companies; and

h.    investing in, managing, operating, financing, rendering consulting services to or assisting, directly or indirectly, the Mobley Affiliates, Mikey Mobley, Cody Mobley, and Solid Liberty for purposes of competing with QLRH and the Quality Companies.

132.    Accordingly, as a direct and proximate cause of the above-described breaches of fiduciary duty by Michael Mobley, Plaintiffs suffered losses in an amount to be proved at trial. Further, as a result of their breaches of fiduciary duty, Michael Mobley

wrongfully derived profits, either personally or through entities they own, control, manage, and/or operate.

133.    Michael Mobley, through Holdco, obtained tens of millions of dollars of money, services, and property from Plaintiffs through fraud or defalcation while an officer of QLRH, and caused willful and malicious injury to QLRH through the conduct described above. This has created debts owed by Michael Mobley to Plaintiffs that should be excepted from and denied discharge under 11 U.S.C. § 523(a)(4), (a)(6).

**SEVENTH CLAIM FOR RELIEF:  UNJUST ENRICHMENT**

134.    Plaintiffs repeat and re-allege the allegations set forth in all preceding paragraphs of this Complaint as if fully set forth herein.

135.    Pursuant to 11 U.S.C. § 523(a), a discharge under §§ 727, 1141, 1228(a), 1228(b), or l328(b) of the Bankruptcy Code does not discharge an individual Debtor from any debt:

> (2) For money, property, [or] services ... to the extent obtained by…
>
>> (A) false pretenses, a false representation, or actual fraud…
>
> (4) For fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny…
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

136.    As described throughout this complaint, Michael Mobley benefited from Plaintiffs by fraud, defalcations, duress, and the taking of undue advantage of business opportunities that did not belong to them. By fraudulently inducing QLRH into the Purchase Transaction, Michael Mobley obtained $60 million in consideration, yet acted like nothing had changed except the name of the companies they ran. Michael Mobley also

reaped enormous benefits from revenues derived by assets rightfully belonging to the Plaintiffs. Similarly, Michael Mobley reaped enormous benefits from customers that they helped to lure away from QLRH and the Quality Companies with misappropriated property.

137.   It would be inequitable and unjust to allow Michael Mobley to retain such benefits. Accordingly, QLRH seeks to recoup these benefits.

138.   Michael Mobley, through Holdco, obtained tens of millions of dollars of money, services, and property from Plaintiffs through fraud or defalcation while an officer of QLRH, made false representations, and caused willful and malicious injury to QLRH through the conduct described above. This has created debts owed by Michael Mobley to Plaintiffs that should be excepted from and denied discharge under 11 U.S.C. § 523(a)(2), (a)(4), (a)(6).

## CONCLUSION AND PRAYER

WHEREFORE, Plaintiffs pray unto the Court as follows:

1.   Actual, compensatory, rescissory, consequential, exemplary, and all other damages and equitable remedies, including rescission, including damages in an amount not less than $62,700,000;

2.   Attorneys' fees;

3.   A judgment and determination against Debtor Michael Mobley that the debts arising from the above-described claims for relief are excepted from and denied discharge under 11 U.S.C. § 523(a)(2), (4), and/or (6) as set forth herein;

4.     That the costs of this action be taxed by this Court against Debtor Michael

Mobley; and

5.     For such further relief to which Plaintiffs are entitled at law or equity, or

which the Court deems just and proper.

Dated: June 30, 2022                            Respectfully submitted,

*/s/ Lisa S. Tsai*
Lisa S. Tsai
State Bar No. 24046999
SDTX Admission No. 561351
ltsai@reidcollins.com
Jordan L. Vimont
State Bar No. 24066246
SDTX Admission No. 2819770
jvimont@reidcollins.com
REID COLLINS & TSAI LLP
1301 S. Capital of Texas Hwy
Building C, Suite 300
Austin, Texas 78746
T: (512) 647-6100
F: (512) 647-6129
*Special Litigation Lead Counsel for Plaintiffs*
*Quality Lease and Rental Holdings, LLC,*
*Quality Lease Rental Service, LLC, Quality*
*Lease Service, LLC, and Rocaceia, LLC*

WALTER J. CICACK
State Bar No. 04250535
wcicack@hcgllp.com
HAWASH CICACK & GASTON LLP
3401 Allen Parkway, Suite 200
Houston, Texas 77019
(713) 658-9015 - tel/fax
*Attorneys for Quality Lease and Rental*
*Holdings, LLC, Quality Lease Rental Service,*
*LLC, Quality Lease Service, LLC, and*
*Rocaceia, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the above and foregoing was served on the 30th day of June, 2022 upon all parties via the Court's electronic case filing system (ECF).

<u>*/s/ Walter J. Cicack*            </u>
Walter J. Cicack