In the United States Bankruptcy Court
Southern District of Texas
Victoria Division

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 22-60004 |
| David Michael Mobley | § | |
| | § | Chapter 11 |
| Debtor | § | |

---

**Quality's Motion to Convert Case to Chapter 7 or, in the Alternative, to Appoint a Chapter 11 Trustee or Examiner**

---

**This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**

**Represented parties should act through their attorney.**

1.      The Court should convert this case to a liquidation under chapter 7 because (a) the Debtor has failed to file any monthly operating reports at all for two entities in which he holds a controlling or substantial interest, in violation of his reporting requirements; (b) in failing to file those reports, he has failed to comply with court orders; (c) he has failed to make any progress at all toward a feasible or confirmable plan, despite eight months to do so; (d) he has grossly mismanaged the estate by failing to challenge certain claims and transfers and by obstructing investigation into his financial dealings; (e) he has subjected the estate to substantial and continuing losses by failing to challenge certain claims and transfers, and making unauthorized post-petition transfers, and allowing his only revenue generating asset, Texas Quality Mats LLC ("Texas Mats"), to be used by his non-debtor wife as her personal piggy bank; (f) even after numerous amendments, he has filed schedules and a Statement of Financial Affairs ("SoFA") that include inaccurate, misleading, and/or false information, including failing to list certain assets of the estate and large pre-petition transfers; (g) he has provided false information in his 2004 Exam, and (h) he has breached his fiduciary duty to the estate on a continuous basis and consistently failed to act in good faith at any point during this bankruptcy case. Any one of these items alone would justify conversion under section 1112(b); together, they cry out for it.

## Jurisdiction

2.     This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). Venue of this proceeding is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The relief requested may be granted pursuant to 11 U.S.C. §§ 1112(b) and/or 1104(a).

## Constitutional Authority

3.     This Court has constitutional authority to enter a final order regarding conversion of a case from Chapter 11 to Chapter 7. 11 U.S.C. §§ 1104 and 1112 have no state law equivalent. Accordingly, the U.S. Supreme Court's opinion in *Stern v. Marshall* is inapplicable. *See In re Carlew*, 469 B.R. 666, 672 (Bankr. S.D. Tex. 2012) (discussing *Stern v. Marshall*, 564 U.S. 462 (2011)). In the alternative, matters relating to the overall administration of the bankruptcy estate, including the chapter under which it is administered and the appointment and supervision of a trustee or examiner, are essential bankruptcy matters which trigger the "public rights" exception. *See id*. The different procedures applicable to bankruptcy estates and proceedings under each of the chapters is central to the public bankruptcy scheme and involves adjudication of rights created by the Bankruptcy Code. Therefore, the relief requested falls within this Court's authority and this Court may enter a final order granting the relief requested.

## Bankruptcy Status

4.      Debtor David Michael Mobley filed a petition for relief under Subchapter V of Chapter 11 on January 21, 2022. Dkt. 1. He amended the petition on January 26, 2022. Dkt. 8. He has amended his schedules numerous times, most recently on July 22, 2022. *See, e.g.,* Dkt. 21, 28, 29, 50, 51, 116, and 120. The U.S. Trustee and Quality[1] objected to the Debtor's Subchapter V designation on March 18, 2022. Dkt. 41. After two days of hearings, the Court sustained the objection, released the Subchapter V Trustee, and ordered the case to proceed "as a chapter 11 non-Subchapter V debtor-in-possession case." Dkt. 104. As of this filing, no plan has been proposed or filed and the Debtor has made it clear that he does not intend to file one.

## Argument & Authorities

### A.    Rules Governing Conversion, Dismissal, and the Appointment of a Trustee or Examiner

5.      Section 1112 provides that the Court, on request of a party in interest, after notice and hearing, for cause shown, must do one of four things, depending on which is in the best interests of the creditors and the estate: (1) convert a Chapter 11 case to a Chapter 7 case, (2) dismiss the case, (3) appoint a trustee under section 1104, or (4) appoint an examiner under section 1104. 11 U.S.C. § 1112(b)(1). Section 1112(b)(4) defines "cause" "with a

---

[1] "Quality" refers to creditors Quality Lease and Rental Holdings LLC, Quality Lease rental Service LLC, Quality Lease Service LLC, and Rocaceia LLC, collectively represented by the undersigned.

non-exhaustive enumerated list," including

> (A)   substantial or continuing loss or diminution of the estate without a reasonable likelihood of rehabilitation,
>
> (B)   gross mismanagement of the estate,
>
> . . .
>
> (E)   failure to comply with court orders,
>
> (F)   unexcused failure to comply with filing and reporting requirements, and
>
> . . .
>
> (J)   failure to file a disclosure statement or file or confirm a plan in the time allotted.

11 U.S.C. § 1112(b)(4). "Additionally, although not specifically enumerated, bad-faith conduct also constitutes cause to convert or dismiss a case." *In re Ozcelebi*, 639 B.R. 365, 384 (Bankr. S.D. Tex. 2022) (citation omitted). "Regardless of the basis for cause, inquiry under § 1112 is case-specific, focusing on the circumstances of each debtor." *Ozcelebi*, 639 B.R. at 384 (quotation and citation omitted).

## B.   The Debtor's Misconduct

6.   On the eve of his bankruptcy filing, the Debtor transferred properties worth at least $3.5 million allegedly to avoid foreclosure on a debt of approximately $1 million. The day before he filed bankruptcy, the Debtor owned a collection of tracts comprising 19.457 acres located at 1401 MLK

Boulevard in El Campo, Texas (the "MLK Properties"). The day he filed bankruptcy, the Debtor transferred the MLK Properties to an entity called Reb TX EC Ventures LLC ("Reb TX") by an Agreement for Deed in Lieu of Foreclosure. Reb TX's principal is Richard Borstmayer, Debtor's personal friend. The transfer documents indicate that the original amount of the loan was $625,000, but the Debtor testified in his 2004 examination that, by the time of the transfer, that debt had increased to "up there at 1, 1.2" million. According to the Wharton County Appraisal District, however, the MLK Properties were collectively valued at $4,012,634 for 2021. In fact, 10 months before he filed bankruptcy, the Debtor swore to the SBA that the MLK Properties had a value of $3.5 million. In other words, at least $3.5 million (probably more) went out and, at most, $1,250,000 of debt relief (probably less) came in. The Debtor has not taken any steps to pursue Reb TX for fraudulent or preferential transfer or otherwise attempt to claw back the MLK Properties for the benefit of the estate and the creditors. And, the Debtor testified that he has no intention to pursue any such action.

7.    Incredibly, the Debtor attempted to justify this fraudulent transfer by arguing that only the IRS has been harmed because it held a lien against the MLK Properties to secure its $3.8 million claim. But, this argument is misleading as the secured portion of the IRS' claim is only approximately $800,000. See Proof of Claim No. 37.

8.      After conveying the MLK Properties in exchange for a fraction of their value, the Debtor came into bankruptcy with two valuable pieces of land:

- the "Shop Property," located at 480 CR 335, El Campo, Texas 77437, with a scheduled value of $800,000[2] and subject to a scheduled secured claim of $560,000 (*see* Dkt. 120 at 1; Dkt. 21 at 4); and

- the "77 Acres," located at 3815 Montgomery Road, Richmond, Texas 77406, with a scheduled value of $2,800,000, and subject to a scheduled secured claim in favor of "First Financial Bk Min" of $2,177,660 (*see* Dkt. 120 at 2; Dkt. 21 at 2).

The Debtor has claimed the 77 Acres Tract as his homestead.  That exemption has been challenged (See Dkt. 111).

9.      However, the Debtor overstated the secured claim against the 77 Acres. He scheduled First Financial Bank's claim at $2,177,660, but First Financial Bank only provided $1,306,226.32 for the purchase of the 77 Acres. After the Debtor acquired the 77 Acres, First Financial Bank advanced another approximate $900,000 in loan advances that are not and cannot be secured by the 77 Acres if such property truly is the Debtor's homestead. By overstating First Financial Bank's secured claim and not contesting it, the Debtor is depriving the estate of at least $900,000 in value.  Moreover, the Debtor has provided no information to explain how the $900,000 in after-acquisition advances was used.  He has failed to provide any accounting at all.

---

[2] Wharton County assessed the Shop Property value at $1,837,485. Exhibit – Wharton CAD (Shop Property).

10.     Despite his own sworn affidavit to the contrary, the Debtor claims the 77 Acres is his homestead.  However, if that is so, then the secured claim of First Financial Bank is limited to the amount it advanced at the closing of the purchase of the 77 Acres on July 12, 2022. That amount is $1,306,226.32. However, the Debtor has incorrectly scheduled the amount of First Financial Bank's secured claim.  And, First Financial Bank has filed a Proof of Claim stating that its secured claim is $2.2 million.  The Debtor has not objected to the First Financial Bank Proof of Claim and has provided a clear intention not to do so.

11.     Whether the 77 Acres is the Debtor's homestead or not, is still a question to be answered by this Court.  But, what is not in question is whether it is his homestead or not, there is at least $900,000 of value available to creditors and the Debtor has taken and continues to take active steps to prevent his bankruptcy estate from realizing this substantial value.

12.     The Debtor has also failed to disclose large transfers of money inside one year of his bankruptcy filing.  Many of these transfers were made from his Bank of America bank account.  Despite being subject to a subpoena served on the Debtor in connection with his 2004 Examination, the Debtor did not produce any of his Bank of America bank records until after his 2004 Examination and then his production was heavily redacted.  Quality was forced to subpoena his bank records from Bank of America.  Quality also subpoenaed his wife's Bank of America bank statements.  Bank of America

recently produced the unredacted bank records and they reveal why the Debtor did not produce them timely and why his wife lodged an objection to the subpoena, albeit a late one.

13.    The Bank of America records reveal over $1 million of transfers made from the Debtor's bank account within one year of his bankruptcy filing, and none of these transfers are disclosed in his SoFA.  The Bank of America records also reveal large transfers of money between two years and one year of the Debtor's bankruptcy filing that were not disclosed in his SoFA.  The bank records also reveal that after his bankruptcy was filed, the Debtor's wife began "working" for Texas Mats and receiving more than $20,000 per month from Texas Mats.  This is cash flow that Texas Mats could have made available to the Debtor to help fund a plan of reorganization.  But, instead the Debtor and his wife have used the Debtor's only income producing asset as their own personal piggy bank during the pendency of this bankruptcy case.  To make matters worse, the Debtor lied about his wife's compensation in his 2004 Examination.  He testified she was receiving $4,000 per month as a sales person.  That is a far cry from what she actually has been receiving.  This squandering of Texas Mats' assets would have been detected much earlier if the Debtor had filed required reports.

14.    The Bank of America records also show that the Debtor transferred $55,000 to his wife 3 days <u>after</u> he filed his bankruptcy case.  They also show that the Debtor received $56,550.00 into his bank account three (3)

days <u>after</u> he filed bankruptcy and he has wholly failed to account for this money.

15.    The Bank of America records also show that on May 19, 2021 (eight months before his bankruptcy filing), the Debtor transferred $802,662.66 to his wife and less than two (2) months later she withdrew $591,161.11 from her Bank of America account in the form of Cashier's Checks.  This money has not been accounted for, nor has it been shown as an asset of this estate on Debtor's schedules despite the fact that community property is property of the estate. The Debtor has shown that he has no inclination to pursue claims against his wife to recover this money for the benefit of his bankruptcy estate.

16.    The Debtor has not been transparent with the Court and his creditors in these proceedings. The Debtor's schedules indicate that he owns a 99% interest in Texas Mats and a 50% interest in Mobley Investments. Dkt. 120 at 7. He should be filing periodic operating reports for those entities on a monthly basis, but he is not. In fact, he has filed no reports concerning these entities.   During the life of this case, the Debtor has filed seven monthly operating reports: Dkt. 35, 48, 85, 92, 107,121, and 129. Each of those reports, however, is limited to *his* operations; none of them describe the operations or activities of Texas Mats or Mobley Investments.

17.    But the Debtor has not only kept his own mouth shut; he has also tried to keep the mouths of others shut. For example, he caused his company (Texas Mats) to object to his 2004 examination, even though he, personally,

had agreed to it. *See* Dkt. 53. And he refused to cooperate in producing his wife (who is not a debtor) for a 2004 examination. And he allowed his company's lawyer to file an objection on behalf of his wife to a subpoena directed to Bank of America. *See* Dkt. 132.

18.   The Debtor owes his bankruptcy estate a fiduciary duty.  He has breached that duty from day one and continues to do so through the date of this Motion.  He has consistently mislead this Court and his creditors by providing false information in his schedules and SoFA and his 2004 Exam testimony.

## C.   The Debtor's Misconduct Justifies Conversion Under § 1112(b)(4)(F)

19.   The Bankruptcy Code, Bankruptcy Rules, and Local Rules all impose filing and reporting requirements on debtors. Section 1112(b)(4)(F) authorizes conversion, dismissal, or the appointment of a trustee or examiner based on the debtor's "unexcused failure to satisfy timely any filing or reporting requirement established by [the Bankruptcy Code] or by any rule applicable to a case under [chapter 11]." 11 U.S.C. § 1112(b)(4)(F).

20.   In this district, chapter 11 debtors are required to file monthly operating reports for both themselves and for any entity in which they hold a controlling or substantial interest. *See* 11 U.S.C. § 704(a)(8) (requiring periodic operating reports); Fed. R. Bankr. P. 2015(a)(3) (requiring debtors-in-possession to file those same reports); Fed. R. Bankr. P. 2015.3 (requiring the

11

reports for entities in which the debtor holds a controlling or substantial interest); LBR 2015-3 (requiring the reports to be filed monthly).

21.   The monthly operating reports are an integral and fundamental part of the bankruptcy process:

> Monthly reports and the financial disclosures contained within them are the life-blood of the Chapter 11 process and are more than 'mere busy work. Monthly operating reports provide necessary information to the Court, creditors, and other parties in interest about the progress and prospects of a debtor's reorganization efforts. Without these reports, the U.S. Trustee and creditors cannot determine when a debtor is incurring additional losses, is rendered administratively insolvent, or is transferring assets without authorization. The reporting requirements provide the primary means for monitoring the debtor's compliance with the Code's requirements and they serve as a litmus test for a debtor's ability to reorganize. Consequently, refusal or inability to provide financial disclosure sounds the death knell of a Chapter 11 case. The failure to file monthly operating statements . . . whether based on inability to do so or otherwise, undermines the Chapter 11 process and constitutes cause for dismissal or conversion of the Chapter 11 proceedings.

*In re Andover Covered Bridge LLC*, 553 B.R. 162, 173 (B.A.P. 1st Cir. 2016) (cleaned up; citing *In re Whetten*, 473 B.R. 380, 383 (Bankr. D. Colo. 2012); *In re Berryhill*, 127 B.R. 427, 433 (Bankr. N.D. Ind. 1991); *ABCD Holdings, LLC v. Hannon (In re Hannon)*, 512 B.R. 1, 19 (Bankr. D. Mass. 2014); *In re Costa Bonita Beach Resort, Inc.*, 513 B.R. 184, 199 (Bankr. D.P.R. 2014)).

22.    In the case at bar, the Debtor has failed to comply with his reporting requirements under Fed. R. Bankr. P.  2015.3. Debtor holds a 99% interest in Texas Mats and a 50% interest in Mobley Investments. Dkt. 120 at 7. Both of those interests qualify as a controlling or substantial interest under Fed. R. Bankr. P.  2015.3(c). Therefore, the Debtor is required by the Code, the Bankruptcy Rules, and the Local Rules to file monthly reports for each of them.

23.    During the life of this case, the Debtor has filed seven monthly operating reports: Dkt. 35, 48, 85, 92, 107,121, and 129. Each of those reports, however, is limited to *his* operations; none of them describe the operations or activities of either Texas Mats or Mobley Investments. By failing to file monthly reports for two entities in which he holds a controlling or substantial interest, the Debtor has failed without excuse to comply with his reporting requirements.  If the Debtor had filed the required reports concerning Texas Mats on a timely basis, his squandering of Texas Mats' assets would have been detected much earlier in the case.

24.    The Court therefore has cause to convert this case to a chapter 7 liquidation, dismiss the case, appoint a trustee, or appoint an examiner, whichever is in the best interest of the estate and the creditors.

## D.    Debtor's Failure to File Periodic Reports Justifies Conversion Under § 1112(b)(4)(E)

25.    Section 1112(b)(4)(E) authorizes conversion, dismissal, or the appointment of a trustee or examiner based on the debtor's "failure to comply

13

with an order of the court." 11 U.S.C. § 1112(b)(4)(E). The protection a debtor receives under the Bankruptcy Code comes with an obligation to strictly abide by the bankruptcy court's orders. *In re Ford Steel LLC*, 629 B.R. 871, 888 (Bankr. S.D. Tex. 2021).

26.     On June 1, 2022, the Court sustained the Trustee's and Quality's objections to the Debtor's Subchapter V designation for this case. Dkt. 104. In so doing, the Court "ORDERED that the Debtor's case shall proceed as a chapter 11 non-Subchapter V debtor-in-possession case." Dkt. 104. The Court therefore ordered the Debtor to comply with, among other things, the reporting requirements in Fed. R. Bankr. P.  2015 and 2015.3 and Local Rule 2015-3. As set forth above, the Debtor failed to comply with those reporting requirements. And, consequently, the Debtor failed to comply with an order of the Court.

27.     The Court therefore has cause to convert this case to a chapter 7 liquidation, dismiss the case, appoint a trustee, or appoint an examiner, whichever is in the best interest of the estate and the creditors.

## E.     There is Ample Cause to Justify Conversion Under § 1112(b)(4)(J)

28.     Section 1112(b)(4)(J) expressly provides that "cause" includes the "failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court." 11 U.S.C. § 1112(b)(4)(J).

29.     The case at bar is currently in its eighth month. It was initially filed in January 2022 as a Subchapter V small business case. Dkt. 1 (filed Jan.

21, 2022). On June 1, 2022, the Court ordered that the case proceed as a chapter 11 non-Subchapter V debtor-in-possession case.  It is now September 15, 2022, and there is no evidence that the Debtor has made any progress whatsoever toward developing a confirmable plan.  In fact, the Debtor has conceded he cannot confirm a plan and that he has no intention of submitting one.

30.    The Court therefore has cause to convert this case to a chapter 7 liquidation, dismiss the case, appoint a trustee, or appoint an examiner, whichever is in the best interest of the estate and the creditors.

## F.    The Debtor's Gross Mismanagement of the Estate Justifies Conversion Under § 1112(b)(4)(B)

31.    Section 1112(b)(4)(B) authorizes conversion for "gross mismanagement of the estate." 11 U.S.C. § 1112(b)(4)(B). Judge Rodriguez explained how the Court should analyze gross mismanagement:

> Analysis under § 1112(b)(4)(B) focuses solely on the management of the estate and does not include mismanagement of the pre-petition debtor. Therefore, the Court considers only the post-petition conduct of Debtor as debtor-in-possession.
>
> A debtor-in-possession is vested with significant power under the Bankruptcy Code and that power comes with certain responsibilities. A debtor-in-possession owes a fiduciary duty to its creditors. Gross mismanagement of the estate is a breach of that duty. And while "gross mismanagement" is not defined by the Bankruptcy Code, Black's Law Dictionary defines "gross" as "beyond all reasonable measure; flagrant."

15

> Given the plain language, a debtor's mismanagement
> must be beyond all reasonable measure.

Ozcelebi, 639 B.R. at 388.

32.    In the case at bar, the Debtor has grossly mismanaged the estate

by

- claiming exemptions to which he is not entitled,

- failing to contest or challenge overstated claims by certain creditors,

- obstructing the creditors' and the Court's access to information about the estate by failing to make monthly reports and by causing his company to lodge objections to his 2004 examination and by causing his company's lawyer to lodge objections to a subpoena to his bank,

- making large unreported post-petition transfers,

- failing to disclose in his schedules large pre-petition transfers and failing to schedule community property assets held by his non-debtor wife,

- misleading the Court and creditors as to the amount of the secured portion of the IRS' claim,

- failing to produce bank records in response to a Rule 2004 Subpoena,

- failing and refusing to produce bank account statements concerning Texas Mats, and

- failing to pursue clear cut fraudulent transfer claims against his friends (i.e., Reb TX) and wife.

all as set forth more fully above.

33.    This conduct is beyond all reasonable measure and flagrant breach

of duty. The Court therefore has cause to convert this case to a chapter 7

liquidation, dismiss the case, appoint a trustee, or appoint an examiner, whichever is in the best interest of the estate and the creditors.

## G.   The Continuing Loss or Diminution of the Estate and Absence of Likelihood to Rehabilitate Justifies Conversion Under § 1112(b)(4)(A)

34.    Section 1112(b)(4)(A) authorizes conversion for "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A). In *Ozcelebi*, Judge Rodriguez explained how a movant can show cause under § 1112(b)(4)(A):

> To demonstrate cause pursuant to § 1112(b)(4)(A), the moving party must show that there is both (1) a substantial or continuing loss to or diminution of the estate and (2) the absence of a reasonable likelihood of rehabilitation. The loss may be substantial or continuing; it need not be both. If the loss is sufficiently large given the financial circumstances of the debtor as to materially negatively impact the bankruptcy estate and interest of creditors, the loss is substantial.

*Ozcelebi*, 639 B.R. at 684 (citations omitted).

35.    The estate is suffering a substantial and continuing loss in at least multiple ways. First, the Debtor transferred out at least $3.5 million value in real property in exchange for paying off a debt of, at most, "1.2" million. *See infra*. That transfer caused the estate to lose at least $2.3 million of value[3], but

---

[3] The loss to the estate likely is much more depending on the true value of the property and whether Reb TX is determined to have acted in good faith.

the Debtor has made no effort to recover that value. Instead, the Debtor testified he had no intention of attempting to recover that value for the benefit of the estate. Second, he has wrongfully claimed a homestead exemption in such a way that he is attempting to deprive the estate of nearly $900,000 in value.

36.     These losses, together, exceed $3 million. He has scheduled only $3,779,470.71 in assets. Dkt. 120 at 21. Recovering these assets for the estate would nearly double the size of it. That is a substantial and continuing loss.

37.     Moreover, the Debtor has failed to account for approximately $900,000 in loan advances made to him just months before the bankruptcy filing, and he has failed to disclose large transfers of money to his wife and others that appear to be fraudulent transfers that could be recovered for the benefit of the estate.

38.     The estate's only means of revenue, Texas Mats, is paying the Debtor's wife more than $20,000 per month when she was not even an employee before the bankruptcy filing.  And, the Debtor lied about this in his 2004 Exam testimony.

39.     The Court therefore has cause to convert this case to a chapter 7 liquidation, dismiss the case, appoint a trustee, or appoint an examiner, whichever is in the best interest of the estate and the creditors.

## H.    The Debtor's Lack of Good Faith Justifies Conversion

40.    Bankruptcy courts have the inherent authority to convert cases for lack of good faith. While a Debtor's good or bad faith must be examined on a case-by-case basis under the totality of the circumstances of each case, the Fifth Circuit has explained what it generally looks like:

> Determining whether the debtor's filing for relief is in good faith depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities. Findings of lack of good faith in proceedings based on §§ 362(d) or 1112(b) have been predicated on certain recurring but non-exclusive patterns, and they are based on a conglomerate of factors rather than on any single datum. Several, but not all, of the following conditions usually exist. The debtor has one asset, such as a tract of undeveloped or developed real property. The secured creditors' liens encumber this tract. There are generally no employees except for the principals, little or no cash flow, and no available sources of income to sustain a plan of reorganization or to make adequate protection payments pursuant to 11 U.S.C. §§ 361, 362(d)(1), 363(e), or 364(d)(1). Typically, there are only a few, if any, unsecured creditors whose claims are relatively small. The property has usually been posted for foreclosure because of arrearages on the debt and the debtor has been unsuccessful in defending actions against the foreclosure in state court. Alternatively, the debtor and one creditor may have proceeded to a stand-still in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford. Bankruptcy offers the only possibility of forestalling loss of the property. There are sometimes allegations

> of wrongdoing by the debtor or its principals. The "new debtor syndrome," in which a one-asset entity has been created or revitalized on the eve of foreclosure to isolate the insolvent property and its creditors, exemplifies, although it does not uniquely categorize, bad faith cases.

*In re Little Creek Development Co.*, 779 F.2d 1068, 1072–73 (5th Cir. 1986).

41.     The facts set forth above—including but not limited to the Debtor's eve-of-bankruptcy removal of at least $2.3 million of value from the estate, the Debtor's attempt to hide from his creditors approximately $900,000 of value for the estate related to the 77 Acres he claims as his homestead, the Debtor's total failure to comply with the reporting requirements for two companies he owns, the Debtor's failure to disclose large transfers of money to his wife and others, and the Debtor's obstruction of attempts to learn the truth about his financial condition—show that the Debtor did not file in good faith and has not prosecuted this bankruptcy in good faith.

42.     The Court therefore has cause to convert this case to a chapter 7 liquidation, dismiss the case, appoint a trustee, or appoint an examiner, whichever is in the best interest of the estate and the creditors.

## I.     The Best Interest of the Estate and the Creditors

43.     Section 1112 allows the Court to do one of four things: convert the case to a chapter 7 liquidation, dismiss the case, appoint a trustee, or appoint an examiner. The Court's decision should be determined by the best interest of the estate and creditors.

44.     "There is no bright line test to determine whether conversion or dismissal is in the best interest of creditors and the estate. The decision is left to the Court's discretion." *Ozcelebi*, 639 B.R. at 425 (citing *In re Fleetstar LLC*, 614 B.R. 767, 781 (Bankr. E.D. La. 2020) (quoting *In re Babayoff*, 445 B.R. 64, 81 (Bankr. E.D.N.Y. 2011))).

45.     Conversion is in the best interest of the estate and the creditors. First, an orderly liquidation under chapter 7 would ensure that all the Debtor's creditors are treated fairly. Second, a chapter 7 trustee would have the authority to investigate and reach the Debtor's assets—including especially those that were fraudulently transferred prior to bankruptcy and those which are being held by third parties—for the benefit of all the creditors. Third, an orderly liquidation would promote judicial economy by allowing one court to analyze the Debtor's many and complicated financial dealings.

46.     If the Court is not inclined to convert this case to a liquidation under chapter 7, Quality respectfully submits that the next best option would be the appointment of a trustee to investigate all the Debtor's financial dealings as well as all his transfers and the claimed exemptions.

47.     Barring that, Quality respectfully requests the appointment of one or more examiners to investigate the Debtor's financial dealings, including the propriety of the eve-of-bankruptcy transfer of the MLK Properties; the propriety of claiming the homestead exemption for the 77 Acres as well as the value of First Financial Bank's lien; and the financial dealings between the

Debtor and his non-debtor wife and between the Debtor and his various companies.

## Conclusion

The Debtor engaged in conduct that justifies conversion under 11 U.S.C. § 1112, including

- failing to comply with his reporting requirements,

- failing to comply with court orders,

- failing to make any progress at all toward a feasible or confirmable plan,

- subjecting the estate to gross mismanagement by failing to challenge certain claims and obstructing investigation into his financial dealings,

- failing to pursue estate assts and claims for the benefit of the estate,

- failing to be truthful in his schedules, SoFA and 2004 Exam testimony,

- subjecting the estate to substantial and continuing losses, and

- failing to file or prosecute this bankruptcy in good faith.

Attached hereto is an Appendix that provides a brief summary of the reasons why this case should be converted to a chapter 7.

For the reasons provided, the Court should convert this case to chapter 7 and appoint a trustee in accordance with the provisions of 11 U.S.C. § 701 *et seq*. Quality asks for this and such other and further relief to which it may be entitled.

Respectfully submitted,

HAWASH CICACK & GASTON LLP

 /s/ Walter J. Cicack
Walter J. Cicack
Texas Bar No. 04250535
wcicack@hcgllp.com
Jeremy M. Masten
Texas Bar No. 24083454
masten@hcgllp.com
3401 Allen Parkway, Suite 200
Houston, Texas 77019
(713) 658-9015 – tel/fax

Counsel for Creditors and Parties in
Interest Quality Lease and Rental
Holdings LLC, Quality Lease rental
Service LLC, Quality Lease Service
LLC, and Rocaceia LLC

## Certificate of Service

I certify that a true and correct copy of the foregoing instrument was
served on all parties of interest on September 15, 2022.

 /s/ Walter J. Cicack
Walter J. Cicack

## **Appendix – Summary**

1.   Debtor has failed to pursue a fraudulent transfer claim against Reb Tex.
   - At least $2.3 million of value for the bankruptcy estate.

2.   Debtor has failed to pursue a fraudulent transfer claim against wife.
   - At least $802,602.66 in value for the bankruptcy estate.
   - Wife has withdrawn $591,161.11 and it is unaccounted for.
   - Failure to disclose in schedules or SoFA.

3.   Failure to account for or disclose approximately $900,000 advanced by First Financial Bank after the 77 Acres were acquired.
   - Approximately $900,000 in value for the bankruptcy estate.

4.   Undisclosed material unauthorized transfers and receipts of money post-petition.

5.   Failure to object to First Financial Bank's Proof of Claim for any secured amount in excess of $1,306,226.32.

6.   Texas Mats has been paying the Debtor's wife more than $20,000 a month since the Debtor's bankruptcy filing.
   - Debtor provided inaccurate information about this in his 2004 Exam.

7.   Debtor has failed to file any reports concerning Texas Mats in violation of federal and local bankruptcy rules.

8.   Debtor filed numerous amendments to schedules and SoFA in attempt to maintain Subchapter V status.

9.   Numerous inaccuracies and misleading statements and material omissions in the Debtor's schedules and SoFA, and he provided misleading testimony in his 2004 Exam.