

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| In re: | § § § | |
| DAVID MICHAEL MOBLEY, | § § | Case No. 22-60004 (CML) |
| Debtor. | § § § | Chapter 11 |

### EXAMINER'S REPORT OF DREW MCMANIGLE

Drew McManigle, court-appointed Examiner in the estate of David Michael Mobley ("Mobley" or "Debtor"), Debtor in the above entitled and captured case, investigated potential claims, causes of action and distributions that may be of benefit to the Debtor's estate.

### I.  Introduction

**A. Background**

1. On January 21, 2022, (the "**Petition Date**"), the Debtor filed a voluntary petition under Subchapter V Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Victoria Division (the "**Court**").

2. The Debtor continues to operate his businesses and manage his properties as debtor and debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3. On December 12, 2022, the Debtor filed his Motion to Compromise and Settle with Quality Lease and Rental Holdings, LLC, Quality Lease Rental Services, LLC, Quality Lease Service, LLC, and Rocaceia, LLC (the "Quality Companies") (the "Motion") [Docket No. 161]. On January 6, 2023, the Court entered the Order Granting Debtor's Motion to Compromise and

Settle with the Quality Companies [Docket No. 164]. Pursuant to the terms of the Mediated Term Sheet attached to the Motion:

- The Quality Companies are allowed a claim in the amount of $40 million.

- A non-dischargeable Agreed Judgment (the "Judgement") was entered in Adv. No. 22-6024, in the amount of $2,250,000. Any funds collected pursuant to the Plan will be credited against the Judgment, and the Quality Companies will forbear further collection against the Judgment for a period of six years after entry of the confirmation order.

- The Plan shall require the Debtor to make certain payments to various classes under the Plan as well as including payments to be made by the Debtor and the Debtor's solely owned company, Texas Quality Mats, LLC.

- The Debtor will grant a lien to a future litigation trustee (the "Litigation Trustee") on the Yard Property in the amount of $1,000,000 to secure the payment of $1,600,000 owed by Texas Quality Mats. The Yard Property is where the company operates. The litigation trustee will be entitled to investigate and prosecute any claims or causes of action, except for the settled claims with the Debtor, Debtor's wife, Lisa Mobley, and Texas Quality Mats, LLC.

4.     On December 13, 20222, Quality Lease Rental Service, LLC, Quality Lease Service, LLC, Quality Lease and Rental Holdings, LLC and Rocaceia, LLC (collectively "Quality Lender") filed a Motion to Appoint Examiner [Docket No. 162]. The Court entered an Order Approving the Appointment of Examiner [Docket No. 175] on January 27, 2023. On February 14, 2023, the U.S. Trustee filed a Motion for Approval of Drew McManigle as Examiner [Docket No. 182]. The Court entered an Order approving the appointment of Drew McManigle as Examiner on March 13, 2023 [Docket No. 186].

**B. <u>Scope of Engagement</u>**

5.     In connection with this Sub Chapter V Chapter 11 case, Mr. McManigle was appointed Examiner to investigate potential claims, causes of action, and/or fraudulent conveyances (the "Causes of Actions"). Thes efforts included review of court records, bank

2

statements, depositions, and other related documentation produced by the Debtor and parties related to the litigation with the Quality Companies. Mr. McManigle was to give his opinion on the viability of the Causes of Action and potential recovery therefrom. This review did not constitute a formal forensic analysis and was limited in scope that excludes the Debtor, David Michael Mobley, Debtor's wife, Lisa Mobley, and the Debtor's solely owned company, Texas Quality Mats, LLC.

C. **Expert Qualifications**

6.  I am the Founder and CEO of MACCO Restructuring Group, LLC ("MACCO"), an interim management and financial advisory firm with 17 professionals and locations across the country. Its website is www.macco.group. MACCO and its professionals regularly provide interim executive leadership, financial advisory and fiduciary services to businesses across a vast array of industries who find themselves in financial and operational distress. MACCO also serves as a financial or restructuring advisor to lenders, creditors, and creditor groups. I have personally led numerous companies through in and out-of-court restructurings. My experience extends across a variety of industries, including energy exploration, production and refining, healthcare, consumer products, defense, commercial construction, distribution, transportation, heavy equipment, and hospitality, among others. During my 27-plus year career working with clients across the country, I have held leadership and fiduciary roles with titles such as operating chapter 11 trustee, chapter 11 plan, litigation or liquidating trustee, interim chief executive officer, chief restructuring officer, receiver, and assignee. I have also served as an independent director to various international and domestic companies in chapter 11 proceedings. I have advised or led debtor or creditor constituencies in bankruptcy and state courts. I have participated in complex litigation and testified in Federal, Bankruptcy, State, and international courts.

7. In February 2020, I was selected by the Office of The U.S. Trustee, Southern District of Texas, as a chapter 11 trustee under 11 U.S.C. Subchapter V. I have served on the Houston Board of Directors of the Turnaround Management Association, and I am a member of the American Bankruptcy Institute.

8. I attended Texas Tech University and received my bachelor's degree from the University of Houston – Downtown. Attached as Appendix A is my Curriculum Vitae.

9. Based on my above experience, along with my knowledge and experience in family-owned businesses, my education, training, and bankruptcy experience, I am qualified to offer the opinions contained herein.

   D. **Statement of Compensation**

10. MACCO is being compensated for my work on this matter at my customary rate of $650 per hour. Professionals of MACCO rendering assistance are, likewise, being compensated at their normal hourly rates ranging from $100 to $575 per hour. All services and activities performed in connection with this engagement were either performed by me or under my supervision by professionals of MACCO.

11. My compensation and that of MACCO professionals is in no way dependent on the contents of this report, the substance of any further opinions or any testimony that I may provide related to this case.

II. **Executive Summary**

12. After review of the court pleadings, deposition transcripts, documents produced in response to the Quality Companies' subpoenas, bank records and other relevant documents, and discussions with counsel and the Subchapter V Trustee, I have determined that two significant probable causes of action exist. The first is related to numerous highly questionable cash bank

transfers. The second is the transfer of real property from the Debtor immediately prior to the filing of the Sub Chapter V case. Several other potential causes of action exist related to unpaid rents; however, I have determined they have questionable value, or the return would not exceed the likely litigation costs. In my opinion, the Liquidation Trustee may pursue on behalf of the Debtor's bankruptcy estate the above with my conclusions more particularly described below, including the investigation and evidence presented to support my opinion. However, as stated previously, my review of the Causes of Action may require a more detailed investigation by Litigation Trustee and his counsel additional inasmuch as my examination was limited to produced documents, and information.

### III. Investigation

13.    As Examiner, I engaged both Ms. Kathy Mayle and Mr. Micah Miller, Senior Directors of MACCO Restructuring Group, LLC to assist me (collectively, the "MACCO Professionals"). Ms. Mayle has over 20 years of experience in bankruptcy and bankruptcy related financial analysis, para-professional legal experience, and similar bankruptcy litigation matters. Mr. Miller is an accomplished financial professional with both bankruptcy and non-bankruptcy accounting, financial analysis, and financial tracing expertise. During the course of my review, I or the MACCO Professionals spoke or met personally with the Debtor's counsel, the Subchapter V Trustee appointed to the case and counsel for the Quality Lender. Under my direction and supervision to determine if any fraudulent conveyance or distributions were made prior to the original petition date. MACCO professionals reviewed and analyzed the schedules and statement of financial affairs and their amendments, the Debtor's tax returns. Deposition and Rule 2004 testimony, including their exhibits were reviewed and assessed. Both Secretary of State records, real property and real property tax records related to both corporate entity and real property

ownership or transfers were obtained and reviewed. My findings detail this review that support my investigation into potential claims, causes of actions, and distributions to insiders that could benefit the creditors of the estate.

### IV.     Potential Fraudulent Transfers

14.     I have identified the following as potential fraudulent conveyances:

- REB TX EC VENTURES, LLC's, a company owned by Richard Borstmayer ("Borstmayer") Fraudulent Conveyance;
- Questionable transfers and withdrawals from Bank of America accounts;
- First Financial Bank Payments related to the Construction Loan; and
- Loss of rents for real property of the estate utilized by family members, and potential cash transactions to family members directly or indirectly to family members.

**Borstmayer Insider Fraudulent Conveyance**

15.     Michael Mobley stated that he and Richard Borstmayer ("Borstmayer") have been friends for twenty years.[1].

Mobley 2004 Exam Page 25:

```
15        Q.   Okay.  Let's look at page 27 of 30.
16             Who is Richard Borstmayer?
17        A.   A friend of mine.
18        Q.   Why is he listed here in your schedules?
19        A.   On what?
20        Q.   He's listed right here and I'm asking you, why
21   is he listed here?  Do you owe him money?
22        A.   No.  He's a codebtor on my property, on that
23   3815 Montgomery Road.
```

---

[1] See 2004 Examination of David Michael Mobley dated April 5, 2022 (the "Mobley 2004 Exam"), Page 25, Lines 15-23. A condensed version of the 2004 Examination is attached hereto as Exhibit "A". Also see the Deposition of David Michael Mobley dated October 13, 2022, Page 46, Lines 2-10, and Page 118 Lines 7-8. A condensed version of the Deposition is attached as Exhibit "B."

Mobley Deposition Page 46:

```
 2    Q.   Okay.  And so Mr. Borstmayer, he's the owner of
 3   Reb Texas?
 4    A.   Yeah, I guess, yes, sir.
 5    Q.   That's your understanding?
 6    A.   Yes, sir.
 7    Q.   Okay.  And he's a personal friend of yours?
 8    A.   Yes, sir.
 9    Q.   And how long has he been a friend?
10    A.   I don't know.  Probably 20 years.
```

October 13, 2022 Deposition Page 118:

```
 7   Geosouthern again either.  Richard Borstmayer is my best
 8   friend.  Because his boss won't let me --
```

16.     Borstmayer signed a Real Estate Note, Deed of Trust, Assignment of Rents, and Non homestead Affidavit as co-borrower with the Debtor and Debtor's wife for the July 6, 2021, purchase of the property located at 3815 Montgomery Road, Richmond, Texas (the "Fulshear Property").  As shown in the above excerpt from the 2004 Examination, Mobley confirms that Borstmayer is a co-debtor on the Fulshear Property with such property included on the Debtor's Fifth Amended Schedule of Assets dated July 22, 2022 [Docket No. 120]. As such, Borstmayer is co-debtor of the Fulshear Property is evidenced by the attached Deed of Trust recorded on July 6, 2021 in the Real Property Records of Wharton County, under File Number 2021113960 attached hereto as Exhibit "C."  Further evidence of potential insider dealing is the Loan Memo produced by First Financial Bank in its response to Quality Companies subpoena and the purchase of the

7

Fulshear Property attached hereto as Exhibit "D." Simply, *Borstmayer does not meet the non-affiliated, third-party standard and is considered for the purposes of this report an "insider"*.

17. On or about November 9, 2012, David Michael Mobley ("Mobley" or "Debtor"), denoted as "Mike" Mobley, an individual, purchased 19.457 acres and commercial buildings, from the Board of Trustees of the El Campo Independent School District, located at 1401 MLK Blvd, El Campo, Texas (the "1401 MLK").

18. On April 17, 2019, he entered into a loan agreement with ILS Lending LLC ("ILS") in the original principal amount of $625,000, 1401 MLK collateralized the loan (the "Note"). On October 25, 2019, Mobley re-platted 1401 MLK as 16 individual lots.

19. On or about November 1, 2019, under the Modification and Extension Agreement, Silver Lending LLC ("Silver") became the holder of the unpaid Note with Loan Source LLC ("Loan Source") as the Note servicer. Pursuant to the Transfer and Assignment of Lien filed of record on September 14, 2020, the holder of note and lien was signed by ILS Lending LLC, transferring the $625,000 note to REB TX EC Ventures, LLC. Borstmayer and his wife, Jennifer Borstmayer, own the membership interest in REB TX EC VENTURES, LLC ("REB TX"). Borstmayer is REB TX and REB TX is, inter alia, Borstmayer. Attached as Exhibit "E" is the Transfer and Assignment of Lien from ILS to REB TX.

20. Mobley was not making payment and Loan Source was intent on foreclosing on 1401 MLK. In Mobley's October 13, 2022, deposition, he stated he called a few friends to see if they would purchase the note from the servicer Loan Source LLC to stop the foreclosure. This included Borstmayer. On Page 33, Lines 5-19 of Mobley's deposition he states:

```
 5      Q.   So he -- he bought the note and the liens from
 6   the prior lienholder?
 7      A.   They were going to the bank -- the prior
 8   lienholder was going to the courthouse to sell it on the
 9   courthouse square.
10      Q.   Right.
11      A.   And I called Richard and I said, "Hey, if I'm
12   going to have to give some stuff away, I'd rather give
13   it to somebody I know."
14           So I called him and a couple other friends
15   of mine and they all said, "Well, I don't want to fool
16   with it."
17           This is -- you know, it's right there in
18   El Campo.  Richard said "Okay.  I'll -- I'll -- I'll
19   take it."
```

21. On January 21, 2022 (the "Bankruptcy Petition Date"), Mobley conveyed 1401 MLK to Borstmayer/Reb TX through a Warranty Deed in Lieu of Foreclosure. The date of the filing a copy of the Deed is attached hereto as Exhibit "F". On the date of the bankruptcy filing, Mobley signed the Deed, had his secretary file the Deed in the real property records of Wharton County, and hand delivered the Deed to Borstmayer's/Reb TX counsel by noon prior to the afternoon Chapter 11 filing (*See* Mobley Deposition, Page 87, Line 4 to Page 89, Line 16.)

22. During Mobley's Deposition, his statements were vague and ambiguous as to dates or even confirmation of the actual amount owed to Borstmayer/Reb TX as the note holder. He claimed that Borstmayer/REB TX had noted a default of the note but did not act as it was agreed that no foreclosure was to occur that could ruin Mobley's credit (*See* Mobley Deposition, Page 32, Lines 1-25). Mobley further stated during his deposition that after Borstmayer/Reb TX bought the

property that no further action was taken on his part since Borstmayer/Reb TX now owned the property (*See* Mobley Deposition, Page 37, Line 4 through Page 38, Line 24).

23. Apparently, Mobley's daughter allegedly continued to collect rents from tenants of 1401 MLK after Borstmayer/REB TX bought the note. However, Mobley continued to collect rent from the MLK 1401 tenant, Zexas Holdings LLC d/b/a First Class Children's Center ("Zexas") (*See* Mobley Deposition, Page 74, Line 7 through Page 75, Line 19) and (Mobley Deposition, Page 41, Line 18-24). Copies of the Zexas Holdings checks are attached hereto as Exhibit "G".

24. Borstmayer/REB TX owned the note on MLK 1401 and paid the outstanding property taxes. According to Mobley, approximately $800,000 was owed on the note and another $200,000 in taxes (*See* Mobley 2004 Exam, Page 29 Line 11 through Page 33, Line 18). He also stated that the total amount of the debt forgiveness related to the deed in lieu of foreclosure totaled $1.25 million that is reflected on the Debtor's Fifth Amended Schedule of Assets [Docket No. 120].

25. When questioned as to the value of the property, Mobley stated that the value of the property was between $1 million to $2 million (*See* Mobley Deposition, Page 43, Lines 8-11). However, the assessed value from the Wharton County Appraisal District values 1401 MLK in the aggregate amount of $4,084,374. Attached hereto as Exhibit "H" are copies of the assessed values pursuant to the replatted lots from the original 2 tracts known as 1401 MLK. These records were downloaded from the public records of Wharton County Appraisal Deed and reflect the date the liens were purchased by Borstmayer/REB TX 's and the recording of the Warranty Deed in Lieu of Foreclosure on the bankruptcy Petition Date.

26. In September 2022, Appraisals of 1401 MLK were performed by M. L. Jones with an effective date of January 21, 2022. Although the land had been re-platted by Mobley, the

appraisals were based on the original plats and have an "As Is" value of $2,876,000. Attached hereto as Exhibit "I" are the appraisals of the two original tracts owned by Mobley.

  27. Further, it is believed that some of the tenants had expressed a desire to purchase their rented buildings but apparently backed out of it. (*See* Mobley 2004 Examination, Page 93, Line 1 through Page 94, Line 5].

```
19      A.   Yes, sir.  We tried to -- we had some people
20   that owned the buildings wanted to buy their own
21   small building.  That's the reason there are so many
22   building addresses now, because I had Mr. Gibson in
23   Houston break it all up because everybody wanted their
24   own buildings and they had money to buy them because
25   they was 4- and $500,000 per building that everybody had
```

```
 1   businesses in.  And that's the reason the loan was
 2   obtained from ILS, so we can fix the roof, the air
 3   conditioners, replace everything on these buildings and
 4   get it up to snuff, and then at the end everybody backed
 5   out of it.
```

```
 6        Q.  Okay.  But did you do -- did you put the
 7   property on the market?  Did you hire a real estate
 8   agent or anything like that?
 9        A.  No, sir.
10        Q.  Did you ever obtain a broker's opinion or
11   something equivalent regarding what the value of the
12   property is, was?
13        A.  No, sir.
14        Q.  Okay.  So would it be fair to say you really
15   don't have any idea what the property is worth?
16        A.  No, sir.
```

28.     While convoluted, it is inescapable to conclude, that, using Mobley's own words, "Hey, if I'm going to have to give some stuff away, I'd rather give it to somebody I know." He did exactly that and on the very same day he filed chapter 11. Mr. Mobley conveyed real property with an estimated value ranging between $2.8 to $4 million to his 20-year friend and co-debtor on the Fulshear property thereby showing a pattern of potentially voidable, fraudulent insider transactions. The Warranty Deed in Lieu of Foreclosure itself is a fraudulent conveyance under 11 U.S.C. § 548 inasmuch as (i) the estate received less than a reasonably equivalent value in exchange for such transfer or obligation; (ii) the transfer made was for the benefit of an insider who cannot claim being an unknown third party held at arms-length in the transfer of such property; and (iii) the conveyance was made on the date of the filing to defraud the estate of value for the benefit of its creditors.

**Cobalt 302 Boat and 2008 McClain Trailer**

29.     Greta Yvette Mobley, Michael Mobley's ex-wife, filed a chapter 7 bankruptcy under Case No. 22-30239, in the United States Bankruptcy Court for the Southern District of

Texas, Houston Division (the "Greta Bankruptcy"). Janet Northrup was appointed her Chapter 7 Trustee.

30. This insider pattern of behavior continued through Greta's chapter 7 wherein Borstmayer asserted he bought a 50% interest for $25,000, or held a lien on, Greta's half of a 2008 Cobalt 302 boat (the "Boat") and a 2008 McClain trailer ("the Trailer") previously owned by Michael Mobley. However, the Chapter 7 Trustee did not uncover or obtain any information supporting this assertion. See Mobley Deposition, Page 76, line 8 through Page 78, Line 8. Pursuant to the Chapter 7 Trustee's Motion for Authority to Sell Motorhome, Boat, and Trailer Free and Clear of Liens, Claims, Interests and Encumbrances [Docket No. 46] and Order approving same [Docket No. 47], Mobley had no further interest in the boat as it was sold at the time Borstmayer bought the Boat and Trailer.

**Questionable Transfers and Withdrawals from Bank of America Accounts**

31. An examination of transfers and withdrawals from two separate Bank of America accounts ("BOA Accounts") was conducted. They were:

> Account Holder: David Mobley
> Account Number Ending: 5387
>
> Account Holder: Lisa Mobley
> Account Number Ending: 8772

32. After examination, it appears as if both the BOA Accounts experienced a number of questionable transfers both in timing and amounts. These transfers were of significant dollar amounts and were made to various unaffiliated/unfamiliar accounts held outside Bank of America. These each appear to be highly suspect in nature. Withdrawals were marked by what are considered irregular patterns, such as multiple withdrawals in small dollar amounts over a short period of

13

time, inconsistent and or unusual locations of withdrawal, and larger cash withdrawals without apparent justification.

33. Attached hereto as Exhibit "J" is a detailed listing of questionable transfers and withdrawals totaling $922,006.18, either directly by Mobley or indirectly from Mobley through pre-petition transfers through his (new) wife Lisa Mobley's account to insiders, family members or their affiliates. It is believed prior to Mobley's chapter 11; Lisa Mobley's accounts were an extension of her husband's accounts. In her deposition, Lisa Mobley stated that her husband had directed her as to how the money was spent[2]. (*See* Page 28, Lines 7-11; Page 29, Lines 19-23, Page 83, Lines 7-14). Based upon my review, my opinion is that each of these transfers could, upon further investigation, constitute fraudulent transfers that could be recovered on behalf of the estate.

**First Financial Bank, N.A.- Construction Loan**

34. As noted above, on or about July 6, 2021, Mobley, Lisa Mobley, and Borstmayer signed a Real Estate Lien Note with First Financial Bank, N.A. (the "First Financial") in the amount of $2,197,400.00 to purchase 77.557 acres (the "Fulshear property").

35. Several issues have been identified. First, Mobley claims the Fulshear property is exempt as his homestead. However, Mobley, his wife Lisa and Borstmayer (collectively the "Fulshear Borrowers") each signed an Affidavit of Non-Homestead Exemption attached hereto as Exhibit "L". Additionally, the Fulshear Borrowers signed an Assignment of Rents. If the Bank prepared loan documents on a residential property to be utilized as the Debtor's homestead and not for commercial purposes, why would the Bank include the Assignment of Rent and Affidavits of Non-Homestead Exemption? Further, on page 476 of the loan documents produced by the Bank, the Commercial Loan Memo/Consumer Real Estate Loan Memo reflect that the purpose of the

---

[2] See Deposition of Lisa Mobley dated October 14, 2022, attached hereto as Exhibit "K".

14

loan was for the purchase of agricultural land and construction of new barn and associated dirt work/etc. Both the Debtor and his wife acknowledged in their depositions that the Non-Affidavit Homestead Exemptions were signed in error. However, questions remain.

36. Secondly, the construction loan balances appear questionable. A bid from HBI for significant improvements at the Fulshear property totaling $876,750.00, a copy of which is attached hereto as Exhibit "M."

37. Pursuant to the Bank's Receipts and Disbursements Ledger, the original amount funded totaled $1,306,226.32 of the total $2,197,400.00 loan amount. Pursuant to the Settlement Statement, $701,400 included funds to be held for future construction draws and Mobley was entitled to draw $175,350 as borrower equity. Mobley and his wife drew down the $175,350.00 as borrower's equity on July 15, 2021. Pursuant to the bank's production of the loan history for the period of July 6, 2021, through July 20, 2022, the total amount of loan advances for the construction loan total $433,133.68, which excludes the payoff of $1,306,226.32 to the buyer at the time of closing, which should show a balance of $268,266 based upon the Loan History attached hereto as Exhibit "N". The construction stopped in March 2022 after the bankruptcy filing. (*See* Mobley Deposition, Page 57, Line 1 through Page 59, Line 4; *See* Lisa Mobley Deposition, Page 22 Line 15 – Page 24, Line 19.)

38. Questions have arisen whether these funds were actual construction loans, equity infusions or used for some other purposes that are not reflected on the loan's settlement agreement marked as Exhibit "O."

**Fraudulent Conveyance to Insiders from Loss of Rents**

The debtor owned and then transferred 1401 MLK to Borstmayer/ REB TX. On this property, his children, Courtney Mobley, Mikayla Mobley, Cody Mobley, and David R. Mobley

(also known as "Mikey" Mobley) owned businesses or enterprise that operated from there. Cody Mobley and David R. Mobley own Solid Liberty Resources, LLC, Solid Liberty Rental Services, LLC and Solid Liberty Safety Services, LLC (collectively Solid Liberty). There does not appear to be a valid lease agreement. It is the Examiner's understanding that Solid Liberty has operated its businesses for more than four years. See Mobley Deposition (Page 14, Lines 16, Line 4; Page 29, Lines 1-9; Page 54, Lines 16-24). Upon information and belief, with the exception of payment of half of the annual property taxes, ostensibly in lieu of rents, it is indeterminable whether the pro rata annual property taxes were paid by Solid Liberty and/or Texas Quality Mats. Nonpayment of rent for the use of the property for business purposes by an insider of the Debtor could be a fraudulent conveyance under 11 U.S.C. §548.

Similarly, the Examiner believes that Palms Tan & Tone LLC ("Palms") owned by Courtney Mobley, also an insider of the debtor, has not paid rents for the benefit of use of the property. Palm was formed October 17, 2013 (*See* Mobley Deposition, Page 41, Lines 18-24). There does not appear to be a valid lease agreement. Nonpayment of rent for the use of the property for business purposes by an insider of the Debtor could be a fraudulent conveyance under 11 U.S.C. §548.

39. Pursuant to Mobley's statements under oath, rentals were collected from other tenants at 1401 MLK ranging from $3,000 to $7,150 per month. The Examiner has not been able to determine why Mobley's children would be exempt from paying rent.

40. Pursuant to the Amended Schedule A/B [Docket No. 120, Schedule 4.1], Mobley's daughter, Cheryl Mobley has lived in the Solitaire mobile home that he purchased individually in or about 2018. The Solitaire mobile home is scheduled at $15,000, but the assessed value by Wharton County Appraisal District shows the value at $53,846. To the best of the Examiner's

knowledge, no rent has been paid by Cheryl Mobley to Mobley as rent for property of the estate. Similarly, pursuant to the above referenced schedule, Mobley's daughter Victoria Mobley, has lived in the Clayton mobile home that he purchased for over 4 years. To the best of the Examiner's knowledge, no rent has been paid by Victoria Mobley as rent for property of the estate.

## V.     Summary of Findings

41.     It is obvious that this Small Business, Sub Chapter V, Chapter 11 case has been "*a long and winding road…*";however, one where there has been a consistent, clear, and convincing pattern of insider behavior that has existed between the Debtor and third parties with a blind eye turned towards the Debtor's family members. Outside a bankruptcy, this behavior is not altogether uncommon; however, we are not outside of bankruptcy whose obligations, rules and the conduct of debtors are well structured. The most obvious potential infractions are the transfer of 1401 MLK and the BOA cash transfers. These must be more thoroughly reviewed and litigated, as required, to bring financial clarity, transparency and, if successful, recoveries to creditors, anticipated under the Bankruptcy Code. Similarly, although I have identified certain potential claims against family members and their businesses, the litigation may be more costly than the resulting recoveries and thus have less weight. My review and those by MACCO professionals have been presented in tandem with both the Order appointing me and based upon available information.

DATED: May 30, 2023

Respectfully Submitted,

*/s/ Drew McManigle*
Drew McManigle
Founder and Chief Executive Officer
MACCO Restructuring Group LLC
The Pennzoil Building
700 Milam Street, Suite 1300
Houston, Texas 77002
Telephone: (410) 350-1839
Email: drew@macco.group

*Examiner*

## CERTIFICATE OF SERVICE

I hereby certify that on May 30, 2023, a copy of the foregoing *Examiner's Report* has been served via the ECF system to the parties receiving ECF notice.

*/s/ Drew McManigle*
DREW MCMANIGLE