# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

In re:

**DAVID MICHAEL MOBLEY**

                    **Debtor.**

)
)
)
)
)
)
)

Case No. 22-60004

Chapter 11

## <u>DEBTOR'S DISCLOSURE STATEMENT FOR PLAN OF REORGANIZATION DATED JULY 31, 2023</u>

Stephen W. Sather
**BARRON & NEWBURGER, P.C.**
7320 N. MoPac Expwy., Suite 400
Austin, Texas 78731
(512) 476-9103
(512) 476-9253 (Facsimile)

ATTORNEYS FOR DEBTOR-IN-POSSESSION

# TABLE OF CONTENTS

**ARTICLE I - SUPPORTING DISCLOSURE - GENERAL** ...................................... 1

**ARTICLE II - REPRESENTATIONS** ............................................................................. 7

**ARTICLE III – OVERVIEW OF THE DEBTOR** ...................................................... 8
   3.01   **Overview of the Debtor** ...................................................................................8
   3.02   **Management of the Debtor** ..............................................................................8
   3.03   **Proposed Operations After Bankruptcy** ........................................................8

**ARTICLE IV – HISTORICAL INFORMATION CONCERNING THE DEBTOR** ............ 8
   4.01   **Significant Transactions Prior to Bankruptcy** ..............................................8
   4.02   **Bankruptcy.** .....................................................................................................9

**ARTICLE V – FINANCIAL RESULTS** ....................................................................... 9
   5.01   **Financial Results Prior to Bankruptcy** ..........................................................9
   5.02   **Financial Results During Bankruptcy** ..........................................................10
   5.03   **Projected Financials After Bankruptcy** .......................................................10

**ARTICLE VI - ANALYSIS AND VALUATION OF PROPERTY** ........................... 10
   6.01   **Real Property.** ................................................................................................10
   6.02   **Personal Property** .........................................................................................10
   6.03   **Liquidation Value of Assets** ........................................................................11

**ARTICLE VII - SUMMARY OF PLAN** ..................................................................... 12
   7.01   **Classification and Treatment of Classes Under the Plan** ............................12
   7.02   **Means for Implementation of Plan**................................................................**14**
   7.03   **Treatment of Executory Contracts and Unexpired Leases** ................. **Error! Bookmark not defined.**
   7.04   **Provisions for the Retention, Enforcement, Settlement, or Adjustment of Claims Belonging to the Debtor and the Estate Including Preferences and Conveyances** ......... **Error! Bookmark not defined.**
   7.05   **Effect of Confirmation** .................................................................................18
   7.06   **Modification of Plan** .....................................................................................18
   7.07   **Post-Confirmation Procedure** ......................................................................18
   7.08   **Default and Other Related Provisions** ..........................................................19

**ARTICLE VIII - FEASIBILITY OF THE PLAN AND RISK TO CREDITORS** .............. 19

**ARTICLE IX - ALTERNATIVES TO DEBTOR' PLAN** ......................................... 19
   9.01   **Conversion** ....................................................................................................19
   9.02   **Dismissal** ......................................................................................................20

**ARTICLE X - RELATIONSHIP OF DEBTOR WITH AFFILIATES** ...................... 20
   10.01   **In General** .....................................................................................................20
   10.02   **Corporate Structure** ............................................................... **Error! Bookmark not defined.**

**ARTICLE XI - TAX CONSEQUENCES** .................................................................... 20

**ARTICLE XII- PENDING AND POTENTIAL LITIGATION** ................................... 20
   12.01   **Pending Litigation** ........................................................................................20
   12.02   **Anticipated Litigation** .................................................................................20

**ARTICLE XIII - SOLICITATION OF VOTES** ......................................................... 21

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | |
|---|---|
| **In re:** | ) |
| | ) |
| | ) **Case No. 22-60004** |
| **DAVID MICHAEL MOBLEY** | ) |
| | ) |
| | ) **Chapter 11** |
| **Debtor.** | ) |
| | ) |

## DEBTOR'S DISCLOSURE STATEMENT FOR PLAN OF REORGANIZATION DATED JULY 31, 2023

    **David Michael Mobley** ("Debtor") propose the following Disclosure Statement for Plan Dated July  2023, pursuant to chapter 11 of title 11, United States Code ("Bankruptcy Code" or "Code").

## ARTICLE I
### GENERAL

*Identity of the Debtor*

    1.01    David Michael Mobley is the Debtor.  He is an individual who resides in Wharton County, Texas and provides support to oil and gas companies by buying and selling equipment and through his company Texas Quality Mats, LLC.

*Purpose of This Disclosure; Source of Information*

    1.02    Debtor submits this disclosure pursuant to 11 U.S.C. § 1125 to all known claimants of Debtor for the purpose of disclosing that information which the Court has determined is material, important, and necessary for Debtor's creditors in order to arrive at an intelligent, reasonably informed decision in exercising the right to vote for acceptance or rejection of the Debtor's Plan.  This Disclosure Statement describes the operations of the Debtor prior to Confirmation.  Any accounting information contained herein has been provided by the Debtor and has been prepared using the cash method of accounting.

*Explanation of chapter 11*

    1.03    Chapter 11 is the principal reorganization chapter of the Code.  Pursuant to chapter 11, a debtor is authorized to reorganize its business for its own benefit and that of its creditor and equity interest holders.  ("Reorganization of its business", as in this Case, may include the cessation of business activities and liquidation of assets to be used to repay creditors.)  Formation of a plan of reorganization is the principal purpose of a chapter 11 reorganization case.  A plan of reorganization sets forth the means for satisfying claims against and interests in the debtor.  After a plan of reorganization has been filed, it must be accepted by holder of claims against, or interests

in, the debtor.  Section 1125 of the Bankruptcy Code requires full disclosure before solicitation of acceptances of a plan of reorganization.  This disclosure is presented to Claimants to satisfy the requirements of 11 U.S.C. § 1125.

### *Explanation of the Process of Confirmation*

1.04    Even if all classes of claims accept the Plan, its confirmation may be refused by the Court.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and, among other things, requires that a plan of reorganization be in the best interests of claimants.  It generally requires that the value to be distributed to Claimants and Equity Interest Holders may not be less than such parties would receive if the debtor were liquidated under chapter 7 of the Code.

1.05    Acceptance of the Plan by Claimants and Equity Interest Holders is important.  In order for the Plan to be accepted by each class of claims, the creditors that hold at least two thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims actually voting on the plan in such class must vote for the plan and the Equity Interest Holders that hold at least two-thirds (2/3) in amount of the allowed interests actually voting on the plan in such class must vote for the plan.  Chapter 11 of the Bankruptcy Code does not require that each holder of a claim against, or interest in, the debtor vote in favor of the plan in order for it to be confirmed by the Court.  The Plan, however, must be accepted by: (i) at least the holder of one (1) class of claims by a majority in number and two-thirds (2/3) in amount of those claims of such class actually voting; or (ii) at least the holders of one (1) class of allowed interests by two-thirds (2/3) in amount of the allowed interests of such class actually voting.

1.06    The Court may confirm the Plan even though less than all of the classes of claims and interests accept it.  The requirements for confirmation of a plan over the objection of one or more classes of claims or interests are set forth in 11 U.S.C. § 1129(b).

1.07    Confirmation of the Plan discharges a debtor from all of its pre-confirmation Debtor and liabilities except as expressly provided for in the plan and 11 U.S.C. § 1141(d).  Confirmation makes the plan binding upon the debtor and all claimants, equity interest holders and other parties-in-interest, regardless of whether or not they have accepted the plan.

### *Voting Procedures*

1.08    **Unimpaired Classes**.  Claimants in Classes 1, 2, 10 and 12 are not impaired under the plan.  Such Classes are not required to vote upon the Plan if they agree that they are not impaired.   However, they may vote upon the Plan if they want to.

1.09    **Impaired Classes**.  Classes 3-9 and 11 are impaired as defined by 11 U.S.C. § 1124 and Debtor is seeking acceptance of the Plan by these classes.  Each holder of an Allowed Claim in Classes 3-9 and 11 may vote on the Plan by completing, dating and signing the ballot sent to each holder and filing the ballot as set forth below.  One ballot will be sent to each Claimant eligible to vote on the plan.  For all classes, the ballot must be returned to Debtor's attorneys as follows:

Barron & Newburger, P.C
Attention:      Mobley Ballots
7320 N. MoPac Expwy., Suite 400
Austin, Texas 78731

In order to be counted, ballots must be RECEIVED no later than at the time and on the date stated on the ballot.  Ballots may be submitted by telecopier to (512) 476-9253 or by email to ssather@bn-lawyers.com.  The Debtor may elect to waive any defect of form with regard to any ballot and may accept a ballot which is not made in the proper form.

     1.10     **Acceptance**.  Ballots that are signed and returned but fail to indicate either an acceptance or rejection will not be counted.

### *Best Interests of Creditors Test*

     1.11     Section 1129(a)(7) of the Bankruptcy Code requires that each impaired class of claims or interests accept the Plan or receive or retain under the Plan on account of such claim or interest, property of a value as of the Effective Date of the Plan that is not less than the amount that such holder would so receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.  If 11 U.S.C. § 1111(b)(2) applies to the claims of such class, each holder of a claim of such class will receive or retain under the Plan on account of such claim property of a value, as of the Effective Date of the Plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.  In order for the Plan to be confirmed, the Court must determine that the Plan is in the best interests of the Debtor's creditors.  Accordingly, the proposed plan must provide the Debtor' creditors with more than they would receive in a chapter 7 liquidation.  Accordingly, since the Plan proposes to pay all Secured Creditors in full and the General Unsecured creditors with more than they would receive in a chapter 7 liquidation for the reasons discussed below, Debtor believe that the Plan satisfies the requirements of 11 U.S.C. § 1129(a)(7).

### *Cramdown*

     1.12     The Court may confirm the Plan even though less than all of the classes of claims and interests accept it.  The requirements for confirmation of a plan over the objection of one or more classes of claims or interests, or "cramdown", are set forth in 11 U.S.C. § 1129(b).  Should cramdown become an issue at confirmation in this Case, Debtor request that the Court determine and enter findings necessary for same—*to wit,* that the Plan does not "discriminate unfairly" and is fair and equitable with respect to any objecting creditor.

     1.13     "Fair and equitable" has different meanings with respect to the treatment of secured and unsecured claims.  As set forth in 11 U.S.C. § 1129(b)(2), those meanings are as follows:

     1.13.01     **Secured Claims.**  With respect to a class of secured claims, the Plan provides:

(a)(i) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the Debtor or transferred to another entity, to the extent to of the allowed amount of such claims; and

(ii)   that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the Effective Date of the Plan, of at least the value of such holder's interest in the estate's interest in such property,

(b)   for the sale, subject to 11 U.S.C. § 363(k), of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (a) and (b) of this subparagraph; or

(c)   The realization by such holders of the "indubitable equivalent" of such claims.

1.13.02      **Unsecured Claims.**  With respect to a class of unsecured claims, the Plan provides:

(a)   that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the Effective Date of the Plan, equal to the allowed amount of such claim; or

(b)   the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the Plan on account of such junior claim or interest in any property.

1.13.03      **Interests.**  With respect to a class of interests, the Plan provides:

(a)   that each holder of an interest of such class receives or retains on account of such interest property of a value, as of the Effective Date of the Plan, equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest; or

(b)   that the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

1.14   In the event that one or more classes of impaired claims or Equity Interests reject the Plan, the Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable with respect to, and does not discriminate unfairly against, any rejecting impaired class of Claims.  The Debtor believe that its unsecured creditors will vote for the Plan.  The absolute priority rule requires that prior to equity retaining an interest in the Debtor, senior classes of claims must be paid in full or vote to accept the Plan.  This means that when the unsecured creditors are not being paid in full, Debtor' shareholders or equity interest holders cannot retain their stock in the Debtor or receive any financial benefit under the Plan because such retention or

receipt violates the absolute priority rule and may make the Plan non-confirmable by the Court.

### *Definition of Impairment*

1.15   "Impaired" as it refers to a class of claims or equity interests" is defined in 11 U.S.C. § 1124, which sets forth the elements for determining whether a claim or equity interest is impaired under a plan of reorganization.

### *Classification and Treatment of Claims and Interests*

1.16   The Plan classifies Claims separately in accordance with the Bankruptcy Code and provides different treatment for different classes of claims.

1.17   Only holders of Allowed Claims are entitled to receive distributions under the Plan. "Allowed Claim" is defined in Section 1.01.03 of the Amended Plan.

1.18   In accordance with the Plan, unless otherwise provided in the Plan or the Confirmation Order, the treatment of any claim under the Plan will be in full satisfaction, settlement, release, and discharge of and in for each and every claim.

### *Requirements for Confirmation of the Plan*

1.19   At the confirmation hearing, the Bankruptcy Court must determine whether the Bankruptcy Code's requirements for confirmation of the Plan have been satisfied, in which event it will enter an order confirming the Plan.  As set forth in 11 U.S.C, § 1129, these requirements are as follows:

1.19.01   The Plan complies with the applicable provisions of the Bankruptcy Code.

1.19.02   The proponent of the Plan complies with the applicable provisions of the Bankruptcy Code.

1.19.03   The Plan has been proposed in good faith and not by any means forbidden by law.

1.19.04   Any payment made or promised by the Debtor, by the plan proponents, or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in, or in connection with, the Case, or in connection with the Plan and incident to the Case, has been approved by, or is subject to approval of the Bankruptcy Court as reasonable.

1.19.05   The proponent of the Plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtor, an affiliate of the Debtor participating in a joint plan with the Debtor, or a successor under the plan.  Additionally, the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

1.19.06        The proponent of the Plan has disclosed the identity of any insider that will be employed or retained by the reorganized Debtor, and the nature of any compensation for such insider.

1.19.07        Any governmental regulatory commission with jurisdiction, after confirmation of the Plan, over the rates of the Debtor has approved any rate change provide for in the Plan, or such rate change is expressly conditioned on such approval.

1.19.08        With respect to each class of claims or interests, (a) such class has accepted the plan; or (b) such class is not impaired under the Plan.

1.19.09        With respect to each impaired class of claims of interests, each holder of a claim or interest of such class has (a) accepted the Plan; or (b) will receive or retain under the Plan on account of such claim or interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtor were liquidated on such date under chapter 7 of the Bankruptcy Code on such date; or (c) if 11 U.S.C. § 1111(b)(2) applies to the claims of such class, the holder of a claim of such class will receive or retain under the Plan on account of such claim property of a value, as of the Effective Date of the Plan, that is not less than the value of such holder's interests in the estate's interest in the property that secures such claims.

1.19.10        Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that with respect to a claim of a kind specified in 11 U.S.C. § 507(a)(2) or 507(a)(3), on the Effective Date of the Plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim.

1.19.11.       Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that with respect to a claim of a kind specified in 11 U.S.C. §§ 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) on the Effective Date of the Plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim; and

1.19.12.       Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that with respect to a claim of a kind specified in 11 U.S.C. § 507(a)(8), the holder of a claim will receive on account of such claim deferred cash payments, over a period not exceeding five (5) years after the date of assessment of such claim, of a value, as of the Effective Date of the Plan, equal to the allowed amount of such claim.

1.19.13        If a class of claims is impaired under the Plan, at least one class of Claims that is impaired has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a claim of such class.

1.19.14        Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

1.19.15      All fees payable under 20 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on confirmation of the Plan, have been paid or the Plan provides for the payments of all such fees on the effective date of the plan.

1.19.16      The Plan provides for the continuation after its Effective Date of payment of all retiree benefits, as that term is defined in 11 U.S.C. § 1114, at the level established pursuant to 11 U.S.C. § 1114(e)(1)(B) or (g), at any time prior to confirmation for the Plan, for the duration of the period the Debtor has obligated itself to provide such benefits.

1.19.17      All transfers of property of the Plan shall be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

1.19.18      Debtor believe that the Plan satisfies all the statutory requirements of chapter 11 of the Bankruptcy Code, that the Debtor have complied with or will have complied with all the requirements of chapter 11, and that the Plan is proposed in good faith.

1.20      At the Confirmation Hearing, the Bankruptcy Court will determine whether holders of allowed claims or allowed equity interests would receive greater distributions under the Plan than they would receive in a liquidation under chapter 7.


## ARTICLE II
### REPRESENTATIONS

2.01      These Disclosures are provided pursuant to 11 U.S.C. § 1125 to the Debtor' known Creditors and other parties-in-interest in connection with solicitation of acceptance of the Plan, as amended or modified.  The purpose of these Disclosures are to provide information as will enable a hypothetical, reasonable investor, typical of the holders of Claims, to make an informed judgment in exercising its rights either to accept or reject the Plan.

2.02      The information contained in these Disclosures has been derived from information submitted by the Debtor, unless specifically stated to be from other sources.

2.03      No representations concerning the Debtor are authorized by the Debtor other than those set forth in these Disclosures.  The Debtor recommend that any representation or inducement made to secure your acceptance or rejection of the Plan which is not contained in this Disclosure should not be relied upon by you in reaching your decision on how to vote on the Plan.  Any representation or inducement made to you not contained herein should be reported to the attorneys for Debtor who shall deliver such information to the Court for such action as may be appropriate.

2.04      ANY BENEFITS OFFERED TO CREDITORS ACCORDING TO THE PLAN WHICH MAY CONSTITUTE "SECURITIES" HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXHANGE COMMISSION ("SEC"), THE TEXAS SECURITIES BOARD, OR OTHER RELEVANT GOVERNMENTAL AUTHORITY IN ANY STATE OF THE UNITED STATES.  IN ADDITION, NEITHER THE SEC, NOR ANY OTHER GOVERMENTAL AUTHORITY HAS PASSED UPON THE

ACCURACY OR ADEQUACY OF THESE DISCLOURES OR UPON THE MERITS OF THE PLAN.   ANY REPRESENTATIONS TO THE CONTRARY MAY BE A CRIMINAL OFFENSE.

2.05   THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT.  FOR THIS REASON AND BECAUSE OF THE IMPOSSIBILITY OF MAKING ASSUMPTIONS, ESTIMATES AND PROJECTIONS INTO THE FUTURE WITH ACCURACY, DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS COMPLETELY ACCURATE, ALTHOUGH EVERY REASONABLE EFFORT HAS BEEN MADE TO ENSURE THAT SUCH INFORMATION IS ACCURATE.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN.

2.06   THE APPROVAL BY THE COURT OF THESE DISCLOSURES DOES NOT CONSTITUTE AN ENDORSEMENT BY THE COURT OF THE PLAN OR GUARANTEE THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

2.07   DEBTOR BELIEVES THAT THE PLAN WILL PROVIDE CLAIMANTS WITH AN OPPORTUNITY TO ULTIMATELY RECEIVE MORE THAN THEY WOULD RECEIVE IN A LIQUIDATION OF THE DEBTOR'S ASSETS.  CONSEQUENTLY, DEBTOR URGES THAT CLAIMANTS ACCEPT THE PLAN AND CASE THEIR VOTES FOR THE PLAN.

## ARTICLE III
### OVERVIEW OF THE DEBTOR

**3**.01   **Overview of the Debtor.**  The Debtor is an individual.

3.02   **Management of the Debtor.**   As an individual, the Debtor manages his own personal finances.  The Debtor owns and operates Texas Quality Mats, LLC.

3.03   **Proposed Operations After Bankruptcy.**  The Debtor will continue to work for Texas Quality Mats, LLC.

## ARTICLE IV
### HISTORICAL INFORMATION CONCERNING THE DEBTOR

4.01   **Significant Transactions Prior to Bankruptcy**

David Michael Mobley is an entrepreneur in the oil and gas business. He was previously married to Yvette Mobley. On December 31, 2012, the Debtor and Yvette Mobley agreed to a sale of two oil and gas service companies. The Debtor and Yvette Mobley, acting through QLS Holdco, Inc. (Holdco), sold Quality Lease Service, LLC (QLS) and Quality Lease Rental Service, LLC (QLRS) to the newly created Quality Lease and Rental Holdings, LLC (QLRH).

8

Disputes arose after the sale and QLRH filed a petition under Chapter 11 of the Bankruptcy Code on October 1, 2014. The Mobleys brought an adversary proceeding against QLRH and others. The QLRH-related parties brought a counterclaim. The matter was removed to U.S. District Court where it was given Case No. 16-0006. QLRH confirmed a plan where the claims between the Quality parties and the Mobley parties were preserved.  After years of protracted litigation, the claims between the Quality parties and the Mobley parties was set for trial on January 24, 2022, in U.S. District Court for the Southern District of Texas, Corpus Christ Division, before the Hon. Judge David Morales.

4.02    **Bankruptcy.**  The Debtor filed bankruptcy on January 21, 2022. He filed his case under Subchapter V of the Bankruptcy Code. The Quality Parties filed an objection to the Subchapter V designation. On June 1, 2022, the Court entered an Order denying the Subchapter V designation.

The Quality Parties filed an objection to the Debtor's homestead exemption. They also filed Adv.No. 22-6024, seeking a determination that their claims were nondischargeable. The Quality Parties also filed a Motion to convert the case to chapter 7.

The Debtor filed a motion to dismiss the Chapter 11 case.

On December 1, 2022, the parties conducted a mediation with the Hon. Eduardo Rodriguez. The mediation resulted in a Mediation Term Sheet, a copy of which is attached as Exhibit A. The parties filed a joint motion to compromise and settle which was approved by the Court on January 6, 2023. Pursuant to the compromise and settlement, Drew McManigle was appointed as Examiner for the purpose of reviewing claims which the estate might have against third parties. Mr. McManigle filed his report on May 30, 2023, a copy of which is attached as Exhibit B.  This plan is filed to implement the terms of the Mediation Termsheet.

## ARTICLE V
### FINANCIAL RESULTS

5.01    **Financial Results Prior to Bankruptcy.**  The following is a summary of the Debtor' federal income tax returns for years 2020 and 2021 as well as those of Texas Quality Mats and Mobley Investments:

Personal Returns:

| Category | 2020 | 2021 |
|---|---|---|
| Wages | $346,538 | $251,154 |
| Capital Gain or Loss | -$3,000 | $603,921 |
| Other Income | -$2,914,334 | -$809,785 |
| Net Income | -$2,570,796 | $41,200 |
| Deductions | $24,800 | $25,100 |
| Taxable Income | $0 | $16,110 |
| Tax Owed | $0 | 10,729 |

| Estimated Tax Payments | | $48,037 |
|---|---|---|
| Refund | | $37,308 |

Texas Quality Mats:

| Category | 2018 | 2019 | 2020 |
|---|---|---|---|
| Total Income | $2,783,530 | $4,038,564 | $3,152,572 |
| Deductions | $2,472,433 | $3,715,466 | $3,650,465 |
| Taxable Income | $311,097 | $323,098 | -$497,893 |

Mobley Investments:

| Category | 2018 | 2019 | 2020 |
|---|---|---|---|
| Total Income | $3,111 | $3,231 | -108,729 |
| Deductions | | | |
| Taxable Income | $3,111 | $3,231 | -108,729 |

     5.02   **Financial Results During Bankruptcy.**  According to the Monthly Operating Report for Period Ending June 30, 2023, the Debtor has accumulated cash of $101,244 in his Debtor in Possession operating account.

     5.03   **Projected Financials After Bankruptcy.**

### ARTICLE VI
### ANALYSIS AND VALUATION OF PROPERTY

     6.01   **Real Property.**  The Debtor owns the following real property.

| Property | Scheduled Value | Liens | Exempt? |
|---|---|---|---|
| 480 CR 335, El Campo, TX | $800,000.00 | $71,764.37 Wharton County $3,896,018.00 (IRS) | |
| 3815 Montgomery Rd., Richmond, TX 77406 | $2,800,000.00 | $2,199,111.38 (First Financial) $1,471.00 Ft. Bend County Tax Assessor | Claimed as exempt; objection to be withdrawn under Plan |

     6.02   **Personal Property**  The Debtor own the following personal property:

| Asset | Value | Liens | Exempt? |
|---|---|---|---|
| Ford F150 | $32,500.00 | | |
| Harley-Davidson Thunder Mountain | $500.00 | | |
| Harley-Davidson Thunder Mountain | $500.00 | | |
| Honda Goldwing | $12,000.00 | | |
| 2018 Dodge Charger | $500.00 | Santander | |
| Solitaire HD-384 | $15,000.00 | IRS—see above | |
| Clayton Homes | $8,000.00 | IRS—see above | |
| McClain Trailer | $2,000.00 | | |
| ½ Int. Cobalt Boat | $17,500.00 | | |
| Household Goods | $2,770.00 | | Yes |
| Electronics | $600.00 | | Yes |
| Hand and power tools | $200.00 | | Yes |
| Clothing | $100.00 | | Yes |
| Cash | $500.00 | | |
| Bank accounts | $101,244.00 | | |
| 99% Texas Quality Mats | $0 | | |
| 50% Mobley Investments | $2,156.71 | | |
| 50% Fleetwood Revolution Motor Home | $32,000.00 | | Yes |
| 2018 Ford 350 | $45,000.00 | | Yes |
| 2017 Kawasaki LXT Mule ATV | $5,000.00 | | Yes |
| | | | |
| | | | |

6.03    **Liquidation Value of Assets.**   In a chapter 7 liquidation, a trustee would be appointed to liquidate the assets of the Debtor.  In this case, the assets of the estate will consist of cash once the court determines the amount to be paid to the Debtor.

A chapter 7 trustee would pay creditors in order of priority, with secured claims, chapter 7 administrative expense claims and chapter 11 administrative expense claims being paid first.  Net remaining funds would be paid to unsecured creditors on a pro rata basis. Most of Debtor' property is either exempt or encumbered by liens.  Debtor estimates that the liquidation value of his non-exempt property would be no more than $153,969.47.  Before unsecured creditors could receive any dividend, Chapter 7 administrative expenses, Chapter 11 administrative expenses and priority claims would have to be paid.  After deducting these expenses, unsecured creditors would expect to receive $126,626.00 in a liquidation. Debtor's liquidation analysis is attached as Exhibit C.

The liquidation analysis is prepared by Debtor' counsel based upon review of the documents in this case with input from Debtor' management.  This analysis is the Debtor' best estimate of what would occur in a chapter 7 liquidation.  It is the Debtor' contention of what would

be most likely to occur in a chapter 7 liquidation.  Since it is a prediction of unknown future events, it should be taken as an opinion subject to many complex variables.

## ARTICLE VII
### SUMMARY OF PLAN

7.01     **Classification and Treatment of Classes Under the Plan**

**Class 1—Administrative Expense Claims**

Administrative Expense Claims consist of expenses incurred during the chapter 11 proceeding prior to confirmation which are approved by the Court and expenses incurred in operating the Debtor' business.  The estimated future UST fees are also included in this class although payment is not required until the fees are due. Most administrative expense claims consist of claims by professionals employed by the Bankruptcy Estate.  The Debtor are aware of the following Class 1 Administrative Claims:

No Administrative Expense Claims for professional fees shall be allowed except pursuant to Court order.  The following professionals have been employed pursuant to Court Order:

Jerome Brown                 Bankruptcy Counsel
Barron & Newburger, P.C.     Bankruptcy Co-Counsel

Unless otherwise agreed, each holder of a Class 1 claim shall be paid in full on the later of the Effective Date or on the date that a final order is entered approving or allowing the Administrative Expense Claim or the claim for professional fees or as due under applicable law.

Class 1 is not impaired.

**Class 2—Priority Claims**

Class 2 consists of Claims entitled to Priority under 11 U.S.C. § 507(a).

The Class 2 claim, if any, shall be paid on the Effective Date is such claim is allowed in the amount of $5,000 or less. If the claim is allowed at an amount in excess of $5,000, it shall be payable in sixty (60) equal monthly installments including interest at the rate of 4% per annum.

Class 2 is not impaired.

4.03     **Class 3—Secured Claims of Wharton County and Matagorda ISD**

Class 3 shall consist of the Secured Claims of Wharton County and Matagorda ISD. Wharton County has filed a claim in the amount of $84,453.73. Matagorda ISD has filed a claim in the amount of $4,989.33.

The Class 3 Creditor shall retain its lien upon the Debtor's property. Class 3 shall be entitled to interest from the petition date to the confirmation date at the rate of 1% per month.

The Debtor shall pay Class 3 in sixty (60) equal monthly installments including interest at the rate of 1% per month.

Class 3 is impaired.

**Class 4—Secured Claim of First Financial Bank**

Class 4 consists of the Secured Claim of First Financial Bank. First Financial Bank has filed a secured claim in the amount of $2,199,111.38.

First Financial Bank shall retain its lien under the Plan.

Debtor shall continue to make the regular contractual payments to First Financial Bank in the amount of $16,298.54.   Interest shall continue to accrue at the contractual rate.

Class 4 is impaired.

**Class 5—Secured Claims of Ford Motor Credit**

Class 5 consists of the Secured Claims of Ford Motor Credit. Ford has filed the following claims:

2-1     $17,300.84
4-1     $33,301.20

Class 5 shall retain its liens under the Plan.

Debtor and/or Texas Quality Mats, LLC shall continue to make the regular monthly payments on the vehicles financed by Ford Motor Credit as provided by the Agreed Order Conditioning Automatic Stay as to Four (4) Ford Vehicles (Dkt. #94).

4.05.04        Class 5 is impaired.

**Class 6—Secured Claim of Internal Revenue Service.**

Class 6 shall consist of the Secured Claim of the Internal Revenue Service. The IRS has filed a claim in the amount of $3,820,119.08. Of this claim, $787,351.25 is claimed as secured.

The Internal Revenue Service shall retain its liens under the Plan.

The Internal Revenue Service shall receive payment of its claim in sixty (60) equal monthly

installments including the statutory rate of interest in effect on the Confirmation Date.

Class 6 is impaired.

## Class 7—Secured Claim of People's United Equipment Finance Corp.

Class 7 shall consist of the Secured Claim of People's United Equipment Finance Corp. People's United filed a claim in the amount of $571,857.75.

People's United Equipment Finance Corp. shall not retain its liens under the Plan.

The Class 7 creditor has been paid in full and will not receive any further payments. Its liens shall be deemed satisfied.

Class 7 is impaired.

## Class 8—Secured Claim of Santander Consumer USA.

Class 8 shall consist of the Secured Claim of Santander Consumer USA. Santander filed a claim in the amount of $24,567.49.

Santander Consumer USA shall retain its liens under the Plan to the extent of the value of its collateral. Unless the Court rules otherwise, the value of the collateral shall be fixed at $500.00. The remaining claim of Santander shall be an unsecured claim.

The Debtor shall pay Santander $500.00 on the Effective Date in full satisfaction of its secured claim (but not its unsecured claim).

Class 8 is impaired.

## Class 9—Unsecured Claims of Less than $75,000.00

Class 9 shall consist of Allowed Unsecured Claims of less than $75,000.00. The Debtor believes that the following claims fall within this class:

| | | | |
|---|---|---|---|
| AT&T Corp. | $ 986.00 | | |
| Bank of America | $ 12,289.00 | $ 12,036.35 | 33 |
| First State Bank Louise | $ 63,794.58 | | |
| Independent Banksbank | | $ 60,258.25 | 12 to 32 |
| Santander Consumer USA | | $ 24,067.49 | |

The Class 9 claims shall receive a single payment of 10% of the amount of their Allowed Claims on the Effective Date or the date that a claim becomes an Allowed Claim, whichever is later.

14

Any Class 9 creditor may elect to be treated under Class 11. Any Class 9 creditors which votes to reject the plan shall be deemed to have elected Class 11 treatment.

Class 9 is impaired.

## Class 10—Guaranty Claims

Class 10 shall consist of unsecured claims where the Debtor is a guarantor of the obligation of a third party.  This class includes the claim of Ford Motor Company for $109,945.94.

Claims falling within Class 10 shall be paid by their principal obligor. The Debtor's guaranty shall remain in force and may be enforced by the creditor in the event of a default by the principal obligor.  These claims shall be paid in full.

Class 10 is unimpaired.

## Class 11--Unsecured Claims of More Than $75,000

Class 11 shall consist of Allowed Unsecured Claims of more than $75,000 which are not Guaranty Claims.  Pursuant to the Settlement Agreement, the Quality Companies shall hold a Class 11 Unsecured Claim in the amount of $40,000,000.

The claims in this class include:

| Internal Revenue Service | | $ 3,032,767.83 | 37 |
|---|---|---|---|
| M/G Finance Co., Ltd. | $  968,407.76 | $ 1,642,924.92 | 5 |
| Quality Lease and Rental Holdings, LLC | Unknown | $ 62,700,000.00 | 10 |
| Texas Champion Bank | $5,525,573.65 | $ 5,140,698.51 | 35 |

The Class 11 Unsecured Creditors shall receive three forms of payment:  Classes 1-10, and Class 12 shall not be entitled to any of these funds, and they shall be paid from other funds available to the Debtor.

(a) Any amounts recovered by the Litigation Trustee net of expenses incurred by the Litigation Trustee shall be distributed pro rata to the Class 11 Creditors.

(b) The Debtor shall pay $5,000.00 per month for 60 months beginning on the Effective Date.

(c) The sum of $1,600,000.00 shall be paid by the Debtor and/or Texas Quality Mats, LLC according to the following schedule:
  (i) $5,000.00 per month for the first twenty-four months after the Effective Date;
  (ii) $10,000.00 per month for the next twelve months;
  (iii) $15,000.00 per month for the next twelve months;

(iv)    $20,000.00 per month for the next twelve months; and

(v)    A balloon payment of $940,000.00 shall be due sixty (60) months after the Effective Date.

The Debtor shall grant the Litigation Trustee a lien on the Yard Property in the amount of $1,000,000.00 to secure the payment of $1,600,000 in paragraph of the Plan 4.11.02(c).

Texas Quality Mats, LLC shall be jointly and severally liable with the Debtor for the timely payment of Class 11 Unsecured Creditors.

The Debtor shall be authorized to convey the Yard Property to Texas Quality Mats, LLC upon final payment to the Class 11 creditors.

Class 11 is impaired.

## Class 12—Equity Interests

4.12.01       Class 12 consists of the Equity Interest of the Debtor.

4.12.02       The Debtor shall retain his interests in property. Within thirty (30) days after entry of the Confirmation Order, the Quality Companies shall withdraw their objection to the Debtor's homestead exemption.

4.12.03       Class 12 is unimpaired.

7.02    MEANS FOR IMPLEMENTING PLAN

**Disbursing Agent.**  The Reorganized Debtor shall be the disbursing agent for the Plan for all Allowed Claims other than Class 11. The Litigation Trustee shall be the disbursing agent for the Class 11 claims.

**Management of the Reorganized Debtor.**  The Debtor shall continue to manage his business affairs.

**Payment of Fees and Expenses.**  The Reorganized Debtor may pay reasonable attorney's fees and out of pocket expenses incurred in the implementation of this Plan.

**7.03 TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**Assumption.**  Unless ordered otherwise by the Court, no executory contracts or unexpired leases shall be assumed.

**Rejection.**  Unless ordered otherwise by the Court, all executory contracts and unexpired leases shall be rejected.  The Debtor believes that any executory contracts in existence on the

Petition Date have been terminated.

**7.04    PROVISIONS FOR THE RETENTION, ENFORCEMENT, SETTLEMENT, OR ADJUSTMENT OF CLAIMS BELONGING TO THE DEBTOR AND THE ESTATE INCLUDING PREFERENCES AND CONVEYANCES AS WELL AS LITIGATION WITH QUALITY LEASE AND RENTAL HOLDINGS, LLC, ET AL**

**The Litigation Trustee.**

(a) The Litigation Trustee shall be an estate representative pursuant to 11 U.S.C. §1123(b)(3)(B). The Litigation Trustee shall be vested with the full power and authority to pursue, compromise or release the Preserved Claims.

(b) The Litigation Trustee shall be entitled to compensation on an hourly basis as well as reimbursement of expenses. Such compensation and expenses shall be paid out of the funds recovered by the Litigation Trustee.

(c) The Litigation Trustee shall be entitled to retain counsel and other professionals to represent him.

(d) The Litigation Trustee shall be entitled to payment of compensation and reimbursement of expenses and shall be entitled to compensate any professional retained by the Trustee by filing a Notice of Intent to Pay Professional Fees with the Court and serving such Notice upon the Class 11 creditors. If no party shall object within fourteen (14) days, the Trustee shall be entitled to make the proposed payment. If a party in interest shall object, the Trustee shall be entitled to make such payment to the extent authorized by the Court following notice and a hearing.

**The Released Claims.**   Entry of the Confirmation Order shall release any and all claims and causes of action which the Debtor or the Estate may hold against Texas Quality Mats, LLC, Lisa Mobley, Allan Martin and/or The Quality Companies; provided that such release shall not affect the obligations of Texas Quality Mats, LLC under this Plan.

**The Preserved Claims.**   All other claims and causes of action belonging to the Debtor other than the Released Claims shall be preserved and shall be assigned to the Litigation Trustee. For purposes of clarity, the claims and causes of action described in the Examiner's Report of Drew McManigle dated May 30, 2023 are preserved. (see attached Exhibit B).

**The Quality Companies Adversary Proceeding.**   The parties shall enter into an Agreed Judgment in Adv. No. 22-6024 awarding the Plaintiffs a non-dischargeable judgment against the Debtor in the amount of $2,250,000. Any amounts received by the Plaintiffs as creditors under this Plan shall be credited against the non-dischargeable judgment. The Plaintiffs shall forebear from exercising any collection remedies for a period of six years after entry of the Confirmation Order. The Agreed Judgment shall not be interest during the six year forbearance period. At the

conclusion of the six year forbearance period, the Agreed Judgment shall begin to accrue interest at the then-applicable federal judgment rate.

**The Settlement Agreement.** All of the terms of the Settlement Agreement shall be deemed to be incorporated into the Plan and binding upon the Parties to the Settlement Agreement regardless of whether they are expressly stated int this Plan.

reasonable attorney's fees and out of pocket expenses incurred in the implementation of this Plan.

## 7.05   Effect of Confirmation

**Discharge.**   The Debtor shall receive a discharge from all debts which are the subject of the Plan upon the conclusion of payments under the Plan.

**Status of Property of the Estate After Confirmation.**   Confirmation of the Plan shall vest the Property of the Estate in the Debtor free and clear of all claims and liens except as expressly provided in the Plan; provided that if the Plan is not substantially consummated, the property of the Estate shall revest in the Estate upon conversion to chapter 7 or entry of an order revoking confirmation of the Plan.

**Binding Nature of Plan.**   Pursuant to 11 U.S.C. § 1141, the provisions of the confirmed Plan shall bind the Debtor and its Creditors and the holders of its Equity Securities existing as of the Effective Date, whether or not the Claim or Equity Interest is impaired under the Plan and whether or not such Creditor or Equity Interest Holder has accepted the Plan.   The distributions provided for Claimants shall not be subject to any Claim by another creditor or interest holder by reason of any assertion of a contractual right of subordination.

## 7.06   Modification of Plan

**Modification to the Plan.**   In accordance with 11 U.S.C. § 1127 and Fed R. Bankr. P. 3019, to the extent applicable, Debtor may modify or amend the Plan prior to the Confirmation Date, provided that notice and an opportunity for hearing are given to any affected party and the Court finds that the proposed modification or correction does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted the modification in writing.   Debtor may modify the Plan after Confirmation and before substantial consummation as long as the modification complies with the requirements of 11 U.S.C. §§ 1122 and 1123 and the Plan as modified will become the Plan if, after notice and hearing, the Court finds that circumstances warrant such modification and confirms the Plan as modified.

## 7.07   Post-Confirmation Procedure

**Application for Final Decree.**   The Debtor shall file an application for final decree as soon as is practicable but not later than one hundred and twenty (120) days after the Effective Date.   If the Plan cannot be substantially consummated as that term is defined in 11 U.S.C. § 1101(2) during this time period or if there are still pending matters to be ruled upon by the Court, the Debtor shall seek an extension of such deadline from the Court.   If the Debtor fail to file an Application for

Final Decree prior to such deadline or fails to timely request an extension of the same, then the Court, on its own motion or at the request of any party in interest, including the United States Trustee, may enter an order closing the Debtor' case.

**U.S. Trustees Matters.**

**Fees.**  The Debtor shall continue to pay U.S. Trustee fees until the case is closed.

**Reports.**  The Debtor shall file post-confirmation reports in the form prescribed by the United States Trustee until the case is closed.

7.08    **Default and Other Related Provisions**

In the event of a default by the Debtor under the Plan (which explicitly includes the failure to pay fees to the United States Trustee as they come due), creditors or affected parties may exercise any rights granted to them under documents executed to evidence the Plan or any rights available to creditors under applicable bankruptcy and/or non-bankruptcy law.  In the absence of documents executed to evidence the Plan, this Plan may be enforced as a contract. Notwithstanding any other provision, any creditor alleging a default shall give the Debtor fifteen (15) days notice and an opportunity to cure before exercising any rights available upon default; no creditor shall be required to give more than three notices of default during the term of this Plan. This provision shall not apply to creditors designated as unimpaired.

**ARTICLE VIII**
**FEASIBILITY OF THE PLAN AND RISK TO CREDITORS**

Feasibility of the Plan and Risk to Creditors measures the likelihood that creditors will receive the payments promised to them.  This Plan depends on the Debtor' ability to earn enough money to make the payments to creditors.  This primarily depends on the ability of Texas Quality Mats, LLC to earn sufficient amounts to make the payments. Because the business of Texas Quality Mats depends on the health of the oil and gas industry, a severe decline in the oil and gas industry could make it difficult to make the payments.

**ARTICLE IX**
**ALTERNATIVES TO DEBTOR' PLAN**

Debtor is aware of two alternatives to its Plan: (i) conversion to chapter 7 liquidation; and (ii) dismissal of the bankruptcy case.

9.01    **Conversion.**  Debtor do not believe that conversion to chapter 7 is in the best interest of creditors.  The Debtor' liquidation analysis indicates that not more than $126,646.00 would be available to creditors in a Chapter 7 liquidation. This would only pay a small percentage to unsecured creditors.

9.02   **Dismissal.**  Debtor also do not believe that dismissal of the Case is in the best interest of creditors.  In the event of a dismissal, there would not be a structured way to distribute the Debtor' funds to creditors.

## ARTICLE X
### RELATIONSHIP OF DEBTOR WITH AFFILIATES

10.01   **In General.**  Under the Bankruptcy Code, the term affiliate refers to an entity that directly or indirectly controls with power to vote twenty (20) percent or more of the securities of the Debtor, a corporation twenty (20) percent or more of whose outstanding voting securities are directly or indirectly controlled by the Debtor, a person whose business is operated under a lease or operating agreement by a Debtor or a person substantially all of whose property is operated under an operating agreement with the Debtor or an entity that operates the business or substantially all of the property of the Debtor under a lease or operating agreement.  Texas Quality Mats, LLC is an affiliate of the Debtor.

## ARTICLE XI
### TAX CONSEQUENCES

**11**.01   Implementation of the Plan may result in federal income tax consequence to holders of Claims, to the Equity Interest Holder, and to the Debtor.  Tax consequences to a particular Creditor or Equity Interest Holder may depend on the particular circumstances or facts regarding the claim of the Creditor or the interests of the Equity Interest Holder.  **CLAIMANTS ARE URGED TO CONSULT THEIR OWN TAX ADVISOR AS TO THE CONSEQUENCES OF THE PLAN TO THEM UNDER FEDERAL AND APPLICABLE STATE AND LOCAL LAW.**

## ARTICLE XII
### PENDING AND POTENTIAL LITIGATION

12.01   **Pending Litigation.**  The main pending litigation at the time of the bankruptcy case was the suit between the Quality Companies and the Debtor. This suit will be dismissed under the Plan. There is also the adversary proceeding brought by the Quality Companies which will be resolved under the Plan.

12.02   **Anticipated Litigation.**  The Litigation Trustee will be able to pursue any of the claims identified in the Examiner's Report attached as Exhibit B.

## ARTICLE XIII
### SOLICITATION OF VOTES

The Debtor has devoted substantial effort to preparation of its Plan of Reorganization. The Debtor believes that the Plan represents a fair adjustment of his relationship with the creditors. The Debtor believes that the Plan is superior to the alternatives. Therefore, the Debtor requests that all parties approve the Plan of Reorganization.

Respectfully submitted,

/s/
David Michael Mobley

**BARRON & NEWBURGER, P.C.**
7320 N. MoPac Expwy., Suite 400
Austin, Texas 78731
(512) 476-9103 Ext. 220
(512) 476-9253 (Facsimile)


By:      /s/Stephen W. Sather
         Stephen W. Sather
         State Bar No. 17657520

ATTORNEYS FOR DEBTOR-IN-POSSESSION

Exhibit A

## IN THE UNITED STATED BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 22-60004 |
| DAVID MICHAEL MOBLEY, | § | |
| | § | |
| Debtor. | § | |
| | § | |
| | § | CHAPTER 11 |

### <u>MEDIATED TERM SHEET</u>

THIS TERM SHEET DESCRIBES THE MATERIAL TERMS OF A PROPOSED COMPROMISE, ADDITIONALLY, THIS TERM SHEET IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS, OTHER THAN AS EXPRESSED HEREIN AND AS REQUIRED TO SEEK BANKRUPTCY COURT APPROVAL OF THIS TERM SHEET.

On December 1, 2022, the following matters were mediated by the Hon. Eduardo V. Rodriguez, Chief United States Bankruptcy Judge for the Southern District of Texas in his capacity as a Judicial Mediator.: (i) *Debtor's Motion to Dismiss*, ECF No. 136; (ii) *Quality's Motion to Convert Case to Chapter 7 or, in the Alternative, to Appoint a Chapter 11 Trustee or Examiner*, ECF No. 137; (iii) *Quality Parties' Objection To Debtor's Homestead Exemption*, ECF No. 111; (iv) *Objection to Claim No 10-1 Filed by Quality Lease and Rental Holdings, LLC,* ECF No. 140; (v) *Plaintiffs' Complaint To Determine The Dischargeability Of Debt Pursuant To 11 U.S.C § 523(A), (2), (4), And (6) Against Debtor/Defendant David Michael Mobley*, Case No. 22-6024, ECF No. 1; and (vi) *Civil action 6:16-0006 Quality Lease and Rental Holdings, et al., v. Greta Yvette Mobley, et al.*

This Mediated Term Sheet is entered into by and among the parties whose signatures appear at the end of this document and resolves all disputes related to the matters referenced herein. The following sets forth the principal terms of a proposed settlement (the "*Settlement*") between David Michael Mobley, ("*Debtor*"), and Quality Lease and Rental Holdings LLC, Quality Lease Rental Service LLC, Quality Lease Service LLC ("*Quality Companies*"), and Rocaceia, LLC ("*Rocaceia*"), (collectively, the "*Parties*"), that would result in a global resolution of all issues between them.

This Term Sheet is executed to evidence the Parties' commitment to proceed in mutual good faith to (i) obtain Bankruptcy Court approval of the Settlement Terms; and (ii) negotiate and enter into any other agreements and such other documents as are necessary for implementation of the Settlement and consistent with the terms of the Settlement.

**TERMS OF SETTLEMENT**

1. Parties understand and acknowledge that this Term Sheet constitutes a compromise and settlement of all disputed matters arising from and related to:

   (i)   *Debtor's Motion to Dismiss*, ECF No. 136;
   (ii)  *Quality's Motion to Convert Case to Chapter 7 or, in the Alternative, to Appoint a Chapter 11 Trustee or Examiner*, ECF No. 137
   (iii) *Quality Parties' Objection To Debtor's Homestead Exemption*, ECF No. 111;
   (iv)  *Objection to Claim No 10-1 Filed by Quality Lease and Rental Holdings, LLC,* ECF No. 140; and
   (v)   *Plaintiffs' Complaint To Determine The Dischargeability Of Debt Pursuant To 11 U.S.C § 523(A), (2), (4), And (6) Against Debtor/Defendant David Michael Mobley*, Case No. 22-6024, ECF No. 1.
   (vi)  *Civil action 6:16-0006 Quality Lease and Rental Holdings, et al., v. Greta Yvette Mobley, et al.*

2. No action taken by the Parties, either previously or in connection with this Term Sheet will be deemed or construed to be (i) an admission of the truth or falsity of any claims heretofore made; or (ii) an acknowledgement or admission by any Party or any fault or liability whatsoever to any Party or any third party. The compromise set forth herein is subject to Bankruptcy Court approval.

3. This Term Sheet is intended to be binding and enforceable upon the Parties immediately and agree that all formal documents and all formal orders by the Bankruptcy Court will not change the material and essential terms of this Term Sheet. If the 9019 Motion is denied by the Bankruptcy Court or the order approving the 9019 Motion is later overturned, reversed, set aside, vacated, or otherwise determined to be null and/or void, the Parties agree that the Parties shall be allowed to withdraw their statements and agreements set forth in this Term Sheet and any related motions filed with the Bankruptcy Court, and may not be used against either of the Parties in any motions or at trial on the merits in this lawsuit or any other lawsuit.

4. Debtor will file a 9019 Motion to approve this compromise described in this Term Sheet by December 15, 2022.

5. The Quality Companies shall file a motion to appoint a litigation trustee on or before December 15, 2022. The Parties agree with that Brendon Singh or Deidre Brown shall be acceptable subject to such individual's agreement. If the Parties are unable to reach agreement with a proposed litigation trustee, they shall confer, and if necessary, return to additional mediation with Judge Rodriguez. The duties of the litigation trustee prior to confirmation of a plan shall consist of investigating potential claims and defining "reserved claims" in the plan to be filed. The expenses of the litigation trustee prior to the confirmation date shall be administrative expenses.

6. The Debtor shall file a plan incorporating the terms of this agreement within 120 days of approval of the Rule 9019 motion.

7. The claim of the Quality Companies shall be allowed in the amount of $40 million.

8. The Debtor and the Quality Companies shall submit an agreed judgment in Adv. No. 22-6024 providing that $2,250,000 shall be non-dischargeable subject to the provisions of this agreement within thirty days after entry of a confirmation order. The Quality Companies agree that any funds received by them pursuant to the Plan shall be credited against the non-dischargeable judgment. The Quality Companies agree to forebear from collection upon the non-dischargeable judgment until six years after entry of the confirmation order.  The non-dischargeable judgment shall not bear interest during the forbearance period described above. Following the expiration of the forbearance period, the non-dischargeable judgment shall bear interest at the federal judgment rate at that time.

9. The Plan shall require the Debtor to make payment on all Allowed administrative, priority and secured claims, including the secured claim of the IRS. In addition, Allowed unsecured creditors shall receive the following payments:

    (a) Any amounts recovered by the litigation trustee net of expenses incurred by the litigation trustee;
    (b) The sum of $300,000.00 to be paid by the Debtor at $5,000.00 per month beginning on the Effective Date; and
    (c) The sum of $1,600,000 to be paid by the Debtor and/or Texas Quality Mats, LLC according to the following schedule:  $5,000 per month for the first twenty-four months after the effective date; $10,000 per month for the next twelve months; $15,000 for the next twelve months; $20,000 for the next twelve months; and a balloon payment of $940,000 due sixty (60) months after the effective date. The Debtor shall be authorized to convey the property known as the Yard Property to Texas Quality Mats, LLC upon final payment.
    (d) The Debtor shall grant the litigation trustee a lien upon the Yard Property in the amount of $1,000,000 to secure the payments of $1,600,000 described in paragraph 9(c) above to be made under the Plan.
    (e) Texas Quality Mats, LLC shall guarantee the Debtor's obligations to unsecured creditors under the Plan.
    (f) Subject to the other provisions of the plan, the Debtor shall retain all real and personal property belonging to the Debtor or the estate (specifically not including the claims assigned to the litigation trustee).

10. The litigation trustee shall be entitled to investigate and prosecute any claims or causes of action belonging to the bankruptcy estate, except for claims or causes of action against Texas Quality Mats, LLC or Lisa Mobley. The litigation trustee shall be entitled to reasonable compensation, which shall be paid out of the funds recovered by the litigation trustee.

11. Upon entry of the agreed judgment in Adv. No. 22-6024, the Parties shall submit a joint motion to dismiss Civil Action 6:16-0006 without prejudice.

12. Within thirty (30) days of entry of a confirmation order, The Quality Companies shall withdraw their objection to the homestead exemption.

13. Within fourteen (14) days after entry of the order on the 9019 motion, the Debtor and the Quality Companies shall withdraw their respective motions to dismiss and to convert without prejudice.

14. Within fourteen (14) days after entry of the order on the 9019 motion, the Debtor shall withdraw its objection to the claim of the Quality Companies without prejudice.

15. Each Party shall bear their own attorney's fees and costs.

16. Prior to an order on the 9019 Motion being entered by the Bankruptcy Court, any disagreement as to appropriate terms, conditions or other provisions of the final Term Sheet may be submitted to the Mediator for a final decision as to inclusion or exclusion of the disputed provisions, or as to the appropriate resolution.

17. The Bankruptcy Court will retain exclusive jurisdiction related to all issues concerning performance of the Term Sheet and enforcement of any order entered approving the 9019 Motion.

18. In the event that the plan contemplated by this agreement is not confirmed by the Bankruptcy Court, either Party may declare this settlement null and void.

19. Compromise of Claims.  It is understood and agreed that this is a compromise of disputed claims between the Parties and that the consideration transferred herein is to compromise those disputed claims, avoid litigation, and buy peace, and that nothing contained herein shall be construed as an admission of liability by, or on behalf of, any Parties to the 9019 Motion, any and all such liability being expressly denied.

20. Representations and Warranties.  The Parties warrant and represent that: (a) Subject to Bankruptcy Court approval, each party has the full right and authority to enter into this Term Sheet and that each party signing the Term Sheet is authorized to do so; (b) they are the current legal and beneficial owners of all claims, liabilities, and/or causes of action released by virtue of the Term Sheet; (c) they have read and understood all aspects of the Term Sheet, and of its effects; and (d) they will have executed the Term Sheet as a free and voluntary act of their own free will without any threat, force, fraud, duress, or coercion of any kind.

21. Binding Effect and Benefit.  The Term Sheet shall inure to the benefit of, and shall be binding upon, the Parties and their respective heirs, executors, administrators, personal representatives, successors and assigns.

22. Modification.  No provision contained herein may be modified, amended or waived except by written agreement or consent signed by the Party to be bound thereby.

23. Headings and Captions.  Subject headings and captions are included for convenience purposes only and shall not affect the interpretation of this Term Sheet.

24. Entire Agreement.  The Term Sheet constitutes the entire agreement of the Parties and supersedes any and all other prior agreements, oral or written, with respect to the subject matter contained herein.

25. <u>Governing Law</u>.  The Term Sheet shall be governed by the laws of the State of Texas, and shall be construed and interpreted in accordance with its laws, notwithstanding its conflict of laws principles or any other rule, regulation or principle that would result in the application of any other state's law.

26. <u>Attorneys' Fees for Enforcement</u>.  If any Party to this Term Sheet succeeds on the merits of any legal action to enforce the Term Sheet or any order entered on a 9019 Motion, such party shall be entitled to recover reasonable attorneys' fees and court costs.

27. <u>Expenses</u>.  Each Party shall pay its own respective legal and other professional fees and other expenses incurred in connection with the matters compromised in this Term Sheet.

28. <u>Severability</u>.  In the event that any part of this Term Sheet shall be found to be illegal or in violation of public policy, or for any reason unenforceable at law, such finding shall not invalidate any other part hereof.

29. <u>Jurisdiction</u>.  Should any disagreement arise out of the interpretation or enforcement of this Term Sheet, the Bankruptcy Court for the Southern District Of Texas shall maintain jurisdiction over any disputes which arise between the Parties.

30. <u>Counterparts.</u> This Term Sheet may be executed and delivered in counterparts which together shall constitute a single instrument.

THE AGREEMENTS MADE IN THIS THIS  TERM SHEET ARE NOT SUBJECT TO REVOCATION AND ARE SIGNED BY ALL PARTIES AND THEIR ATTORNEYS, WHO WERE PRESENT AT THE TIME THAT THEIR RESPECTIVE CLIENTS SIGNED THIS TERM SHEET.

BY THE SIGNATURES BELOW, WE ACKNOWLEDGE THAT THIS MEDIATION WAS CONDUCTED IN ACCORDANCE WITH THE *TEXAS CIVIL PRACTICE AND REMEDIES CODE* AND OTHER APPLICABLE STATE LAWS, AND THAT THE JUDICIAL MEDIATOR IS NOT AN ADVOCATE FOR EITHER PARTY. WE ALSO ACKNOWLEDGE THAT WE ARE FREELY ENTERING INTO THIS AGREEMENT, AND THAT THERE WAS NO DURESS OR UNDUE INFLUENCE BY THE MEDIATOR OR ANY ATTORNEY OR PARTY DURING THIS MEDIATION.

WE FURTHER ACKNOWLEDGE THAT THE JUDICIAL MEDIATOR ASSISTED IN THE PREPARATION OF THIS RECORD OF OUR AGREEMENT AT OUR REQUEST. WE UNDERSTAND THESE TERMS AND ACKNOWLEDGE THAT WE VOLUNTARILY RESOLVED AND/OR CLARIFIED THE ISSUES IN DISPUTE AND HOLD THE JUDICIAL MEDIATOR HARMLESS FOR OUR AGREEMENT. PURSUANT TO THE *TEXAS CIVIL PRACTICE AND REMEDIES CODE*, THIS MEDIATION IS CONFIDENTIAL. ALL RECORDS, REPORTS, OR OTHER DOCUMENTS RECEIVED BY THIS JUDICIAL MEDIATOR AND ADMINISTRATIVE ENTITY (ODR) ARE CONFIDENTIAL AND SHALL BE DESTROYED BY THE JUDICIAL MEDIATOR.

THE SIGNATURES BELOW AFFIRM THIS IS A WRITTEN TERM SHEET AS CONTEMPLATED BY SECTION 154.071 OF THE TEXAS CIVIL PRACTICE AND REMEDIES CODE AND RULE 11 OF THE TEXAS RULES OF CIVIL PROCEDURE.

**IN WITNESS WHEREOF,** the Parties have caused this Term Sheet to be executed on their behalf by the signatures of their duly authorized representatives below.

**Dated:  December 1, 2022.**

David Michael Mobley, individually and as authorized representative of Texas Quality Mats, LLC

Stephen Wayne Sather
Barron Newburger, P.C.
7320 N Mopac Expy
Ste 400
Austin, TX 78731

By: Jason Beauvais, authorized representative
Quality Lease & Rental Holdings, LLC
Quality Lease Rental Service, LLC
Quality Lease Service, LLC, and
Rocaceia LLC

Walter J. Cicack
Texas Bar No. 04250535
wcicack@hcgllp.com
Jeremy M. Masten
Texas Bar No. 24083454
masten@hcgllp.com
3401 Allen Parkway, Suite 200
Houston, Texas 77019



Exhibit B

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| | § | |
| **DAVID MICHAEL MOBLEY,** | § | **Case No. 22-60004 (CML)** |
| | § | **Chapter 11** |
| **Debtor.** | § | |
| | § | |

### EXAMINER'S REPORT OF DREW MCMANIGLE

Drew McManigle, court-appointed Examiner in the estate of David Michael Mobley ("Mobley" or "Debtor"), Debtor in the above entitled and captured case, investigated potential claims, causes of action and distributions that may be of benefit to the Debtor's estate.

### I.    Introduction

**A.  Background**

1.    On January 21, 2022, (the "**Petition Date**"), the Debtor filed a voluntary petition under Subchapter V Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Victoria Division (the "**Court**").

2.    The Debtor continues to operate his businesses and manage his properties as debtor and debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.    On December 12, 2022, the Debtor filed his Motion to Compromise and Settle with Quality Lease and Rental Holdings, LLC, Quality Lease Rental Services, LLC, Quality Lease Service, LLC, and Rocaceia, LLC (the "Quality Companies") (the "Motion") [Docket No. 161]. On January 6, 2023, the Court entered the Order Granting Debtor's Motion to Compromise and

Settle with the Quality Companies [Docket No. 164]. Pursuant to the terms of the Mediated Term Sheet attached to the Motion:

- The Quality Companies are allowed a claim in the amount of $40 million.

- A non-dischargeable Agreed Judgment (the "Judgement") was entered in Adv. No. 22-6024, in the amount of $2,250,000. Any funds collected pursuant to the Plan will be credited against the Judgment, and the Quality Companies will forbear further collection against the Judgment for a period of six years after entry of the confirmation order.

- The Plan shall require the Debtor to make certain payments to various classes under the Plan as well as including payments to be made by the Debtor and the Debtor's solely owned company, Texas Quality Mats, LLC.

- The Debtor will grant a lien to a future litigation trustee (the "Litigation Trustee") on the Yard Property in the amount of $1,000,000 to secure the payment of $1,600,000 owed by Texas Quality Mats. The Yard Property is where the company operates. The litigation trustee will be entitled to investigate and prosecute any claims or causes of action, except for the settled claims with the Debtor, Debtor's wife, Lisa Mobley, and Texas Quality Mats, LLC.

4.      On December 13, 20222, Quality Lease Rental Service, LLC, Quality Lease Service, LLC, Quality Lease and Rental Holdings, LLC and Rocaceia, LLC (collectively "Quality Lender") filed a Motion to Appoint Examiner [Docket No. 162]. The Court entered an Order Approving the Appointment of Examiner [Docket No. 175] on January 27, 2023. On February 14, 2023, the U.S. Trustee filed a Motion for Approval of Drew McManigle as Examiner [Docket No. 182]. The Court entered an Order approving the appointment of Drew McManigle as Examiner on March 13, 2023 [Docket No. 186].

**B.  <u>Scope of Engagement</u>**

5.       In connection with this Sub Chapter V Chapter 11 case, Mr. McManigle was appointed Examiner to investigate potential claims, causes of action, and/or fraudulent conveyances (the "Causes of Actions"). Thes efforts included review of court records, bank

statements, depositions, and other related documentation produced by the Debtor and parties related to the litigation with the Quality Companies. Mr. McManigle was to give his opinion on the viability of the Causes of Action and potential recovery therefrom.  This review did not constitute a formal forensic analysis and was limited in scope that excludes the Debtor, David Michael Mobley, Debtor's wife, Lisa Mobley, and the Debtor's solely owned company, Texas Quality Mats, LLC.

### C.  Expert Qualifications

6.      I am the Founder and CEO of MACCO Restructuring Group, LLC ("MACCO"), an interim management and financial advisory firm with 17 professionals and locations across the country. Its website is www.macco.group. MACCO and its professionals regularly provide interim executive leadership, financial advisory and fiduciary services to businesses across a vast array of industries who find themselves in financial and operational distress. MACCO also serves as a financial or restructuring advisor to lenders, creditors, and creditor groups. I have personally led numerous companies through in and out-of-court restructurings. My experience extends across a variety of industries, including energy exploration, production and refining, healthcare, consumer products, defense, commercial construction, distribution, transportation, heavy equipment, and hospitality, among others. During my 27-plus year career working with clients across the country, I have held leadership and fiduciary roles with titles such as operating chapter 11 trustee, chapter 11 plan, litigation or liquidating trustee, interim chief executive officer, chief restructuring officer, receiver, and assignee.  I have also served as an independent director to various international and domestic companies in chapter 11 proceedings. I have advised or led debtor or creditor constituencies in bankruptcy and state courts. I have participated in complex litigation and testified in Federal, Bankruptcy, State, and international courts.

7.     In February 2020, I was selected by the Office of The U.S. Trustee, Southern District of Texas, as a chapter 11 trustee under 11 U.S.C. Subchapter V. I have served on the Houston Board of Directors of the Turnaround Management Association, and I am a member of the American Bankruptcy Institute.

8.     I attended Texas Tech University and received my bachelor's degree from the University of Houston – Downtown. Attached as Appendix A is my Curriculum Vitae.

9.     Based on my above experience, along with my knowledge and experience in family-owned businesses, my education, training, and bankruptcy experience, I am qualified to offer the opinions contained herein.

**D.  Statement of Compensation**

10.    MACCO is being compensated for my work on this matter at my customary rate of $650 per hour. Professionals of MACCO rendering assistance are, likewise, being compensated at their normal hourly rates ranging from $100 to $575 per hour. All services and activities performed in connection with this engagement were either performed by me or under my supervision by professionals of MACCO.

11.    My compensation and that of MACCO professionals is in no way dependent on the contents of this report, the substance of any further opinions or any testimony that I may provide related to this case.

## II.    Executive Summary

12.    After review of the court pleadings, deposition transcripts, documents produced in response to the Quality Companies' subpoenas, bank records and other relevant documents, and discussions with counsel and the Subchapter V Trustee, I have determined that two significant probable causes of action exist. The first is related to numerous highly questionable cash bank

4

transfers. The second is the transfer of real property from the Debtor immediately prior to the filing of the Sub Chapter V case. Several other potential causes of action exist related to unpaid rents; however, I have determined they have questionable value, or the return would not exceed the likely litigation costs. In my opinion, the Liquidation Trustee may pursue on behalf of the Debtor's bankruptcy estate the above with my conclusions more particularly described below, including the investigation and evidence presented to support my opinion. However, as stated previously, my review of the Causes of Action may require a more detailed investigation by Litigation Trustee and his counsel additional inasmuch as my examination was limited to produced documents, and information.

### III.   Investigation

13.    As Examiner, I engaged both Ms. Kathy Mayle and Mr. Micah Miller, Senior Directors of MACCO Restructuring Group, LLC to assist me (collectively, the "MACCO Professionals"). Ms. Mayle has over 20 years of experience in bankruptcy and bankruptcy related financial analysis, para-professional legal experience, and similar bankruptcy litigation matters. Mr. Miller is an accomplished financial professional with both bankruptcy and non-bankruptcy accounting, financial analysis, and financial tracing expertise. During the course of my review, I or the MACCO Professionals spoke or met personally with the Debtor's counsel, the Subchapter V Trustee appointed to the case and counsel for the Quality Lender. Under my direction and supervision to determine if any fraudulent conveyance or distributions were made prior to the original petition date. MACCO professionals reviewed and analyzed the schedules and statement of financial affairs and their amendments, the Debtor's tax returns. Deposition and Rule 2004 testimony, including their exhibits were reviewed and assessed. Both Secretary of State records, real property and real property tax records related to both corporate entity and real property

5

ownership or transfers were obtained and reviewed.  My findings detail this review that support

my investigation into potential claims, causes of actions, and distributions to insiders that could

benefit the creditors of the estate.

### IV.    Potential Fraudulent Transfers

14.    I have identified the following as potential fraudulent conveyances:

- REB TX EC VENTURES, LLC's, a company owned by Richard Borstmayer ("Borstmayer") Fraudulent Conveyance;
- Questionable transfers and withdrawals from Bank of America accounts;
- First Financial Bank Payments related to the Construction Loan; and
- Loss of rents for real property of the estate utilized by family members, and potential cash transactions to family members directly or indirectly to family members.

### Borstmayer Insider Fraudulent Conveyance

15.    Michael Mobley stated that he and Richard Borstmayer ("Borstmayer") have been

friends for twenty years.[1]

Mobley 2004 Exam Page 25:

```
15      Q.  Okay.  Let's look at page 27 of 30.
16          Who is Richard Borstmayer?
17      A.  A friend of mine.
18      Q.  Why is he listed here in your schedules?
19      A.  On what?
20      Q.  He's listed right here and I'm asking you, why
21 is he listed here?  Do you owe him money?
22      A.  No.  He's a codebtor on my property, on that
23 3815 Montgomery Road.
```

---

[1] See 2004 Examination of David Michael Mobley dated April 5, 2022 (the "Mobley 2004 Exam"), Page 25, Lines 15-23. A condensed version of the 2004 Examination is attached hereto as Exhibit "A". Also see the Deposition of David Michael Mobley dated October 13, 2022, Page 46, Lines 2-10, and Page 118 Lines 7-8.  A condensed version of the Deposition is attached as Exhibit "B".

Mobley Deposition Page 46:

```
 2      Q.   Okay.  And so Mr. Borstmayer, he's the owner of
 3   Reb Texas?
 4      A.   Yeah, I guess, yes, sir.
 5      Q.   That's your understanding?
 6      A.   Yes, sir.
 7      Q.   Okay.  And he's a personal friend of yours?
 8      A.   Yes, sir.
 9      Q.   And how long has he been a friend?
10      A.   I don't know.  Probably 20 years.
```

October 13, 2022 Deposition Page 118:

```
 7   Geosouthern again either.  Richard Borstmayer is my best
 8   friend.  Because his boss won't let me --
```

16.     Borstmayer signed a Real Estate Note, Deed of Trust, Assignment of Rents, and Non homestead Affidavit as co-borrower with the Debtor and Debtor's wife for the July 6, 2021, purchase of the property located at 3815 Montgomery Road, Richmond, Texas (the "Fulshear Property").  As shown in the above excerpt from the 2004 Examination, Mobley confirms that Borstmayer is a co-debtor on the Fulshear Property with such property included on the Debtor's Fifth Amended Schedule of Assets dated July 22, 2022 [Docket No. 120]. As such, Borstmayer is co-debtor of the Fulshear Property is evidenced by the attached Deed of Trust recorded on July 6, 2021 in the Real Property Records of Wharton County, under File Number 2021113960 attached hereto as Exhibit "C."   Further evidence of potential insider dealing is the Loan Memo produced by First Financial Bank in its response to Quality Companies subpoena and the purchase of the

Fulshear Property attached hereto as Exhibit "D." Simply, *Borstmayer does not meet the non-affiliated, third-party standard and is considered for the purposes of this report an "insider"*.

17.     On or about November 9, 2012, David Michael Mobley ("Mobley" or "Debtor"), denoted as "Mike" Mobley, an individual, purchased 19.457 acres and commercial buildings, from the Board of Trustees of the El Campo Independent School District, located at 1401 MLK Blvd, El Campo, Texas (the "1401 MLK").

18.     On April 17, 2019, he entered into a loan agreement with ILS Lending LLC ("ILS") in the original principal amount of $625,000, 1401 MLK collateralized the loan (the "Note"). On October 25, 2019, Mobley re-platted 1401 MLK as 16 individual lots.

19.     On or about November 1, 2019, under the Modification and Extension Agreement, Silver Lending LLC ("Silver") became the holder of the unpaid Note with Loan Source LLC ("Loan Source") as the Note servicer. Pursuant to the Transfer and Assignment of Lien filed of record on September 14, 2020, the holder of note and lien was signed by ILS Lending LLC, transferring the $625,000 note to REB TX EC Ventures, LLC.  Borstmayer and his wife, Jennifer Borstmayer, own the membership interest in REB TX EC VENTURES, LLC ("REB TX"). Borstmayer is REB TX and REB TX is, inter alia, Borstmayer. Attached as Exhibit "E" is the Transfer and Assignment of Lien from ILS to REB TX.

20.     Mobley was not making payment and Loan Source was intent on foreclosing on 1401 MLK.  In Mobley's October 13, 2022, deposition, he stated he called a few friends to see if they would purchase the note from the servicer Loan Source LLC to stop the foreclosure. This included Borstmayer.  On Page 33, Lines 5-19 of Mobley's deposition he states:

```
 5        Q.    So he -- he bought the note and the liens from
 6   the prior lienholder?
 7        A.    They were going to the bank -- the prior
 8   lienholder was going to the courthouse to sell it on the
 9   courthouse square.
10        Q.    Right.
11        A.    And I called Richard and I said, "Hey, if I'm
12   going to have to give some stuff away, I'd rather give
13   it to somebody I know."
14              So I called him and a couple other friends
15   of mine and they all said, "Well, I don't want to fool
16   with it."
17              This is -- you know, it's right there in
18   El Campo.  Richard said "Okay.  I'll -- I'll -- I'll
19   take it."
```

21.    On January 21, 2022 (the "Bankruptcy Petition Date"), Mobley conveyed 1401 MLK to Borstmayer/Reb TX through a Warranty Deed in Lieu of Foreclosure. The date of the filing a copy of the Deed is attached hereto as Exhibit "F". On the date of the bankruptcy filing, Mobley signed the Deed, had his secretary file the Deed in the real property records of Wharton County, and hand delivered the Deed to Borstmayer's/Reb TX counsel by noon prior to the afternoon Chapter 11 filing (*See* Mobley Deposition, Page 87, Line 4 to Page 89, Line 16.)

22.    During Mobley's Deposition, his statements were vague and ambiguous as to dates or even confirmation of the actual amount owed to Borstmayer/Reb TX as the note holder. He claimed that Borstmayer/REB TX had noted a default of the note but did not act as it was agreed that no foreclosure was to occur that could ruin Mobley's credit (*See* Mobley Deposition, Page 32, Lines 1-25). Mobley further stated during his deposition that after Borstmayer/Reb TX bought the

property that no further action was taken on his part since Borstmayer/Reb TX now owned the property (*See* Mobley Deposition, Page 37, Line 4 through Page 38, Line 24).

23.     Apparently, Mobley's daughter allegedly continued to collect rents from tenants of 1401 MLK after Borstmayer/REB TX bought the note. However, Mobley continued to collect rent from the MLK 1401 tenant, Zexas Holdings LLC d/b/a First Class Children's Center ("Zexas") (*See* Mobley Deposition, Page 74, Line 7 through Page 75, Line 19) and (Mobley Deposition, Page 41, Line 18-24).  Copies of the Zexas Holdings checks are attached hereto as Exhibit "G".

24.     Borstmayer/REB TX owned the note on MLK 1401 and paid the outstanding property taxes. According to Mobley, approximately $800,000 was owed on the note and another $200,000 in taxes (*See* Mobley 2004 Exam, Page 29 Line 11 through Page 33, Line 18).  He also stated that the total amount of the debt forgiveness related to the deed in lieu of foreclosure totaled $1.25 million that is reflected on the Debtor's Fifth Amended Schedule of Assets [Docket No. 120].

25.     When questioned as to the value of the property, Mobley stated that the value of the property was between $1 million to $2 million (*See* Mobley Deposition, Page 43, Lines 8-11). However, the assessed value from the Wharton County Appraisal District values 1401 MLK in the aggregate amount of $4,084,374.  Attached hereto as Exhibit "H" are copies of the assessed values pursuant to the replatted lots from the original 2 tracts known as 1401 MLK.  These records were downloaded from the public records of Wharton County Appraisal Deed and reflect the date the liens were purchased by Borstmayer/REB TX 's and the recording of the Warranty Deed in Lieu of Foreclosure on the bankruptcy Petition Date.

26.     In September 2022, Appraisals of 1401 MLK were performed by M. L. Jones with an effective date of January 21, 2022. Although the land had been re-platted by Mobley, the

appraisals were based on the original plats and have an "As Is" value of $2,876,000. Attached hereto as Exhibit "I" are the appraisals of the two original tracts owned by Mobley.

27.     Further, it is believed that some of the tenants had expressed a desire to purchase their rented buildings but apparently backed out of it. (*See* Mobley 2004 Examination, Page 93, Line 1 through Page 94, Line 5].

```
19     I A.  Yes, sir.  We tried to -- we had some people
20   that owned the buildings wanted to buy their own
21   small building.  That's the reason there are so many
22   building addresses now, because I had Mr. Gibson in
23   Houston break it all up because everybody wanted their
24   own buildings and they had money to buy them because
25   they was 4- and $500,000 per building that everybody had
```

```
1   businesses in.  And that's the reason the loan was
2   obtained from ILS, so we can fix the roof, the air
3   conditioners, replace everything on these buildings and
4   get it up to snuff, and then at the end everybody backed
5   out of it.
```

```
 6        Q.  Okay.  But did you do -- did you put the
 7   property on the market?  Did you hire a real estate
 8   agent or anything like that?
 9        A.  No, sir.
10        Q.  Did you ever obtain a broker's opinion or
11   something equivalent regarding what the value of the
12   property is, was?
13        A.  No, sir.
14        Q.  Okay.  So would it be fair to say you really
15   don't have any idea what the property is worth?
16        A.  No, sir.
```

28.    While convoluted, it is inescapable to conclude, that, using Mobley's own words, "Hey, if I'm going to have to give some stuff away, I'd rather give it to somebody I know." He did exactly that and on the very same day he filed chapter 11. Mr. Mobley conveyed real property with an estimated value ranging between $2.8 to $4 million to his 20-year friend and co-debtor on the Fulshear property thereby showing a pattern of potentially voidable, fraudulent insider transactions. The Warranty Deed in Lieu of Foreclosure itself is a fraudulent conveyance under 11 U.S.C. § 548 inasmuch as (i) the estate received less than a reasonably equivalent value in exchange for such transfer or obligation; (ii) the transfer made was for the benefit of an insider who cannot claim being an unknown third party held at arms-length in the transfer of such property; and (iii) the conveyance was made on the date of the filing to defraud the estate of value for the benefit of its creditors.

**<u>Cobalt 302 Boat and 2008 McClain Trailer</u>**

29.    Greta Yvette Mobley, Michael Mobley's ex-wife, filed a chapter 7 bankruptcy under Case No. 22-30239, in the United States Bankruptcy Court for the Southern District of

Texas, Houston Division (the "Greta Bankruptcy"). Janet Northrup was appointed her Chapter 7 Trustee.

30.     This insider pattern of behavior continued through Greta's chapter 7 wherein Borstmayer asserted he bought a 50% interest for $25,000, or held a lien on, Greta's half of a 2008 Cobalt 302 boat (the "Boat") and a 2008 McClain trailer ("the Trailer") previously owned by Michael Mobley. However, the Chapter 7 Trustee did not uncover or obtain any information supporting this assertion. See Mobley Deposition, Page 76, line 8 through Page 78, Line 8. Pursuant to the Chapter 7 Trustee's Motion for Authority to Sell Motorhome, Boat, and Trailer Free and Clear of Liens, Claims, Interests and Encumbrances [Docket No. 46] and Order approving same [Docket No. 47], Mobley had no further interest in the boat as it was sold at the time Borstmayer bought the Boat and Trailer.

### Questionable Transfers and Withdrawals from Bank of America Accounts

31.     An examination of transfers and withdrawals from two separate Bank of America accounts ("BOA Accounts") was conducted. They were:

> Account Holder: David Mobley
> Account Number Ending: 5387
>
> Account Holder: Lisa Mobley
> Account Number Ending: 8772

32.     After examination, it appears as if both the BOA Accounts experienced a number of questionable transfers both in timing and amounts. These transfers were of significant dollar amounts and were made to various unaffiliated/unfamiliar accounts held outside Bank of America. These each appear to be highly suspect in nature. Withdrawals were marked by what are considered irregular patterns, such as multiple withdrawals in small dollar amounts over a short period of

time, inconsistent and or unusual locations of withdrawal, and larger cash withdrawals without apparent justification.

33.     Attached hereto as Exhibit "J" is a detailed listing of questionable transfers and withdrawals totaling $922,006.18, either directly by Mobley or indirectly from Mobley through pre-petition transfers through his (new) wife Lisa Mobley's account to insiders, family members or their affiliates. It is believed prior to Mobley's chapter 11; Lisa Mobley's accounts were an extension of her husband's accounts. In her deposition, Lisa Mobley stated that her husband had directed her as to how the money was spent[2]. (*See* Page 28, Lines 7-11; Page 29, Lines 19-23, Page 83, Lines 7-14).  Based upon my review, my opinion is that each of these transfers could, upon further investigation, constitute fraudulent transfers that could be recovered on behalf of the estate.

**First Financial Bank, N.A.- Construction Loan**

34.     As noted above, on or about July 6, 2021, Mobley, Lisa Mobley, and Borstmayer signed a Real Estate Lien Note with First Financial Bank, N.A. (the "First Financial") in the amount of $2,197,400.00 to purchase 77.557 acres (the "Fulshear property").

35.     Several issues have been identified. First, Mobley claims the Fulshear property is exempt as his homestead. However, Mobley, his wife Lisa and Borstmayer (collectively the "Fulshear Borrowers") each signed an Affidavit of Non-Homestead Exemption attached hereto as Exhibit "L".  Additionally, the Fulshear Borrowers signed an Assignment of Rents. If the Bank prepared loan documents on a residential property to be utilized as the Debtor's homestead and not for commercial purposes, why would the Bank include the Assignment of Rent and Affidavits of Non-Homestead Exemption? Further, on page 476 of the loan documents produced by the Bank, the Commercial Loan Memo/Consumer Real Estate Loan Memo reflect that the purpose of the

---

[2] See Deposition of Lisa Mobley dated October 14, 2022, attached hereto as Exhibit "K".

14

loan was for the purchase of agricultural land and construction of new barn and associated dirt work/etc.  Both the Debtor and his wife acknowledged in their depositions that the Non-Affidavit Homestead Exemptions were signed in error. However, questions remain.

36.     Secondly, the construction loan balances appear questionable. A bid from HBI for significant improvements at the Fulshear property totaling $876,750.00, a copy of which is attached hereto as Exhibit "M."

37.     Pursuant to the Bank's Receipts and Disbursements Ledger, the original amount funded totaled $1,306,226.32 of the total $2,197,400.00 loan amount. Pursuant to the Settlement Statement, $701,400 included funds to be held for future construction draws and Mobley was entitled to draw $175,350 as borrower equity. Mobley and his wife drew down the $175,350.00 as borrower's equity on July 15, 2021. Pursuant to the bank's production of the loan history for the period of July 6, 2021, through July 20, 2022, the total amount of loan advances for the construction loan total $433,133.68, which excludes the payoff of $1,306,226.32 to the buyer at the time of closing, which should show a balance of $268,266 based upon the Loan History attached hereto as Exhibit "N".  The construction stopped in March 2022 after the bankruptcy filing. (*See* Mobley Deposition, Page 57, Line 1 through Page 59, Line 4; *See* Lisa Mobley Deposition, Page 22 Line 15 – Page 24, Line 19.)

38.     Questions have arisen whether these funds were actual construction loans, equity infusions or used for some other purposes that are not reflected on the loan's settlement agreement marked as Exhibit "O."

**Fraudulent Conveyance to Insiders from Loss of Rents**

The debtor owned and then transferred 1401 MLK to Borstmayer/ REB TX.  On this property, his children, Courtney Mobley, Mikayla Mobley, Cody Mobley, and David R. Mobley

(also known as "Mikey" Mobley) owned businesses or enterprise that operated from there. Cody Mobley and David R. Mobley own Solid Liberty Resources, LLC, Solid Liberty Rental Services, LLC and Solid Liberty Safety Services, LLC (collectively Solid Liberty). There does not appear to be a valid lease agreement. It is the Examiner's understanding that Solid Liberty has operated its businesses for more than four years. See Mobley Deposition (Page 14, Lines 16, Line 4; Page 29, Lines 1-9; Page 54, Lines 16-24). Upon information and belief, with the exception of payment of half of the annual property taxes, ostensibly in lieu of rents, it is indeterminable whether the pro rata annual property taxes were paid by Solid Liberty and/or Texas Quality Mats.  Nonpayment of rent for the use of the property for business purposes by an insider of the Debtor could be a fraudulent conveyance under 11 U.S.C. §548.

Similarly, the Examiner believes that Palms Tan & Tone LLC ("Palms") owned by Courtney Mobley, also an insider of the debtor, has not paid rents for the benefit of use of the property. Palm was formed October 17, 2013 (*See* Mobley Deposition, Page 41, Lines 18-24). There does not appear to be a valid lease agreement. Nonpayment of rent for the use of the property for business purposes by an insider of the Debtor could be a fraudulent conveyance under 11 U.S.C. §548.

39.     Pursuant to Mobley's statements under oath, rentals were collected from other tenants at 1401 MLK ranging from $3,000 to $7,150 per month. The Examiner has not been able to determine why Mobley's children would be exempt from paying rent.

40.     Pursuant to the Amended Schedule A/B [Docket No. 120, Schedule 4.1], Mobley's daughter, Cheryl Mobley has lived in the Solitaire mobile home that he purchased individually in or about 2018.  The Solitaire mobile home is scheduled at $15,000, but the assessed value by Wharton County Appraisal District shows the value at $53,846. To the best of the Examiner's

knowledge, no rent has been paid by Cheryl Mobley to Mobley as rent for property of the estate. Similarly, pursuant to the above referenced schedule, Mobley's daughter Victoria Mobley, has lived in the Clayton mobile home that he purchased for over 4 years. To the best of the Examiner's knowledge, no rent has been paid by Victoria Mobley as rent for property of the estate.

## V.    Summary of Findings

41.    It is obvious that this Small Business, Sub Chapter V, Chapter 11 case has been "*a long and* winding *road...*";however, one where there has been a consistent, clear, and convincing pattern of insider behavior that has existed between the Debtor and third parties with a blind eye turned towards the Debtor's family members. Outside a bankruptcy, this behavior is not altogether uncommon; however, we are not outside of bankruptcy whose obligations, rules and the conduct of debtors are well structured. The most obvious potential infractions are the transfer of 1401 MLK and the BOA cash transfers. These must be more thoroughly reviewed and litigated, as required, to bring financial clarity, transparency and, if successful, recoveries to creditors, anticipated under the Bankruptcy Code. Similarly, although I have identified certain potential claims against family members and their businesses, the litigation may be more costly than the resulting recoveries and thus have less weight. My review and those by MACCO professionals have been presented in tandem with both the Order appointing me and based upon available information.

17

DATED: May 30, 2023

Respectfully Submitted,

*/s/ Drew McManigle*
Drew McManigle
Founder and Chief Executive Officer
MACCO Restructuring Group LLC
The Pennzoil Building
700 Milam Street, Suite 1300
Houston, Texas 77002
Telephone: (410) 350-1839
Email: drew@macco.group

***Examiner***

## CERTIFICATE OF SERVICE

I hereby certify that on May 30, 2023, a copy of the foregoing *Examiner's Report* has been served via the ECF system to the parties receiving ECF notice.

*/s/ Drew McManigle*
DREW MCMANIGLE

18

Exhibit C        Liquidation Analysis

| Asset | Scheduled Value | Less Liens | Less Exemption | Net Value | |
|---|---|---|---|---|---|
| 20.680 acres, Wharton County | $ 800,000.00 | $ 3,896,018.00 | | $ - | Note 1 |
| 3815 Montgomery Blvd. | $ 2,800,000.00 | $ 2,200,582.38 | $ 599,417.62 | $ - | Note 2 |
| 2018 Ford F150 | $ 32,500.00 | $ 17,300.84 | | $ 15,199.16 | |
| 2004 Harley Davidson | $ 500.00 | | | $ 500.00 | |
| 2004 Harley Davidson | $ 500.00 | | | $ 500.00 | |
| 2008 Honda Goldwing | $ 12,000.00 | | | $ 12,000.00 | |
| 2018 Dodge Charger | $ 500.00 | $ 24,567.00 | | $ - | |
| 2018 Solitaire Mobile Home | $ 15,000.00 | $ 3,896,018.00 | | $ - | |
| 2012 Clayton Mobile Home | $ 8,000.00 | $ 3,896,018.00 | | $ - | |
| 2008 McClain Trailer | $ 2,000.00 | | | $ 2,000.00 | |
| 2008 Cobalt Boat | $ 17,500.00 | | | $ 17,500.00 | |
| Household Goods | $ 2,770.00 | | $ 2,770.00 | $ - | |
| Electronics | $ 600.00 | | $ 600.00 | $ - | |
| Hand and Power Tools | $ 200.00 | | $ 200.00 | $ - | |
| Clothing | $ 100.00 | | $ 100.00 | $ - | |
| Cash | $ 500.00 | | | $ 500.00 | |
| Bank accounts | $ 101,244.00 | | | $ 101,244.00 | Note 3 |
| Texas Quality Mats, LLC | $ - | | | $ - | |
| Mobley Investments, LLC | $ 2,156.71 | | | $ 2,156.71 | |
| Machinery, Fixtures, Equipment | $ 82,000.00 | $ 33,301.20 | $ 46,329.20 | $ 2,369.60 | |
| Total | $ 3,878,070.71 | | | $ 153,969.47 | |
| | | | | | |
| Less Chapter 7 Trustee | | | | $ 10,823.47 | |
| Less Chapter 7 Accountant | | | | $ 500.00 | |
| Less Chapter 7 Attorney | | | | $ 5,000.00 | |
| Less Chapter 11 Admin Claims | | | | $ 10,000.00 | |
| Less IRS Priority Claim | | | | $ 1,000.00 | |
| | | | | | |
| Net Proceeds to Unsecured Creditors | | | | $ 126,646.00 | |